**ORIGINAL**



Alan Himmelfarb (90480)
consumerlaw1@earthlink.net
THE LAW OFFICES OF ALAN HIMMELFARB
80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

TASION COMMUNICATIONS INC., a Canadian corporation, dba Planet Telecom, on behalf of itself and all others similarly situated,

        Plaintiffs,

        v.

UBIQUITI NETWORKS, INC. a Delaware corporation,

        Defendant.

CASE NO. **CV 13 1803**

**CLASS ACTION COMPLAINT FOR:**

1) Negligence

2) Negligent Misrepresentation

**JURY DEMAND**

FILED
APR 19 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

HRL

BY FAX

Class Action Complaint

1

1

**CLASS ACTION COMPLAINT**

2   Plaintiff Tasion Communications Inc., a Canadian corporation, dba Planet Telecom

3   ("Planet Telecom" or "Plaintiff"), by and through its attorneys, states this complaint against

4   Defendant Ubiquiti Networks, Inc., ("Ubiquiti" or "Defendant"). Plaintiff's allegations are

5   based on information and belief, except to its own actions, which are based on knowledge.

6   Plaintiff's allegations on information and belief are based on the investigation of its counsel and

7   facts that are a matter of public record.

8

**NATURE OF THE CLAIM**

9   1.   Ubiquiti Networks, Inc. is a communications technology company. Ubiquiti

10  designs, manufactures and sells broadband wireless products including high performance radios,

11  antennas, software, and programming tools to manage the hardware. Ubiquiti's products are

12  designed for wireless networking and other applications in the unlicensed radio frequency (RF)

13  spectrum. Ubiquiti products and technologies permit companies the ability to provide high speed

14  wireless connections for customers in a wide variety of locations, including markets that are

15  otherwise difficult to service, such as mountainous regions, rural areas, islands, and

16  underdeveloped locations, both within and outside of the United States.

17  2.   In late 2010, Ubiquiti announced a new shielded cable product, which it called

18  "TOUGHCable." TOUGHCable was designed by Ubiquiti to provide the wire connections

19  necessary for the installation of its radio transceiver equipment.

20  3.   Ubiquiti heavily promoted its TOUGHCable to its customers. Contemporaneous

21  with the introduction of its TOUGHCable product, Ubiquiti required that all of its products be

22  installed with the use of shielded Ethernet cable and earth grounding (both of which were

23  features of its TOUGHCable product), as a condition of its product warranty. If a customer did

24  not use shielded Ethernet cable with earth grounding in the installation, Ubiquiti would not honor

25  the warranty on the installed product.

26  4.   Ubiquiti made the following representations about TOUGHCable:

27

28

Class Action Complaint

**Outdoor carrier class shielded Ethernet cable**

Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Extreme Weather-proof**

TOUGHCables have been built to perform even in the harshest weather and environments.

**Features:**

\* Multi-Layered Shielding design enables TOUGHCables to withstand harsh weather and heavy use.

5.   These representations were false.

6.   Contrary to Ubiquiti's representations, TOUGHCable was not "Extreme Weather-proof," nor able to operate in "brutal environments," nor able to "withstand harsh weather and heavy use." In fact, Ubiquiti's TOUGHCable was entirely unsuited for any outdoor use whatsoever.

7.   Ubiquiti's TOUGHCable was defectively manufactured. Purchasers and installers of Ubiquiti's TOUGHCable found that, within a year of installation, and sometimes after a period of only several months, TOUGHCable began to corrode, crack, and split. When the TOUGHCable outer shielding failed, it did exactly the opposite of what it was promoted to do. Instead of shielding and protecting the inner transmission wires from outside elements, the cable actually became a sponge, wicking up water from the outside, drawing it inside the cable, and, like a straw, providing a channel for the water to flow down directly into sensitive and delicate radio equipment, often destroying the equipment.

8.   Indoor cabling, which is not designed for outdoor use, will often last outdoors for five or even ten years in extreme conditions before cracking, wicking, and failing. Ubiquiti's TOUGHCable, which was represented by Ubiquiti to be shielded outdoor cable, expressly

1  designed for outdoor use, was failing within months of installation. In other words, Ubiquiti's
2  TOUGHCable was completely unsuited for any outdoor use.

3      9.      Ubiquiti designed, manufactured and sold cable that it expressly represented was
4  ideal for outdoor use.  Ubiquiti had a duty to insure that the cable it sold conformed to these
5  representations.  It failed in this duty.

6      10.     Ubiquiti sold tens of thousands of feet of cable to customers.  The Ubiquiti
7  TOUGHCable was installed in businesses, residences, and other locations all over the world,
8  including in the United States, much of it in remote, isolated, and difficult to access sites.

9      11.     Because Ubiquiti failed in its duty to insure that the cable was what it said it was,
10 customers suffered financial harm.  Because the TOUGHCable is wholly unsuited for outdoor
11 use, its installation poses an unreasonable and completely foreseeable risk of harm to the
12 expensive radio transceiver equipment it is connected to.  The Ubiquiti TOUGHCable had to be
13 and will have to be, ripped out and completely replaced.  Installers of Ubiquiti's TOUGHCable
14 have been forced to go back to the original install location and reinstall new cable.

15     12.     Ubiquiti's customers have been forced to expend significant sums of money on an
16 item that never should have cost them anything beyond the initial investment, and will be forced
17 to expend additional sums in the future, until all of the defective Ubiquiti TOUGHCable has
18 been replaced.  Ubiquiti's negligence in manufacturing a product that was not suitable for the
19 express purpose for which it was sold was a disaster for each install in which the TOUGHCable
20 was used.  Customers world-wide are paying the price, and have been stuck with the costs of
21 Ubiquiti's error.

22     13.     This action is brought on behalf of a Class of all persons and entities that have
23 purchased Ubiquiti TOUGHCable who have sustained loss or damage, including costs of
24 replacement, as a result of the defective nature of the product.

25
26
27
28

Class Action Complaint

4

**VENUE AND JURISDICTION**

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The aggregate claims of Plaintiff and the proposed Class members exceed, for all jurisdictional purposes, the sum or value of $5,000,000.00.

15.     Ubiquiti is a corporation organized and existing under the laws of Delaware, with its principal place of business in San Jose, California, and is a citizen of the state of California.

16.     Plaintiff is a citizen of Canada, and asserts claims on behalf of proposed Class members who are scattered throughout the world. There is minimal diversity of citizenship between proposed Class members and the Defendant.

17.     This Court has personal jurisdiction over Defendant because Ubiquiti maintains its principal headquarters in San Jose, California, is registered to conduct business in California, has sufficient minimum contacts to California, or otherwise intentionally avails itself of the markets within California, through manufacturing, production, promotion, sale, marketing, and distribution of its products in California, to render the exercise of jurisdiction by this Court proper and necessary.

18.     This Court also has personal jurisdiction over Ubiquiti because, on information and belief, the advertising statements that give rise to the causes of action alleged in this complaint were created, reviewed, approved, and published in and from Ubiquiti's headquarters in San Jose, California. Also, on information and belief, decisions made by Ubiquiti employees that give rise to Plaintiff's claim were made in and from its San Jose, California headquarters. Venue is also proper before this Court under 28 U.S.C. § 1391(b)(2) as a substantial part of the events, circumstances, and omissions giving rise to Plaintiff's claim occurred in this District.

**INTRADISTRICT ASSIGNMENT**

19.     Pursuant to Local Rule 3-5(b) and 3-2(c), this action should be assigned to the Oakland Division of the Northern District of California because Defendant resides in San Jose.

Class Action Complaint

5

1

**PARTIES**

2      20.     Plaintiff Tasion Communications Inc,. is a Canadian corporation, doing business

3   as Planet Telecom.   Planet Telecom offers high speed internet connectivity for business and

4   residential subscribers in locations around the world, including Panama, Canada, and other areas.

5      21.     Defendant Ubiquiti Networks, Inc. is a corporation organized and existing under

6   the laws of Delaware, with its principal place of business in San Jose, California, and is a citizen

7   of the state of California.

8

**FACTUAL ALLEGATIONS**

9      22.     Ubiquiti designs, manufactures, and sells broadband wireless products. Ubiquiti's

10  hardware products include high performance radios, antenna, and repeaters, among other

11  telecommunications hardware and software, to enable the broadcast and reception of wireless

12  signals for customers in a wide variety of locations, including remote and underdeveloped areas.

13     23.     The Ubiquiti radio transceiver is typically a unit that consists of both a transmitter

14  and a receiver.  The unit typically mounts on a roof or other high, exterior location.  The radio

15  transceiver is connected to electrical power by a power over Ethernet ("POE") injector. This

16  injector has two Ethernet connections: One that connected to the transceiver; and the other that

17  connects to the customer computer, router or infrastructure equipment.  The Ethernet cable

18  connected to the transceiver provides data signals on two wire pairs of the cable and electrical

19  power on two wire pairs of the cable.  The Ubiquity radio transceiver will not function without a

20  hard-wired cable connection.

21     24.     This hard-wired POE link is typically achieved with Category 5e cable.  Category

22  5e cable (Cat 5e) is the current standard cable for computer networks such as Ethernet. The Cat

23  5e provides transmission performance of up to 100 MHz.

24     25.     A shielded cable is an electrical cable of one or more insulated conductors

25  enclosed by a common conductive layer. The shield may be composed of braided strands of

26  copper (or other metal, such as aluminum), a non-braided spiral winding of copper tape, or a

27  layer of conducting polymer. Usually, this shield is covered with a jacket. The shield acts as a

28  Faraday cage (an enclosure formed by conducting material) to reduce electrical noise from

Class Action Complaint

outside the cable (such as lightning) from affecting the signals, and to reduce transient electromagnetic radiation that may interfere with other devices.

26. Prior to the introduction of its shielded cabling, Ubiquiti conducted a number of failure analyses on Ubiquiti equipment that had been returned to Ubiquiti by its customers. Ubiquiti determined that the largest single cause of failure to its radio equipment was electrostatic discharge ("ESD"). ESD permitted a fatally large spike of electrical charge to be introduced into the radio equipment, shorting it out.

27. Ubiquiti determined that the primary source of ESD leading to equipment failure could be traced to the cable powering and connecting the radio transceivers. With the assumption that its equipment in the field could be better protected from failure caused by ESD if the cable used was both shielded, and included a drain wire to provide earth grounding, Ubiquiti embarked upon a program to design and manufacture its own shielded, earth-grounded Cat 5e cable for use with installations of its radio equipment.

28. In October 2010, Ubiquiti announced a new cable product line which it called TOUGHCable. Ubiquiti made the following representations about its new product:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**

Class Action Complaint

7

- Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

[See Exhibit 1]

29.     TOUGHCable introduced a small drain wire that was built into the cable. A separate drain wire is not normally present in ordinary shielded cable. The drain wire works by connecting to the transceiver (attaching it to the metal Cat 5e connector body, a metal component) and connecting it to the same type of connector on the premise end to the POE injector. This connection provides electrical power to the radio.

30.     The POE injector is connected to the premise electrical supply and has a grounded plug. This design permitted any static collecting in the radio, cable, or connectors to be drained away to ground, thereby protecting the sensitive components in the radio from ESD and resulting damage.

31.     Contemporaneous with the introduction of its TOUGHCable product, Ubiquiti informed its customers that it would no longer honor warranties on its radio equipment unless the

Class Action Complaint

8

1   customer utilized "Shielded Ethernet cable and earth grounding" as conditions of the product

2   warranty.

3       32.     Ubiquiti's TOUGHCable was the only shielded cable product on the market at

4   that time that included a built-in drain wire ("earth grounding").

5       33.     Ubiquiti began shipping its TOUGHCable in or around March 2011.

6       34.     Many customers, including Plaintiff Planet Telecom, began to utilize Ubiquiti's

7   TOUGHCable on all their new installations, and also began to replace all non-shielded cable

8   with Ubiquiti's TOUGHCable on existing installations.

9       35.     Within months, Ubiquiti's TOUGHCable began failing.

10      36.     Contrary to all representations as to the suitability of TOUGHCable for outdoor

11  and harsh weather use, TOUGHCable proved to be highly unsuitable for any outdoor use

12  whatsoever. TOUGHCable was defectively manufactured, and the defect, on information and

13  belief, was a complete lack of ultraviolet ("UV") protection. After several months of exposure to

14  the sun, the TOUGHCable changed color, became brittle, developed cracks, and exposed the

15  unprotected interior of cable to the outside elements. The interior material of the TOUGHCable,

16  once exposed to outside elements, instead of keeping water out of the cable, did exactly the

17  opposite and wicked up water into the interior of the cable.

18      37.     Rather than protect delicate and expensive radio equipment, the Ubiquiti

19  TOUGHCable instead became the equipment's greatest liability.

20      38.     Radio installations are almost invariably set up in a simple paradigm: The

21  antenna is located as high as possible to both broadcast and receive signals clear of obstructions,

22  and the equipment which processes those signals is located near ground level.

23      39.     When the wicked up water began to pool inside the cable, the water followed its

24  natural propensity to flow downhill – directly into the expensive radio equipment, corroding

25  connections, shorting out and destroying the equipment.

26      40.     TOUGHCable was installed in thousands of installations worldwide. Wireless

27  service providers installed thousands of feet of TOUGHCable to power and connect their

28  broadcast facilities to the broadcast dishes on top of antennas. An antenna could be many

Class Action Complaint

9

1 hundreds of feet high, and there must be a hard-wired connection between the broadcasting
2 station and the broadcast dish at the top of the antenna.

3      41.     Providers of wireless services also installed hundreds of feet of TOUGHCable at
4 the receiving customer's locations.  The customer's radio transceiver would usually be placed on
5 a rooftop or other elevated location.  A hard-wired cable connection would then pass the signal
6 to the indoor processing equipment.  In a given rural area, there might be hundreds of customers,
7 each with their own individual installation, which utilized TOUGHCable as the link between the
8 outdoor transceiver and the customer's indoor equipment.

9      42.     Independent subcontractors provide installation of wired and wireless broadcast
10 equipment on behalf of both providers and recipients of broadcast services.  Based upon the
11 recommendations and representations of Ubiquiti, these independent subcontractors
12 recommended the use of Ubiquiti's TOUGHCable for installations that required outdoor cabling.
13 Independent installers installed thousands of feet of Ubiquiti's TOUGHCable at thousands of
14 locations throughout the world, both at broadcast companies transmission points, and at the
15 receiving locations of the customers of the broadcast companies.

16      43.     When TOUGHCable began to fail, users would discover that their connection was
17 down.  Investigation soon revealed that the TOUGHCable was the cause.

18      44.     TOUGHCable is completely unsuited for outdoor use.  Wherever it has been
19 installed, it must be completely replaced.  Not replacing the TOUGHCable subjects delicate and
20 expensive radio and transmission equipment to certain and inevitable failure.  Broadcasters risk
21 complete cessation of broadcast capacity.  Each customer's location must be completely rewired
22 – all of the defective TOUGHCable completely removed and replaced – to protect the equipment
23 at the customer's location.

24                          **PLAINTIFF'S EXPERIENCE**

25      45.     Planet Telecom is a high speed wireless telecommunications provider.  Planet
26 Telecom offers high speed internet connectivity for business and residential subscribers in
27 remote locations around the world, including Panama, Canada, and other areas.  Planet Telecom
28 provides installation of the equipment necessary for wireless reception for its customers.

Class Action Complaint

10

1  Installation consists of the provision of radio transceiver equipment which typically includes a
2  wired connection to the processing components located indoors.

3      46.    Once the wireless receiving equipment is installed, in exchange for a monthly
4  subscription fee (the amount depends upon the Internet connection speed), Planet Telecom
5  provides uplink for continuous Internet connectivity, telephone services, and/or Internet
6  connectivity for other IP based products. In order to provide wireless Internet connection to its
7  customers, particularly those in remote locations, Planet Telecom must broadcast the
8  telecommunications signals from a broadcast facility, which includes a radio transceiver which
9  sends and receives the signals to and from its customers. These signals are transmitted and
10  received from the top of a transmission tower.

11      47.    Most of the radio equipment Planet Telecom utilized in its broadcast and
12  transmission facilities were Ubiquiti products.

13      48.    Sometime in or around the beginning of 2011, Ubiquiti began to place its
14  customers (the purchasers of Ubiquiti's broadcast and receiving equipment) on notice that, in
15  order for the Ubiquiti equipment to be covered under Ubiquiti's warranty: "Shielded Ethernet
16  cable and earth grounding must be used as conditions of product warranty."

17      49.    Contemporaneous with this announcement, Ubiquiti introduced TOUGHCable, a
18  shielded Cat 5e cable product which would satisfy Ubiquiti's new warranty conditions on its
19  hardware.

20      50.    On March 8, 2011, Planet Telecom placed its first order of TOUGHCable,
21  ordering four boxes of TOUGHCable at 1000 feet per box at a cost of $109.00 per box. This
22  initial order also included an order for two boxes of Ubiquiti's TOUGHCable cable connectors
23  (100 pieces, $47.00 per box). With shipping and handling, the total for this initial order came to
24  $639.86.

25      51.    Over the course of the next year, Planet Telecom made numerous additional
26  purchases of Ubiquiti's TOUGHCable. In all, Planet Telecom ordered 22 boxes (1000 feet each)
27  of Ubiquiti's TOUGHCable, paying either $109 or $119 per box. In addition, Planet Telecom
28

Class Action Complaint

1   purchased additional boxes of TOUGHCable cable connectors, and incurred costs in shipping
2   and handling.

3       52.     In no instance did any of the boxes of TOUGHCable that Planet Telecom took
4   delivery of include any warranty, nor any limitation of warranty, liability, or damages.

5       53.     Because purchases of TOUGHCable were sourced from a U.S.-based supplier,
6   and the equipment being purchased was for use outside of the United States, Planet Telecom also
7   incurred additional costs. Specifically, Planet Telecom paid a U.S.-based shipping company to
8   receive the U.S. originating shipment and then to transship the TOUGHCable boxes to Planet
9   Telecom's overseas operations in Panama. Planet Telecom paid duty to Panamanian customs for
10  each box of TOUGHCable it imported into Panama.

11      54.     Upon receipt of the first shipment of TOUGHCable in or about March 2011,
12  Planet Telecom began using the TOUGHCable for all of its outdoor installations.

13      55.     Around a year later, in May 2012, one of Planet Telecom's customers in a remote
14  location in Panama reported that their Planet Telecom Internet connection was non-operative.

15      56.     Planet Telecom sent two employees to the customer's location to investigate why
16  the Internet connection was down. It took the two men approximately two hours to reach the
17  customer's remote location.

18      57.     When they arrived, they found that the radio receiver was shorted out. Somehow,
19  water had gotten into the radio even though the radio was located indoors. Further investigation
20  revealed that the TOUGHCable which had been installed at this customer location had become
21  brittle, cracked, and discolored. Further investigation revealed that the TOUGHCable was
22  wicking up water from the outside and the water was draining down into the customer's radio,
23  whereupon the water corroded the connection to the receiving unit and shorted out the radio.

24      58.     It took the Planet Telecom employees three hours resolve the problem. The total
25  travel time to and from the customer's location was an additional four hours. The Planet
26  Telecom employees replaced 60 feet of cable, 2 cable connectors, and the non-functioning radio.

27      59.     Over the next couple of weeks, more customers reported that their Internet
28  connections were going down. Each time a customer lost connectivity, Planet Telecom was

1  required to send out technicians to diagnose the problem. Because Planet Telecom provided

2  remote location service, each on-site visit involved many hours of travel to and from the

3  customer location, sometimes as much as 5 hours each way, to locations that sometimes could

4  only be reached by boat.

5       60.     Between May 2012 and March 2013, at least 48 Planet Telecom customers lost

6  Internet service due to corrosion of the TOUGHCable. Six radios were destroyed by wicking

7  water through the TOUGHCable, all of which had to be replaced at Planet Telecom's cost. At

8  each location, Planet Telecom had to replace all of the cabling, between 25 and 85 feet of

9  TOUGHCable per customer site, plus two connectors per location.

10       61.     Planet Telecom has thus far expended 204 hours of employee time fixing the

11  damage caused by the TOUGHCable and replacing the defective TOUGHCable with a different

12  cable.

13       62.     Planet Telecom has expended an additional 429 employee hours in travel time to

14  and from each customer location to repair the Internet connection and replace the TOUGHCable.

15       63.     Planet Telecom has also lost customers as a result of lost Internet service due to

16  the failure of the TOUGHCable installations.

17       64.     Planet Telecom also installed TOUGHCable on its own towers in 2011. The

18  towers are essential to broadcast Planet Telecom's signal to a particular area of coverage, and

19  additional towers are needed to act as repeaters to extend Planet Telecom's coverage to ever

20  more remote locations. Each tower installation may utilize as many as 9 radios, multiple

21  connectors, and up to 1,080 feet of Cat 5e cabling.

22       65.     Between January and March 2013, Planet Telecom ripped out and replaced all of

23  the TOUGHCable it had previously installed (at significant initial installation cost) on 12 of its

24  broadcast or repeating towers in Panama. Many of these towers were located in remote, difficult

25  to access regions, including antennas on the top of mountains and antennas located in areas only

26  accessible by boat. The rewiring of a tower is a complex and time-consuming operation,

27  requiring anywhere between 20 and 36 man-hours per tower. Planet Telecom expended 333

28  hours in employee time to undertake this rewiring of 12 towers, plus an additional 93 hours in

1  travel time for each employee to get to and from the towers, and incurred additional travel costs
2  (such as water taxis at $20.00 per trip) in order to repair the towers which were rendered
3  vulnerable to failure due to the defective Ubiquiti TOUGHCable.

4      66.    Ubiquiti stopped shipping TOUGHCable Level 1 and TOUGHCable Level 2 in
5  2012. In or about July 2012, Ubiquiti introduced its upgraded shielded Cat 5e cable products
6  which it called TOUGHCable Pro and TOUGHCable Carrier (discontinuing TOUGHCable
7  Level 1 and TOUGHCable Level 2).

8      67.    Though there was never a recall and Ubiquiti did little or nothing to publicize its
9  actions, Ubiquiti authorized previous purchasers of TOUGHCable Level 1 and TOUGHCable
10  Level 2 who complained to obtain its new cable products without charge, box for box, to replace
11  the defective TOUGHCable Level 1 and TOUGHCable Level 2 with the new TOUGHCable Pro
12  and TOUGHCable Carrier.

13      68.    To obtain the replacement Cat 5e cable, Planet Telecom was forced to incur
14  additional costs, including shipping costs and customs duties, in order to get the replacement
15  cable to the locations in Panama where the TOUGHCable had been initially installed.

16      69.    In no instance has Ubiquiti offered or agreed to pay for damage caused by the
17  defective cable, costs of replacing the cable, or other consequential damages incurred by Planet
18  Telecom as a result of the initial installation of the defective TOUGHCable.

19                 **RULE 9(b) ALLEGATIONS**

20      70.    Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or
21  mistake, a party must state with particularity the circumstances constituting fraud or mistake."
22  Fed. R. Civ. P. 9(b). As detailed in the paragraphs above, Plaintiff has satisfied the requirements
23  of Rule 9(b) by establishing the following elements with sufficient particularity:

24  
25      WHAT:

26      71.    Defendant Ubiquiti made the following material misrepresentations regarding its
27  Ubiquiti TOUGHCable Level 1 and TOUGHCable Level 2 Cat 5e Cables:

28  

Class Action Complaint

14

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

WHEN:

72.     On or about October 2011, Defendant announced that it was introducing a new product it identified as a Category 5e outdoor carrier-class shielded cable. It called these products TOUGHCable Level 1 and TOUGHCable Level 2. Thereafter, and for the entire period

Class Action Complaint

for which TOUGHCable was available on the market, Defendant continuously and

uninterruptedly made identical representations regarding the qualities and attributes of its

TOUGHCable product.

WHERE:

73.    The following representations:

**TOUGHcable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with
  Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall
  performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest
  weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge
  (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power
  handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.

Class Action Complaint

- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

were made, *inter alia:* in the brochures Ubiquiti printed to advertise and promote its Ubiquiti products; on Ubiquiti's home page website which advertised and promoted its Ubiquiti TOUGHCables; and throughout the internet as promoted and propagated by Defendant on thousands of web pages located on third-party websites.

WHO:

74.    Defendant Ubiquiti, acting through its employees, created, reviewed, approved, and published each of the above-identified statements. The individual employees at Ubiquiti who had responsibility for the statements are unknown at this time, however internal records of the corporation will permit specific individuals to be identified through discovery. The specific employees of Ubiquiti who had specific responsibility can be identified as those individuals who created, reviewed, approved, and directed or participated in the publication of the statements, and those individuals who had authority to correct, retract, or amend the statement, but did not.

HOW:

75.    Defendant's written material misrepresentations were published in advertisements, in brochures, and in promotional materials for Ubiquiti products. Once Ubiquiti introduced TOUGHCable, every brochure that Ubiquiti published included an additional page at the end of the brochure which touted its TOUGHCable products. So, even its brochures for its radios, antennas, dishes, cameras, etc., also included a description page for TOUGHCable. Every page describing TOUGHCable included, verbatim, the representations listed above. Defendant further distributed its material misrepresentations through digital advertisements, promotions, web pages, and through links to its home web pages, promoting its Ubiquiti TOUGHCable products. Any person researching information on any of Ubiquiti products would

Class Action Complaint

17

1   have necessarily been exposed to these material statements, since the statements appear

2   prominently in all advertisements Ubiquiti made available during the pertinent time period.

3   Given the combination of cost, the specialized design, manufacture, and marketing, and the

4   expert application of the Ubiquiti products, it is unreasonable to assume that any purchaser

5   would have made their purchase without having conducted research.  The most minimal research

6   on any of Ubiquiti's products invariably exposes the prospective purchaser to the TOUGHCable

7   statements listed above, which were identical in all publications.

8
9       WHY:

10      76.     Defendant engaged in the material misrepresentation detailed herein for the

11  express purpose of inducing Plaintiff and other reasonable buyers to purchase TOUGHCable

12  from Ubiquiti.  By requiring that customers who purchased radio transmission products from

13  Ubiquiti to also use shielded, earth-grounded cable in order to be covered under the Ubiquiti

14  warranty for their purchases, Ubiquiti hoped that it would sell more TOUGHCable.   This

15  strategy was successful, in that Ubiquiti has sold thousands of boxes TOUGHCable to businesses

16  and members of the public.

17      MATERIALITY:

18      77.     Defendant Ubiquiti's representations regarding Ubiquiti TOUGHCable that:

19
20          **TOUGHcable**

21          **OUTDOOR CARRIER CLASS SHIELDED**

22          • Protect your networks from the most brutal environments with

23              Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

24          **Increase Performance**

25          • Dramatically improve your Ethernet link states, speeds, and overall

26              performance with Ubiquiti TOUGHCables.

27          **Extreme Weatherproof**

28

Class Action Complaint

- TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions: Level 1 Shielding Protection and Level 2 Shielding Protection.
- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

led users to believe that TOUGHCable:

- Was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Would allow users to realize "Increase[d] Performance" by using TOUGHCable;
- That the use of TOUGHCable would "Dramatically improve your Ethernet link states, speeds, and overall performance;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was "developed to have increased power handling performance for

Class Action Complaint

19

1    extended cable run lengths";

2    • Would "Bulletproof [their] networks";

3    • Was available in two versions, both of which offered Shielding Protection.

4    • Was a Category 5e outdoor carrier-class shielded cable.

5    These selling points are all highly material to the decision to spend upwards of $ 109 per box

6    (1,000 feet) of cable. Defendant profited by selling its TOUGHCables to thousands of

7    unsuspecting users.

8

9    78.    At a minimum, all Class members were at least exposed to the misrepresentations

10   appropriate for "outdoor" use, and "extreme weatherproof" environments.

11   79.    Had Plaintiff and the members of the Class known that the Ubiquiti

12   TOUGHCable was not suitable for outdoor use and was not weatherproof, they would not have

13   purchased it.

14                              **CLASS ALLEGATIONS**

15   80.    Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal

16   Rules of Civil Procedure, on behalf of itself and a Class defined as follows:

17       All persons and entities who purchased Ubiquiti TOUGHCable Level 1 or

18       Ubiquiti TOUGHCable Level 2.

19       Excluded from the Class definition are:

20           i.  Defendant, any entity in which Defendant has a controlling interest or

21               which has a controlling interest in Defendant, and Defendant's legal

22               representatives, predecessors, successors, assigns, and employees:

23           ii. the judge and staff to whom this case is assigned, and any member of the

24               judge's immediate family.

25   81.    Plaintiff reserves the right to amend the Class definition if discovery and further

26   investigation reveals that the Class should be expanded or otherwise modified.

27   82.    Plaintiff reserves the right to establish sub-classes as appropriate.

28

                              Class Action Complaint

1    83.    Plaintiff is a member of the Class it seeks to represent.  Members of the Class can

2  be identified using records of retail sales and/or other information that is kept by Defendant in

3  the usual course of business and/or in the control of Defendant.  Class members can also be

4  notified of the class action through publication and direct mailings to address lists maintained in

5  the usual course of business by Defendant.

6    84.    **Numerosity**:  Class members are so numerous that their individual joinder is

7  impracticable.  The precise number of Class members is unknown to Plaintiff, but it is clear that

8  the number greatly exceeds the number to make joinder impossible.

9    85.    **Existence and predominance of common questions:**  Common questions of law

10  and fact predominate over the questions affecting only individual Class members.  Some of the

11  common legal and factual questions include:

a.  Whether  TOUGHCable:

•    was suitable for outdoor use;

•    Was "OUTDOOR CARRIER CLASS SHIELDED;"

•    Would "Protect . . . . networks from the most brutal environments;"

•    Was actually "industrial-grade shielded Ethernet cable;"

•    Was appropriate for "Extreme Weatherproof" environments;

•    Was "built to perform even in the harshest weather and environments";

•    Was a Category 5e outdoor carrier-class shielded cable.

b.  Whether Ubiquiti had a duty to ensure to Plaintiff and the Class that the statements it
    was making about its TOUGHCable actually comported with the facts;

c.  Whether Ubiquiti breached its duty to ensure to Plaintiff and the Class that the
    statements it was making about its TOUGHCable actually comported with the facts;

d.  Whether Ubiquiti's breach of its duty to ensure the accuracy of its statements about
    its TOUGHCable product caused damage to Plaintiff and the Class ;

Class Action Complaint

21

e. Whether California law can and should be applied to Plaintiff and the Class;

f. Whether Ubiquiti was negligent in making the herein-described representations regarding its TOUGHCable product;

g. Whether, as a result of Ubiquiti's conduct, Plaintiff and the Class have suffered damages; and if so the appropriate amount thereof.

86. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Class. Similar or identical statutory and common law violations, business practices, statements and advertising regarding the product are involved. Individual questions, if any, pale by comparison to the numerous common questions that predominate.

87. The injuries sustained by Plaintiff and the Class flow, in each instance, from a common nucleus of operative facts. Between March 2011 and until Ubiquiti stopped shipping its TOUGHCable level 1 and level 2 products, Ubiquiti continuously and uninterruptedly made the claims that TOUGHCable:

- Was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable.

88. These claims, identical in their iterations, were broadly disseminated, continuous, and ubiquitous.

89. Class members have been damaged by Defendant's misconduct. The claims Ubiquiti made that TOUGHCable:

- Was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable.

were false, and Class members, by virtue of their purchase of Ubiquiti TOUGHCable products, were harmed thereby. Class members would not have purchased Ubiquiti TOUGHCable had they known the truth about the TOUGHCable.

90. **Typicality**: Plaintiff's claims are typical of the claims of the other proposed Class members. Plaintiff purchased one or more boxes of Ubiquiti TOUGHCable. However, the TOUGHCable that Plaintiff purchased was, contrary to Ubiquiti's claims, not suitable for outdoor use and not weatherproof, and Plaintiff suffered damage thereby, and has had to replace all of the TOUGHCable it installed. Plaintiff has been damaged in similar or equivalent manners as each member of the proposed Class.

91. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is familiar with the basic facts that form the bases of the proposed Class members' claims. Plaintiff's interests do not conflict with the interests of the other Class members that it seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation who will prosecute this action vigorously. Plaintiff's counsel has successfully prosecuted complex actions including consumer protection class actions. Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the Class members.

92. **Superiority**: The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and the proposed Class members. The relief sought per individual member of the Class is relatively small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of

Class Action Complaint

23

1 | Defendant. Furthermore, it would be virtually impossible for the Class members to seek redress
2 | on an individual basis. Even if the Class members themselves could afford such individual
3 | litigation, the court system could not.

4 |     93.    Individual litigation of the legal and factual issues raised by the conduct of
5 | Defendant would increase delay and expense to all parties and to the court system. The class
6 | action device presents far fewer management difficulties and provides the benefits of a single,
7 | uniform adjudication, economies of scale and comprehensive supervision by a single court.

8 |     94.    Given the similar nature of the Class members' claims and the absence of material
9 | differences in the state statutes upon which the Class members' claims are based, a class will be
10 | easily managed by the court and the parties.

11 |     95.    The court may be requested to also incorporate subclasses of plaintiffs,
12 | defendants, or both, in the interest of justice and judicial economy.

13 |     96.    In the alternative, the Class may be certified because:

14 |     a.    the prosecution of separate actions by the individual members of the Class
15 | would create a risk of inconsistent or varying adjudication with respect to
16 | individual Class members which would establish incompatible standards of
17 | conduct by Defendant;

18 |     b.    the prosecution of separate actions by individual Class members would
19 | create a risk of adjudications with respect to them which would, as a practical
20 | matter, be dispositive of the interests of other Class members not parties to the
21 | adjudications, or substantially impair or impede their ability to protect their
22 | interests; and

23 |     c.    Defendant has acted or refused to act on grounds generally applicable to
24 | the Class, thereby making appropriate final and injunctive relief with respect to
25 | the members of the Class as a whole.

26 |
27 |
28 |

Class Action Complaint

24

1

**FIRST CAUSE OF ACTION**

2

**(Negligence)**

3      97.    Plaintiff incorporates by reference each allegation set forth in the preceding

4    paragraphs.

5      98.    Defendant had a duty to Plaintiff and the Class to exercise reasonable and

6    ordinary care in the formulation, testing, design, manufacturing, production, marketing, and

7    distribution of its TOUGHCable.

8      99.    Defendant breached its duty by inadequately formulating and designing its

9    defective TOUGHCable product.

10      100.    Defendant breached its duty by manufacturing, producing, and selling a defective

11    product to Plaintiff and the Class.

12      101.    Defendant breached its duty by inadequately testing, or not testing at all, its

13    TOUGHCable to ascertain if the TOUGHCable actually conformed to the statements and

14    representations Ubiquiti made in describing TOUGHCable.

15      102.    Defendant breached its duty by representing to the Plaintiff and the Class that

16    TOUGHCable was suitable for outdoor use, when in fact, it was not.

17      103.    Defendant breached its duty by representing to Plaintiff and the Class that

18    TOUGHCable was "outdoor carrier class shielded" when in fact, it was not.

19      104.    Defendant breached its duty by representing to Plaintiff and the Class that

20    TOUGHCable would "Protect . . . . networks from the most brutal environments," when in fact,

21    it would not.

22      105.    Defendant breached its duty by representing to Plaintiff and the Class that

23    TOUGHCable was "industrial-grade shielded Ethernet cable" when in fact, it was not.

24      106.    Defendant breached its duty by representing to Plaintiff and the Class that

25    TOUGHCable was appropriate for "Extreme Weatherproof" environments when in fact, it was

26    not.

27

28

Class Action Complaint

25

1   107.   Defendant breached its duty by representing to Plaintiff and the Class that

2   TOUGHCable was "built to perform even in the harshest weather and environments" when in

3   fact, it was not.

4   108.   Defendant breached its duty by representing to Plaintiff and the Class that

5   TOUGHCable was "Category 5e outdoor carrier-class shielded cable" when in fact, it was not.

6   109.   As described herein, Ubiquiti's defective TOUGHCable failed when used as

7   directed in outdoor use, by cracking and splitting, and allowing the TOUGHCable to wick up

8   water, and pool the water down into sensitive electronic equipment, placing that equipment at

9   risk of failure, or destroying it.

10   110.   Ubiquiti further breached its duty by failing to notify Plaintiff and the Class of the

11   defects in the TOUGHCable they were purchasing.

12   111.   Ubiquiti had complete control over its manufacturing, testing, production, and

13   distribution facilities and knew or should have known that its TOUGHCable was defective.

14   112.   It was also completely foreseeable to Ubiquiti that Plaintiff and the Class would

15   rely upon Ubiquiti's marketing claims that TOUGHCable:

16      • Was suitable for outdoor use;

17      • Was "OUTDOOR CARRIER CLASS SHIELDED;"

18

19      • Would "Protect . . . . networks from the most brutal environments;"

20      • Was actually "industrial-grade shielded Ethernet cable;"

21      • Was appropriate for "Extreme Weatherproof" environments;

22      • Was "built to perform even in the harshest weather and environments";

23

24      • Was a Category 5e outdoor carrier-class shielded cable.

25

26   113.   Ubiquiti's negligence was the proximate cause of the damages suffered by

27   Plaintiff and the Class in the form of purchasing defective TOUGHCable, installing the

28   TOUGHCable, repairing damages caused by the TOUGHCable, addressing the costs of

Class Action Complaint

1  removing and replacing the TOUGHCable, including replacement costs, transportation costs,

2  import duties, worker and employee hours, travel time, and lost business due to equipment

3  failures.

4      114.    Neither Plaintiff nor the Class members contributed to the failure of

5  TOUGHCable to conform with the representations Ubiquiti made about its TOUGHCable

6  products.

7                          **SECOND CAUSE OF ACTION**

8                            **(Negligent Misrepresentation)**

9      115.    Plaintiff incorporates by reference each allegation set forth in the preceding

10  paragraphs.

11      116.    Defendant represented to Plaintiff and the Class that TOUGHCable:

12      • Was suitable for outdoor use;

13
      • Was "OUTDOOR CARRIER CLASS SHIELDED;"
14
15      • Would "Protect . . . . networks from the most brutal environments;"

16      • Was actually "industrial-grade shielded Ethernet cable;"

17      • Was appropriate for "Extreme Weatherproof" environments;

18
      • Was "built to perform even in the harshest weather and environments";
19
20      • Was a Category 5e outdoor carrier-class shielded cable.

21  and was merchantable and fit for its intended use.

22      117.    These representations were not true because Ubiquiti's TOUGHCable was
23
    defective and completely unsuited for outdoor use.
24
      118.    Defendant had no reasonable grounds for believing these representations to be
25
    true, or alternatively Defendant failed to ascertain if the representations were true before making
26
    them.
27

28

                               Class Action Complaint

                                      27

119.    Defendant intended for Plaintiff and the Class to rely on its representations regarding the quality and attributes of its TOUGHCable.

120.    Defendant owed Plaintiff and the Class a duty to: (a) act with reasonable care in preparing the information contained in its advertisements, brochures, and marketing materials, and disseminated to Plaintiff and the Class, and which Plaintiff and the Class relied upon in deciding to purchase TOUGHCable; and (b) use reasonable care in determining the accuracy of the information contained therein.

121.    Defendant breached its duty to Plaintiff and the Class by failing to investigate, test, confirm, and review with reasonable care the information contained in its advertisements, brochures, and marketing materials, and in failing to correct the misstatements, omissions and inaccuracies contained therein.

122.    Plaintiff and the Class relied on Defendant's labeling representations set forth herein, and, in reliance thereon, purchased Ubiquiti's TOUGHCable. The reliance by Plaintiff and the Class was reasonable and justified in that Defendant appeared to be, and represented itself to be, a reputable business, and it distributed and sold TOUGHCable through reputable companies.

123.    Defendant had a legal duty to disclose to Plaintiff and the Class at all times before the sale of TOUGHCable all facts that would have materially affected the product being utilized to provide the wired communication link between outdoor and indoor equipment. The complete unsuitability of TOUGHCable for outdoor use was a material fact that would and should have affected the buying and installation decisions of purchasers.

124.    Such knowledge was completely in the possession of Defendant and was unknown to Plaintiff and the Class. The failure to disclose such material facts was uniform in the sale of all TOUGHCable.

125.    Defendant uniformly represented to Plaintiff and the Class through its written materials that TOUGHCable:

● was suitable for outdoor use;

Class Action Complaint

28

- Was "OUTDOOR CARRIER CLASS SHIELDED;"

- Would "Protect . . . . networks from the most brutal environments;"

- Was actually "industrial-grade shielded Ethernet cable;"

- Was appropriate for "Extreme Weatherproof" environments;

- Was "built to perform even in the harshest weather and environments";

- Was a Category 5e outdoor carrier-class shielded cable.

126.    Defendant knew, or in the exercise of reasonable diligence should have known, that Plaintiff and the Class would rely upon such representations.

127.    Plaintiff and the Class did reasonably rely on those representations. Had Plaintiff and the Class known about these material facts, they would not have purchased Defendant's TOUGHCable.

128.    As a result of the conduct of Defendant, Plaintiff and the Class have been damaged.

129.    As a direct, foreseeable, and proximate result of this negligence, Plaintiff and the Class have incurred damages, including but not limited to:  purchasing defective TOUGHCable; installing the TOUGHCable; repairing damages caused by the TOUGHCable; addressing the costs of removing and replacing the TOUGHCable, including replacement costs; transportation costs; import duties; worker and employee hours; travel time; and lost business due to equipment failures.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment against Defendant granting the following relief:

a.    An order certifying this case as a class action and appointing Plaintiff's counsel to represent the Class;

b.    All recoverable compensatory and other damages sustained by Plaintiff

Class Action Complaint

and the Class;

    d.    Pre-judgment and post-judgment interest on any amounts;

    g.    Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

    h.    Such other relief as the Court may deem just and proper.

DATED: April 19, 2013

PARISI & HAVENS LLP
LAW OFFICES OF ALAN HIMMELFARB



By:  David C. Parisi

THE LAW OFFICES OF ALAN HIMMELFARB
80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Class Action Complaint

1  **JURY TRIAL DEMAND**

2  The Plaintiff hereby demands a trial by jury of all issues so triable.

3

DATED: April 19, 2013

4                                         PARISI & HAVENS LLP
                                       LAW OFFICES OF ALAN HIMMELFARB

5

6

7                                  By:   David C. Parisi

8                                     THE LAW OFFICES OF ALAN HIMMELFARB

9                                     80 W. Sierra Madre Blvd. #80
                                   Sierra Madre, California 91024

10                                    Telephone: (626) 325-3104

11                                    David C. Parisi (SBN 162248)
                                  Suzanne Havens Beckman (SBN 188814)

12                                    PARISI & HAVENS LLP

13                                    15233 Valleyheart Drive
                                  Sherman Oaks, California 91403

14                                    Telephone: (818) 990-1299

15                                    Facsimile: (818) 501-7852

16

17

18

19

20

21

22

23

24

25

26

27

28

Class Action Complaint

31

**EXHIBIT 1**



# **TOUGH**Cable™

Outdoor Carrier Class Shielded Ethernet Cable

Models: Level 1/Level 2, TOUGHCable Connectors

Increase Performance

Extreme Weather-Proof

ESD Damage Protection

Extended Cable Support



# TOUGHCable
## OUTDOOR CARRIER CLASS SHIELDED

Datasheet

TOUGHCable™

2

Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**  Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**  TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**  Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**  TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.



## TOUGHCable Connectors

Specifically designed for use with Ubiquiti TOUGHCables and available in 100 pc. bags, TOUGHCable Connectors protect against ESD attacks and Ethernet hardware damage while allowing rapid field deployment without soldering.

## Bulletproof your networks

TOUGHCable is currently available in two versions: Level 1 Shielding Protection and Level 2 Shielding Protection.

**Level 1**  is a Category 5e outdoor carrier-class shielded cable.

**Level 2**  is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

### Additional Information:

· 24 AWG copper conductor pairs
· 26 AWG integrated ESD drain wire to prevent ESD attacks & damage
· PE outdoor-rated weatherproof jacket
· Multi-layered shielding
· Available in 1000 ft (304.8 m) length

ESD attacks are overwhelmingly the leading cause for device failures. The diagram below illustrates the areas vulnerable to ESD attacks in a defenseless network.



By using a grounded Ubiquiti Power over Ethernet (PoE) adapter along with Ubiquiti TOUGHCable and TOUGHCable Connectors, you can effectively protect against ESD attacks.



www.ubnt.com/toughcable

# Specifications

Datasheet

TOUGHCable™

| Level 1 Specifications | |
|---|---|
| Cable | CAT5e, Shielded |
| Ethernet Support | Up to 1 Gbps |
| Conductor Wire Gauge | 24 AWG |
| Conductor | Solid bare copper |
| Conductor Diameter | 0.500±0.005 mm |
| Insulation Type | Solid PE |
| Insulation Thickness | AVG: 0.26mm, MIN: 0.25 mm |
| Insulation Diameter | 1.04±0.03 mm |
| Separation (Polyester Wrapping) | Thick: 0.025mm, Extent: 20 mm |
| Anti-Crosstalk Divider | None |
| Cable Shield (Aluminum Foil) | Thick: 0.060 mm, Extent: 18 mm |
| ESD Drain Wire | 0.4 CCS |
| Rip Cord | Yes |
| Jacket Material | PE |
| Jacket Thickness | AVG: 0.50mm, MIN: 0.46 mm |
| Jacket Outer Diameter | 6.0±0.30 mm |
| Jacket Color | Gray |
| Reference Standard | ISO/IEC 11801, TIA/EIA568B.2 |

*Level 1 Shielding Protection*

| Level 1 Performance | | | | | |
|---|---|---|---|---|---|
| Frequency (MHz) | RL (dB) min. | Attenuation (dB/100m) | NEXT/PSNEXT (dB) | ACR (dB) | ELFEXT/PSELFEXT (dB/100m) |
| 1 | 17.0 | 2.03 | 62.30 | 60.30 | 60.75 |
| 4 | 18.8 | 4.04 | 53.26 | 49.20 | 48.71 |
| 8 | 19.7 | 5.76 | 48.75 | 43.00 | 42.69 |
| 10 | 20.0 | 6.46 | 47.30 | 40.80 | 40.75 |
| 16 | 20.0 | 8.24 | 44.30 | 36.10 | 36.67 |
| 20 | 20.0 | 9.26 | 42.78 | 33.50 | 34.73 |
| 25 | 19.3 | 10.41 | 41.33 | 30.90 | 32.79 |
| 31.25 | 18.6 | 11.72 | 39.87 | 28.20 | 30.86 |
| 62.5 | 16.5 | 16.99 | 35.36 | 18.40 | 24.83 |
| 100 | 15.1 | 21.97 | 32.29 | 10.30 | 20.75 |
| 150 | 13.80 | 23.40 | 18.60/30.30 | 8.30 | 17.60/18.50 |



# LEVEL 1
SHIELDING PROTECTION



- Conductor
- Insulation
- ESD Drain Wire
- Separation
- Cable Shield
- Rip Cord
- Weatherproof Jacket

www.ubnt.com/toughcable

# Specifications

| Level 2 Specifications | |
|---|---|
| Cable | CAT5e, Shielded |
| Ethernet Support | 1 Gbps |
| Conductor Wire Gauge | 24 AWG |
| Conductor | Solid bare copper |
| Conductor Diameter | 0.500±0.005 mm |
| Insulation Type | Solid PE |
| Insulation Thickness | AVG: 0.295mm, MIN: 0.29 mm |
| Insulation Diameter | 1.16±0.02 mm |
| Separation (Polyester Wrapping) | Thick: 0.025mm, Extent: 20 mm |
| Anti-Crosstalk Divider | LDPE: 4.2*0.3 mm |
| Cable Shield (Aluminum Foil) | Thick: 0.060 mm, Extent: 20 mm |
| ESD Drain Wire | 0.4 TC |
| Rip Cord | Yes |
| Secondary Cable Shield (Braid) | 16*8*0.16AA  Density: 95% |
| Jacket Material | PE |
| Jacket Thickness | AVG: 0.52mm, MIN: 0.46 mm |
| Jacket Outer Diameter | 6.8±0.30 mm |
| Jacket Color | Gray |
| Reference Standard | ISO/IEC 11801, TIA/EIA568B.2 |

| Level 2 Performance | | | | | |
|---|---|---|---|---|---|
| Frequency (MHz) | RL (dB) min. | Attenuation (dB/100m) | NEXT/PSNEXT (dB) | ACR (dB) | ELFEXT/PSELFEXT (dB/100m) |
| 1 | 18.0 | 1.93 | 65.30 | 60.30 | 61.00 |
| 4 | 19.9 | 3.90 | 56.27 | 49.20 | 48.96 |
| 8 | 20.7 | 5.50 | 51.75 | 43.00 | 42.94 |
| 10 | 21.0 | 6.30 | 50.30 | 40.80 | 41.00 |
| 16 | 21.0 | 8.00 | 47.24 | 36.10 | 36.92 |
| 20 | 21.0 | 9.00 | 45.78 | 33.50 | 34.98 |
| 25 | 20.3 | 10.20 | 44.33 | 30.90 | 33.04 |
| 31.25 | 19.5 | 11.50 | 42.88 | 28.20 | 31.10 |
| 62.5 | 19.0 | 16.70 | 38.36 | 18.40 | 25.08 |
| 100 | 18.3 | 21.70 | 35.30 | 10.30 | 21.00 |
| 200 | 16.5 | 32.20 | 30.78/27.78 | 7.60 | 17.78/14.98W |



LEVEL 2
SHIELDING PROTECTION

- Conductor
- Insulation
- Anti-Crosstalk Divider
- ESD Drain Wire
- Separation
- Cable Shield
- Secondary Cable Shield
- Rip Cord
- Weatherproof Jacket

www.ubnt.com/toughcable

Datasheet

TOUGHCable™

Level 2 Shielding Protection

4

Datasheet

TOUGHCable™



TERMS OF USE: The Ubiquiti radio device must be professionally installed. Shielded ethernet cable and earth grounding must be used as conditions of product warranty. It is the installers responsibility to follow local country regulations including operation within legal frequency channels, output power, and Dynamic Frequency Selection (DFS) requirements.

For further information, please visit www.ubnt.com.

All specifications in this document are subject to change without notice.

© 2011 Ubiquiti Networks, Inc. All rights reserved

MA072211

www.ubnt.com