Alan Himmelfarb
consumerlaw1@earthlink.net
The Law Offices of Alan Himmelfarb
80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299

Attorneys for Plaintiffs
and all others similarly situated

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASION COMMUNICATIONS, INC., a Canadian corporation, dba Planet Telecom, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UBIQUITI NETWORKS, INC. a Delaware corporation, <br><br> Defendant. | CASE No. CV 13-1803-HRL <br><br> **PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY** |

Plaintiff Tasion Communications Inc., a Canadian corporation, doing business as Planet Telecom ("Planet Telecom"), International Power Systems, LLC, an Arizona limited Liability corporation doing business as Freeway Networks ("Freeway Networks"), and Fundamental Holdings, Corp., a Delaware corporation based in Colorado doing as Peak Internet ("Peak Internet") (collectively, "Plaintiffs") by and through their attorneys, state this complaint against Defendant Ubiquiti Networks, Inc., ("Ubiquiti"), and Defendant Streakwave Wireless, Inc. ("Streakwave") (collectively "Defendants").  Plaintiffs' allegations are based on information and belief, except to their own actions, which are based on knowledge.  Plaintiffs' allegations on information and belief are based on the investigation of their counsel and facts that are a matter of public record.

## NATURE OF THE CLAIM

1.      Ubiquiti Networks, Inc. ("Ubiquiti") is a communications technology company. Ubiquiti designs, manufactures and sells broadband wireless products.

2.      Streakwave Wireless, Inc.("Streakwave") is a seller/distributor of wireless broadband networking equipment, including equipment manufactured by Ubiquiti.

3.      In late 2010, Ubiquiti announced a new shielded cable product, which it called "TOUGHCable."  TOUGHCable was designed by Ubiquiti to provide the wire connections necessary for the installation of its radio transceiver equipment.

4.      Ubiquiti heavily promoted its TOUGHCable to its customers. Contemporaneous with the introduction of its TOUGHCable product, Ubiquiti required that all of its products be installed with the use of shielded Ethernet cable and earth grounding (both of which were features of its TOUGHCable product), as a condition of its product warranty.  If a customer did not use shielded Ethernet cable and earth grounding in the installation, Ubiquiti would not honor the warranty on the installed product.

5.      Both Ubiquiti and Streakwave made the following representations about TOUGHCable:

**Outdoor carrier class shielded Ethernet cable**

Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

1

**Extreme Weather-proof**

2

TOUGHCables have been built to perform even in the harshest

3

weather and environments.

4

**Features:**

5

* Multi-Layered Shielding design enables TOUGHCables to withstand

6

harsh weather and heavy use.

7

8
6.     These representations were false.

9
7.     Contrary to Ubiquiti's and Streakwave's representations, TOUGHCable was

not "Extreme Weather-proof," nor able to operate in "brutal environments," nor able to

10
"withstand harsh weather and heavy use."  In fact, TOUGHCable was entirely unsuited for

11
any outdoor use whatsoever.

12
8.     TOUGHCable was defectively manufactured.  Purchasers and installers of

13
TOUGHCable found that, within a year of installation, and sometimes after a period of only

14
several months, TOUGHCable began to corrode, crack, and split.  When the TOUGHCable

15
outer shielding failed, it did exactly the opposite of what it was promoted to do.  Instead of

16
shielding and protecting the inner transmission wires from outside elements, the cable

17
actually became a sponge, wicking up water from the outside, drawing it inside the cable,

18
and, like a straw, providing a channel for the water to flow down directly into sensitive and

delicate radio equipment, often destroying the equipment.

19
9.     Indoor cabling, which is not designed for outdoor use, will often last outdoors

20
for five or more years in extreme conditions before showing any signs of cracking, wicking,

21
and failing.  Ubiquiti's TOUGHCable, which was represented by Ubiquiti and Streakwave to

22
be shielded outdoor cable, expressly designed for outdoor use, was failing within months of

installation. In other words, TOUGHCable was completely unsuited for any outdoor use.

23
10.    Ubiquiti designed, manufactured and sold TOUGHCable that it expressly

24
represented was ideal for outdoor use.  Streakwave sold and distributed TOUGHCable that it

25
expressly represented was ideal for outdoor use.

26
11.    Both Ubiquiti and Streakwave had a duty to insure that the cable they sold

27
conformed to these representations.  They both failed in this duty.

28

---

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

12.     Ubiquiti, though its distributors, and Streakwave sold tens of thousands of feet of cable to customers.  The TOUGHCable was installed in installations, businesses, and residential location all over the world, including in the United States.

13.     Because Defendants failed in their duty to insure that TOUGHCable was what they said it was, customers suffered financial harm.  Because the TOUGHCable is wholly unsuited for outdoor use, its installation poses an unreasonable and completely foreseeable risk of harm to the expensive radio transceiver equipment it is connected to.  The TOUGHCable had to be and will have to be, ripped out and completely replaced.  Installers of TOUGHCable have been forced to go back to the original install location and reinstall new cable.

14.     Ubiquiti and Streakwave's customers have been forced to expend significant sums of money on an item that never should have cost them anything beyond the initial investment, and will be forced to expend additional sums in the future, until all of the defective TOUGHCable has been replaced.  Ubiquiti's negligence in manufacturing a product that was not suitable for the express purpose for which it was sold, and Streakwave's failure to insure that the TOUGHCable it was selling was suitable for the express purpose for which it was sold was a disaster for each install in which the TOUGHCable was used. Customers world-wide are paying the price, and have been stuck with the costs of Defendants' error.

15.     This action is brought on behalf of a Class of all persons and entities that have purchased TOUGHCable who have sustained losses or damage, including costs of replacement, as a result of the defective nature of the product.

**VENUE AND JURISDICTION**

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The aggregate claims of plaintiffs and the proposed Class members exceed, for all jurisdictional purposes, the sum or value of $5,000,000.00.

17.     Ubiquiti is a corporation organized and existing under the laws of Delaware, with its principal place of business in San Jose, California, and is a citizen of the state of California.

18.     Streakwave Wireless, Inc., is a corporation organized and existing under the laws of California, with its principal place of business in San Jose, California, and is a citizen of the state of California.

19.     Plaintiff Tasion Communications, Inc. is a citizen of Canada.

20.     Plaintiff International Power Systems, LLC is a citizen of Arizona.

21.     Plaintiff Fundamental Holdings, Corp. is a citizen of both Delaware and Colorado.

22.     Plaintiffs assert claims on of behalf of proposed Class whose members are scattered throughout the world.  There is minimal diversity of citizenship between proposed Class members and Defendants.

23.     This Court has personal jurisdiction over Defendants because both Ubiquiti and Streakwave maintain their principal headquarters in San Jose, California, are registered to conduct business in California, have sufficient minimum contacts to California, or otherwise intentionally avail themselves of the markets within California, through manufacturing, production, promotion, marketing, sale, and distribution of their products in California, to render the exercise of jurisdiction by this Court proper and necessary.

24.     This Court also has personal jurisdiction over both Ubiquiti and Streakwave because, on information and belief, the advertising statements that give rise to the causes of action alleged in this complaint were created, reviewed, approved, and/or published in and from Ubiquiti and Streakwave headquarters in San Jose, California.  Also, on information and belief, decisions made by Ubiquiti employees that give rise to Plaintiffs' claims were made in and from its San Jose, California headquarters.  Venue is also proper before this Court under 28 U.S.C. § 1391(b)(2) as a substantial part of the events, circumstances, and omissions giving rise to Plaintiffs' claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

25.     Pursuant to Local Rule 3-5(b) and 3-2(c), this action should be assigned to the Oakland Division of the Northern District of California because Defendants reside in San Jose.

**PARTIES**

26.     Plaintiff Tasion Communications, Inc., is a Canadian corporation, doing business as Planet Telecom.  Planet Telecom offers high speed internet connectivity for business and residential subscribers in locations around the world, including Panama, Canada, and other areas.

27.     Plaintiff International Power Systems, LLC, an Arizona limited Liability corporation doing business as Freeway Networks, provides installation services for wireless internet.

28.     Plaintiff Fundamental Holdings, Corp., a Delaware corporation based in Colorado doing as Peak Internet, provides internet and telephone connectivity for both home and business.

29.     Defendant Ubiquiti Networks, Inc.  ("Ubiquiti" or "Defendant") is a corporation organized and existing under the laws of Delaware, with its principal place of business in San Jose, California.  Ubiquiti designs, manufactures and sells broadband wireless products including high performance radios, antennas, software, and programming tools to manage the hardware.  Ubiquiti's products are designed for wireless networking and other applications in the unlicensed radio frequency (RF) spectrum.  Ubiquiti products and technologies permit companies the ability to provide high speed wireless connections for customers in a wide variety of locations, including markets that are otherwise difficult to service, such as mountainous regions, rural areas, islands, and underdeveloped locations, both within and outside of the United States.

30.     Defendant Streakwave Wireless, Inc., is a corporation organized and existing under the laws of California, with its principal place of business in San Jose, California, and is a seller/distributor of wireless products, including Ubiquiti products.

**FACTUAL ALLEGATIONS**

31.     Ubiquiti designs, manufactures, and sells broadband wireless products. Ubiquiti's hardware products include high performance radios, antenna, and repeaters, among other telecommunications hardware and software, to enable the broadcasters and

reception of wireless signals for customers in a wide variety of locations, including remote and underdeveloped areas.

32.     The Ubiquiti radio transceiver is a unit that consists of both a transmitter and a receiver.  The unit typically mounts on a roof or other high, exterior high location.  The radio transceiver is connected to electrical power and the customer (or infrastructure equipment) by a power over Ethernet ("POE") injector. This injector has 2 Ethernet connections:  One that goes to the transceiver; and the other that goes to the customer computer or router or infrastructure equipment.  The Ethernet cable that goes to the transceiver provides data signals on 2 wire pairs of the cable and electrical power on 2 wire pairs of the cable.  The Ubiquiti radio transceiver will not function without a hard-wired cable connection.

33.     This hard-wired POE link is typically achieved with Category 5e cable. Category 5e cable (Cat 5e) is the current standard cable for computer networks such as Ethernet. The Cat 5e provides transmission performance of up to 100 MHz.

34.     A shielded cable is an electrical cable of one or more insulated conductors enclosed by a common conductive layer. The shield may be composed of braided strands of copper (or other metal, such as aluminum), a non-braided spiral winding of copper tape, or a layer of conducting polymer. Usually, this shield is covered with a jacket. The shield acts as a Faraday cage (an enclosure formed by conducting material) to reduce electrical noise from outside the cable (such as lightning) from affecting the signals, and to reduce transient electromagnetic radiation that may interfere with other devices.

35.     Prior to the introduction of its shielded cabling, Ubiquiti conducted a number of failure analyses on Ubiquiti equipment that had been returned to Ubiquiti by its customers. Ubiquiti determined that the largest single cause of failure to its radio equipment was electrostatic discharge ("ESD").  ESD permitted a fatally large spike of electrical charge to be introduced into the radio equipment, shorting it out.

36.     Ubiquiti determined that the primary source of ESD leading to equipment failure could be traced to the cabling powering and connecting the radio transceivers.  With the assumption that its equipment in the field could be better protected from failure caused by ESD if the cabling used was both shielded, and included a drain wire to provide earth grounding, Ubiquiti embarked upon a program to design and manufacture its own shielded, earth-grounded  Cat 5e cabling for use with installations of its radio equipment.

37.     In October 2010, Ubiquiti announced a new cable product line which it called TOUGHCable.  Ubiquiti made the following representations about its new product:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

[See Exhibit C]

38.     TOUGHCable introduced a small drain wire that was built into the cable. A separate drain wire is not normally present in ordinary shielded cable. The drain wire works

by connecting to the transceiver (attaching it to the metal Cat 5e connector body, a metal component) and connecting it to the same type of connector on the premise end to the POE injector.  This connection provides electrical power to the radio.

39.     The POE injector is connected to the premise electrical supply and has a grounded plug.  This design permitted any static collecting in the radio, cable, or connectors to be drained away to ground, thereby protecting the sensitive components in the radio from electrostatic discharge (ESD) and resulting damage.

40.     Contemporaneous with the introduction of its TOUGHCable product, Ubiquiti informed its customers that it would no longer honor warranties on its Radio equipment unless the customer utilized "Shielded Ethernet cable and earth grounding" as conditions of product warranty.

41.     Ubiquiti began shipping its TOUGHCable in or around March 2011.

42.     Many customers including Plaintiffs began to utilize Ubiquiti's TOUGHCable on all its new installations, and also began to replace all its non-shielded cable with Ubiquiti's TOUGHCable on existing installations.

43.     Within months, Ubiquiti's TOUGHCable began failing.

44.     Contrary to all representations as to the suitability of TOUGHCable for outdoor and harsh weather use, TOUGHCable proved to be highly unsuitable for any outdoor use whatsoever.  TOUGHCable was defectively manufactured, and the defect, on information and belief, was a complete lack of UV (ultraviolet) protection.  After several months of exposure to the sun, the TOUGHCable changed color, became brittle, developed cracks, and exposed the unprotected interior of cable to the outside elements.  The interior material of the TOUGHCable, once exposed to outside elements, instead of keeping water out of the cable, did exactly the opposite and wicked up water into the interior of the cable.

45.     Rather than protect delicate and expensive radio equipment, the Ubiquiti TOUGHCable instead became the equipment's greatest liability.

46.     Radio installations are almost invariably set up in a simple paradigm:  The antenna is located as high as possible to both broadcast and receive signals clear of obstructions, and the equipment which processes those signals is located near ground level.

47.     When the wicked up water began to pool inside the cable, the water followed its natural propensity to flow downhill – directly into the expensive radio equipment, corroding connections, shorting out and destroying the equipment.

48.     TOUGHCable was installed in thousands of installations worldwide.  Wireless service providers installed thousands of feet of TOUGHCable to power and connect their broadcast facilities to the broadcast dishes on top of antennas.  An antenna could be many hundreds of feet high, and there must be a hard-wired connection between the broadcasting station and the broadcast dish at the top of the antenna.

49.     Providers of wireless services also installed hundreds of feet of TOUGHCable at the receiving customer's locations.  The customer's radio transceiver would usually be placed on a rooftop or other elevated location.  A hard-wired cable connection would then pass the signal to the indoor processing equipment.  In a given rural area, there might be hundreds of customers, each with their own individual installation, which utilized TOUGHCable as the link between the outdoor transceiver and the customer's indoor equipment.

50.     Independent subcontractors provide installation of wired and wireless broadcast equipment on behalf of both providers and recipients of broadcast services.  Based upon the recommendations and representations of Ubiquiti, these independent subcontractors recommended the use of Ubiquiti's TOUGHCable for installations that required outdoor cabling. Independent installers installed thousands of feet of Ubiquiti's TOUGHCable at thousands of locations throughout the world, both at broadcast companies transmission points, and at the receiving locations of the customers of the broadcast companies.

51.     When TOUGHCable began to fail, users would discover that their connection was down.  Investigation soon revealed that the TOUGHCable was the cause.

52.     TOUGHCable was completely unsuited for outdoor use.  Wherever it has been installed, it must be completely replaced.  Not replacing the TOUGHCable subjects delicate and expensive radio and transmission equipment to certain and inevitable failure.  Broadcasters risk complete cessation of broadcast capacity.  Each customer's location must be completely rewired – all of the defective TOUGHCable completely removed and replaced – to protect the equipment at each location where the TOUGHCable was used.

**PLAINTIFF PLANET TELECOM'S 'S EXPERIENCE**

53.     Planet Telecom is a high speed wireless telecommunications provider.  Planet Telecom offers high speed internet connectivity for business and residential subscribers in remote locations around the world, including Panama, Canada, and other areas.   Planet Telecom provides installation of the equipment necessary for wireless reception for its customers.  Installation consists of the provision of radio transceiver equipment which typically includes a wired connection to the processing components located indoors.

54.     Once the wireless receiving equipment is installed, in exchange for a monthly subscription fee (the amount depending upon the Internet connection speed), Planet Telecom provides uplink for continuous Internet connectivity, telephone services, and/or Internet connectivity for other IP based products.  In order to provide wireless Internet connection to its customers, particularly those in remote locations, Planet Telecom must broadcast the telecommunications signals from a broadcast facility, which includes a radio transceiver which sends and receives the signals to and from its customers.  These signals are transmitted and received from the top of a transmission tower.

55.     Most of the radio equipment Planet Telecom utilized in its broadcast and transmission facilities were Ubiquiti products.

56.     Sometime in or around the beginning of 2011, Ubiquiti began to place its customers (the purchasers of Ubiquiti's broadcast and receiving equipment) on notice that, in order for the Ubiquiti equipment to be covered under Ubiquiti's warranty:  "Shielded Ethernet cable and earth grounding must be used as conditions of product warranty."

57.     Contemporaneous with this announcement, Ubiquiti introduced TOUGHCable, a shielded Cat 5e cable product which would satisfy Ubiquiti's new warranty conditions on its hardware.

58.     On March 8, 2011, Planet Telecom placed its first order of TOUGHCable, ordering four boxes of TOUGHCable at 1000 feet per box at a cost of $109.00 per box.  This initial order also included an order for two boxes of Ubiquiti's TOUGHCable cable connectors (100 pieces, $47.00 per box).  With shipping and handling, the total for this initial order came to $639.86.

59.     Over the course of the next year, Planet Telecom made numerous additional purchases of Ubiquiti's TOUGHCable.  In all, Planet telecom ordered 22 boxes (1000 feet

each) of Ubiquiti's TOUGHCable, paying either $109 or $119 per box.  In addition, Planet Telecom purchased additional boxes of TOUGHCable cable connectors, and incurred costs in shipping and handling.

60.     All purchases of TOUGHCable were effectuated by telephone.  Dave Veilleux, President of Tasion Communications, Inc., called and spoke to Streakwave sales representatives based in San Jose, California.  During the course of each telephone call, Mr. Veilleux made an offer to purchase TOUGHCable Level 1, specifying quantities, and place of delivery.  Streakwave, based in California, accepted Mr. Veilleux's offer, and a binding contract was formed upon acceptance by the Streakwave sales representative of Mr. Veilleux's offer to purchase the TOUGHCable.

61.     At no time during the purchase and sale of the Ubiquiti TOUGHCable, was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral,  provided to Mr. Veilleux.

62.     In performance of the contract, Streakwave shipped the boxes of TOUGHCable to Planet Telecom as directed by Mr. Veilleux, to either Planet Telecom's Canadian office or to Planet Telecom's Florida shipping agent.  In no case, did any box of TOUGHCable include any limitation of warranty, limitation of liability, limitation of damage, or reference to any such limitations.

63.     Because purchases of TOUGHCable were sourced from a U.S.-based supplier, and the equipment being purchased was for use outside of the United States, Planet Telecom also incurred additional costs.  Specifically, Planet Telecom paid a U.S.-based shipping company to receive the U.S. originating shipment and then to transship the TOUGHCable boxes to Planet Telecom's overseas operations in Panama.   Planet Telecom further paid duty to Panamanian customs for each box of TOUGHCable it imported into Panama.

64.     Upon receipt of the first shipment of TOUGHCable in or about March 2011, Planet Telecom began using the TOUGHCable for all of its outdoor installations.

65.     Less than a year later, in May 2012, one of Planet Telecom's customers in a remote location in Panama reported that their Planet Telecom internet connection was non-operative.

66.     Planet Telecom sent two employees to the customer's location to investigate why the internet connection was down.  It took the two men approximately two hours to reach the customer's remote location.

67.     When they arrived, they found that the radio receiver was shorted out.  Somehow, water had gotten into the radio even though the radio was located indoors.  Further investigation revealed that the TOUGHCable which had been installed at this customer location had become brittle, cracked, and discolored.  Further investigation revealed that the TOUGHCable was wicking up water from the outside and the water was draining into the customer's radio, whereupon the water corroded the connection to the receiving unit and shorted out the radio.

68.     It took the Planet Telecom employees three hours resolve the problem.  Total travel time to and from the customer's location comprised an additional four hours.  The Planet Telecom employees replaced 60 feet of cable, 2 cable connectors, and the non-functioning radio.

69.     Over the next couple of weeks, more customers reported that their Internet connections were going down.  Each time a customer lost connectivity, Planet Telecom was required to send out technicians to diagnose the problem.   Because Planet Telecom provided remote location service, each on-site visit involved many hours of travel to and from the customer location, sometimes as much as 5 hours each way, to locations that sometimes could only be reached by boat.

70.     Between May 2012 and March 2013, at least 48 Planet Telecom customers lost Internet service due to corrosion of the TOUGHCable.   Six radios belonging to Planet Telecom were destroyed by wicking water through the TOUGHCable, all of which had to be replaced at Planet Telecom's cost.  At each location, Planet Telecom had to replace all of the cabling, between 25 and 85 feet of TOUGHCable per customer site, plus two connectors per location.

71.     As of March 2013, Planet Telecom had expended 204 hours of employee time fixing the damage caused by the TOUGHCable and replacing the defective TOUGHCable with a different cable.  Further expenditures of Planet Telecom employee time have been necessitated since March 2013 to fix subsequent damage caused by defective TOUGHCable.

72.     As of March 2013, Planet Telecom expended an additional 429 employee hours in travel time to and from each customer location to repair the Internet connection and replace the TOUGHCable.

73.     Since March 2013, previously installed TOUGHCable at various Planet Telecom installations have failed, necessitating additional expenditures in employee time, resources, equipment, travel time, and replacement of destroyed radios.

74.     Planet Telecom has also lost customers as a result of lost Internet service due to the failure of the TOUGHCable installations.

75.     Planet Telecom also installed TOUGHCable on its towers in 2011.  The towers are essential to broadcast Planet Telecom's signal to a particular area of coverage, and additional towers are needed to act as repeaters to extend Planet Telecom's coverage to ever more remote locations.  Each tower installation may utilize as many as 9 radios, multiple connectors, and up to 1,080 feet of Cat 5e cabling.

76.     Between January and March 2013, Planet Telecom ripped out and replaced all of the TOUGHCable it had previously installed (at significant initial installation cost) on 12 of its broadcast or repeating towers in Panama. Many of these towers were located in remote, difficult to access regions, including antennas on the top of mountains and antennas located in areas only accessible by boat.  The rewiring of a tower is a complex and time-consuming operation, requiring anywhere between 20 and 36 man-hours per tower.   Planet Telecom expended 333 hours in employee time to undertake this rewiring of 12 towers, plus an additional 93 hours in travel time for each employee to get to and from the towers, and incurred additional travel costs (such as water taxis at $20.00 per trip) in order to repair the towers which were rendered vulnerable to failure due to the defective Ubiquiti TOUGHCable.

77.     Ubiquiti stopped shipping TOUGHCable Level 1 and TOUGHCable Level 2 in 2012.   On or about July 2012, Ubiquiti introduced its upgraded shielded Cat 5e cable products which it called TOUGHCable Pro and TOUGHCable Carrier (discontinuing TOUGHCable Level 1 and TOUGHCable Level 2).

78.     Ubiquiti authorized previous purchasers of TOUGHCable Level 1 and TOUGHCable Level 2 to obtain its new cable products without charge, box for box, to

replace the defective TOUGHCable Level 1 and TOUGHCable Level 2 with the new products TOUGHCable Pro and TOUGHCable Carrier.

79.    To obtain the replacement Cat 5e cable, Planet Telecom was forced to incur additional costs, including shipping costs and customs duties, in order to get the replacement cable to the locations in Panama where the TOUGHCable had been initially installed.

80.    In no instance has Ubiquiti offered or agreed to pay for damage caused by the defective cable, costs of obtaining, shipping, installing the replacement cable, ripping out the defective cable, or other consequential damages incurred by Planet Telecom as a result of the initial installation of the defective TOUGHCable.

## PLAINTIFF FREEWAY NETWORKS' EXPERIENCE

81.    Freeway Networks purchased three boxes of TOUGHCable, (both Level 1, and Level 2), for a total of approximately 3,000 feet.

82.    All purchases of TOUGHCable were effectuated by telephone.  A representative of Freeway Networks called and spoke to Streakwave sales representatives based in San Jose California.  During the course of each telephone call, The Freeway networks representative made an offer to purchase TOUGHCable Level, specifying quantities, type, and place of delivery.  Streakwave, based in California, accepted this offer, and a binding contract was formed upon acceptance of the offer by the Streakwave sales representative.

83.    At no time during the purchase and sale the Ubiquiti TOUGHCable, was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral, provided to Freeway Networks.

84.    Freeway Networks installed this TOUGHCable in locations in Arizona.

85.    The TOUGHCable jacket on the installed TOUGHCable disintegrated, resulting in damage and necessitating replacement.

86.    Freeway Networks has incurred damages as a result of the purchase, installation and use of the defective TOUGHCable, including, but not limited to:

a.  Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

b.  Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

c.  Cost of cover cable;

d.  Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

e.  Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

f.  Employee/subcontractor travel time and expenses to replace defective cable;

g.  Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

h.  Lost customers, and compensation to damaged customers;

i.  Lost profits, and

j.  Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

87.    At no time during the purchase and sale the Ubiquiti TOUGHCable, was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral, communicated to Freeway Networks.

88.    In performance of the contract, Streakwave shipped the TOUGHCable to Freeway Networks.  In no case, did any box of TOUGHCable include any limitation of warranty, limitation of liability, limitation of damage, or reference to any such limitations.

**PLAINTIFF PEAK INTERNET'S EXPERIENCE**

89.    Peak Internet purchased fifteen boxes of TOUGHCable, (both Level 1, and Level 2), for a total of approximately 15,000 feet.

90.    All purchases of TOUGHCable were effectuated by telephone.  A representative of Peak Internet called and spoke to sales representatives based in San Jose California, including Streakwave representatives.  During the course of each telephone call, the Peak Internet representative made an offer to purchase TOUGHCable, specifying quantities, type, and place of delivery.  The sellers, including Streakwave, accepted Peak Internet's offer, and a binding contract was formed upon acceptance of the offer by the sales representatives based in California.

91.     At no time during the purchase and sale the Ubiquiti TOUGHCable, was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral, provided to Peak Internet.

92.     Peak Internet installed this TOUGHCable in locations in Colorado and Costa Rica.

93.     The TOUGHCable jacket on the installed TOUGHCable disintegrated, resulting in damage and necessitating replacement.

94.     Peak Internet has incurred damages as a result of the purchase, installation and use of the defective TOUGHCable, including, but not limited to:

    a.  Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

    b.  Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

    c.  Cost of cover cable;

    d.  Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

    e.  Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

    f.  Employee/subcontractor travel time and expenses to replace defective cable;

    g.  Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

    h.  Lost customers, and compensation to damaged customers;

    i.  Lost profits, and

    j.  Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

95.     At no time during the purchase and sale the Ubiquiti TOUGHCable, was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral, communicated to Peak Internet.

96.     In performance of the contract, California-based sellers, including Streakwave shipped the TOUGHCable to Peak Internet.  In no case, did any box of TOUGHCable

include any limitation of warranty, limitation of liability, limitation of damage, or reference to any such limitations.

### RULE 9(b) ALLEGATIONS AGAINST DEFENDANT UBIQUITI

97.     Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  As detailed in the paragraphs above, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity with respect to Defendant Ubiquiti:

<u>WHAT:</u>

98.     Defendant Ubiquiti made the following material misrepresentations regarding its Ubiquiti TOUGHCable Level 1 and TOUGHCable Level 2 Cat 5e Cables:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

WHEN:

99.   On or about October 2011, Defendant Ubiquiti announced that it was introducing a new product it identified as a Category 5e outdoor carrier-class shielded cable. It called these products TOUGHCable Level 1 and TOUGHCable Level 2.  Thereafter, and for the entire period for which TOUGHCable was available on the market, Defendant Ubiquiti continuously and uninterruptedly made identical representations regarding the qualities and attributes of its TOUGHCable product.

WHERE:

100.   The following representations:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

were made, *inter alia:* in the brochures Ubiquiti printed to advertise and promote its Ubiquiti products; on Ubiquiti's home page website which advertised and promoted its Ubiquiti TOUGHCables; and throughout the internet as promoted and propagated by Defendant Ubiquiti on thousands of web pages located on third-party websites.

    WHO:

    101.    Defendant Ubiquiti, acting through its employees, created, reviewed, approved, and published each of the above-identified statements.  The individual employees at Ubiquiti who had responsibility for the statements are unknown at this time, however internal records of the corporation will permit specific individuals to be identified through discovery.  The specific employees of Ubiquiti who had specific responsibility can be identified as those individuals who created, reviewed, approved, and directed or participated

1   in the publication of the statements, and those individuals who had authority to correct,
2   retract, or amend the statement, but did not.

3   HOW:

4
5   102.    Defendant Ubiquiti's written material misrepresentations were published in
6   advertisements, in brochures, and in promotional materials for Ubiquiti products.  Once
    Ubiquiti introduced TOUGHCable, every brochure that Ubiquiti published included an
7   additional page at the end of the brochure which touted its TOUGHCable products.  So, even
8   its brochures for its radios, antennas, dishes, cameras, etc., also included a description page
9   for TOUGHCable.  Every page describing TOUGHCable included, verbatim, the
10  representations listed above.  Defendant Ubiquiti further distributed its material
11  misrepresentations through digital advertisements, promotions, web pages, and through links
12  to its home web pages, promoting its Ubiquiti TOUGHCable products.  Any person
13  researching information on any of Ubiquiti products would have necessarily been exposed to
14  these material statements, since the statements appear prominently in all advertisements
15  Ubiquiti made available during the pertinent time period.  Given the combination of cost, the
16  specialized design, manufacture, and marketing, and the expert application of the Ubiquiti
17  products, it is unreasonable to assume that any purchaser would have made their purchase
18  without having conducted research.  The most minimal research on any of Ubiquiti's
19  products invariably exposes the prospective purchaser to the TOUGHCable statements listed
    above, which were identical in all publications.

20  WHY:

21
22  103.    Defendant Ubiquiti engaged in the material misrepresentation detailed herein
23  for the express purpose of inducing Plaintiffs and other reasonable buyers to purchase
24  TOUGHCable from Ubiquiti.  By requiring that customers who purchased radio transmission
25  products from Ubiquiti to also use shielded, earth-grounded cable in order to be covered
26  under the Ubiquiti warranty for their purchases, Ubiquiti hoped that it would sell more
27  TOUGHCable.   This strategy was successful, in that Ubiquiti has sold thousands of boxes
    TOUGHCable to businesses and members of the public.
28

1

<u>MATERIALITY:</u>

2

104.    Defendant Ubiquiti's representations regarding Ubiquiti TOUGHCable that:

3

**TOUGHCable**

4

**OUTDOOR CARRIER CLASS SHIELDED**

5

6
- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

7

8

**Increase Performance**

9
- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

10

**Extreme Weatherproof**

11

12
- TOUGHCables have been built to perform even in the harshest weather and environments.

13

**ESD Damage Protection**

14

15
- Protect your networks from devastating electrostatic discharge (ESD) attacks.

16

**Extended Cable Support**

17

18
- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

19

**Bulletproof your networks**

20
- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

21
- **Level 1** is a Category 5e outdoor carrier-class shielded cable.

22

23
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

24

25

26

led users to believe that TOUGHCable:

27
- was suitable for outdoor use;

28
- Was "OUTDOOR CARRIER CLASS SHIELDED;"

- Would "Protect . . . . networks from the most brutal environments;"

- Was actually "industrial-grade shielded Ethernet cable;"

- Would allow users to realize "Increase[d] Performance" by using TOUGHCable;

- That the use of TOUGHCable would "Dramatically improve your Ethernet link states, speeds, and overall performance";

- Was appropriate for "Extreme Weatherproof" environments;

- Was "built to perform even in the harshest weather and environments";

- Was "developed to have increased power handling performance for extended cable run lengths";

- Would "Bulletproof [their] networks";

- Was available in two versions, both of which offered Shielding Protection.

- Was a Category 5e outdoor carrier-class shielded cable.

These selling points are all highly material to the decision to spend upwards of $109 per box (1,000 feet) of cable. Defendant Ubiquiti profited by selling its TOUGHCables to thousands of unsuspecting users.

105.    At a minimum, all Class members were at least exposed to the misrepresentations appropriate for "outdoor" use, and "extreme weatherproof" environments.

106.    Had Plaintiff and the members of the Class known that the Ubiquiti TOUGHCable was not suitable for outdoor use and was not weatherproof, they would not have purchased it.

**RULE 9(b) ALLEGATIONS AGAINST DEFENDANT STREAKWAVE**

107.    Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  As detailed in the paragraphs above, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity with respect to Defendant Streakwave:

1

<u>WHAT:</u>

2

108.     Defendant Streakwave made the following material misrepresentations

3

regarding Ubiquiti TOUGHCable Level 1 and TOUGHCable Level 2 Cat 5e Cables:

4

5

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

6

7

- Protect your networks from the most brutal environments with

8

Ubiquiti's industrial-grade shielded Ethernet cable,

TOUGHCable.

9

**Increase Performance**

10

- Dramatically improve your Ethernet link states, speeds, and

11

overall performance with Ubiquiti TOUGHCables.

12

**Extreme Weatherproof**

13

- TOUGHCables have been built to perform even in the harshest

14

weather and environments.

15

**ESD Damage Protection**

16

- Protect your networks from devastating electrostatic discharge

(ESD) attacks.

17

**Extended Cable Support**

18

- TOUGHCables have been developed to have increased power

19

handling performance for extended cable run lengths.

20

**Bulletproof your networks**

21

- TOUGHCable is currently available in two versions:

22

Level 1 Shielding Protection and Level 2 Shielding Protection.

23

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.

24

- **Level 2** is a Category 5e outdoor carrier-class shielded cable

that features an Anti-Crosstalk Divider, additional shielding

25

and is rated to provide optimal performance on Gigabit

26

Ethernet networks.

27

28

<u>WHEN:</u>

109.    During the entire time Defendant Streakwave offered for sale the products TOUGHCable Level 1 and TOUGHCable Level 2, Defendant Streakwave published on its website all of the representations listed above.  For the entire period for which TOUGHCable was available for sale through Streakwave, Defendant Streakwave continuously and uninterruptedly made identical representations regarding the qualities and attributes of the TOUGHCable product.

110.    At some point, but no later than February 1, 2012 (the precise date is determinable though discovery of records internal to Streakwave and through deposition of Streakwave personnel), Streakwave learned that TOUGHCable Level 1 and TOUGHCable Level 2 were defective products.  Nevertheless, Defendant Streakwave continued to sell TOUGHCable Level 1 and TOUGHCable Level 2.  Every sale of Streakwave product after that date to Plaintiffs and members of the class was a fraudulent sale.  Planet Telecom's last purchase of TOUGHCable Level 1 from Streakwave was made on February 2, 2012.

<u>WHERE:</u>

111.    The following representations:

**TOUGHCable**
**OUTDOOR CARRIER CLASS SHIELDED**
- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**
- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**
- TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

were made, *inter alia:* on the website Defendant Streakwave utilized to advertise and promote the sale of Ubiquiti TOUGHCable.

WHO:

112.     Defendant Streakwave, acting through its employees, published each of the above-identified statements.  The individual employees at Streakwave who had responsibility for the statements are unknown at this time, however internal records of the corporation will permit specific individuals to be identified through discovery.  The specific employees of Streakwave who had specific responsibility can be identified as those individuals who reviewed, approved, and directed or participated in the publication of the statements, and those individuals who had authority to correct, retract, or amend the statement, but did not.

HOW:

113.     Defendant Streakwave's written material misrepresentations were published on Streakwave's website.  Every brochure that Defendant Ubiquiti published included an additional page at the end of the brochure which touted Ubiquiti's TOUGHCable products.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Even Ubiquiti's brochures advertising Ubiquiti radios, antennas, dishes, cameras, etc., also included a description page for TOUGHCable.  Every description page for Ubiquiti's TOUGHCable included, verbatim, the representations listed above.

114.    Each of these product brochures, including the brochures TOUGHCable itself, and all of the contemporaneous Ubiquiti product brochures, were published by Defendant Streakwave on the Streakwave website.  Defendant Streakwave further distributed these material misrepresentations through digital advertisements, promotions, web pages, and through links to its web pages promoting the TOUGHCable products.  Any person researching a TOUGHCable purchase though Streakwave would have necessarily been exposed to these material statements, since the statements appear prominently in all advertisements Streakwave made available for Ubiquiti products during the pertinent time period.  Given the combination of cost, the specialized design, manufacture, and marketing, and the expert application of the Ubiquiti products, it is unreasonable to assume that any purchaser would have made their purchase without having conducted research.  The most minimal research on any of Ubiquiti's products through Streakwave invariably exposes the prospective purchaser to the TOUGHCable statements listed above, which were identical in all publications.

WHY:

115.    Defendant Streakwave engaged in the material misrepresentation detailed herein for the express purpose of inducing Plaintiff and other reasonable buyers to purchase TOUGHCable from Streakwave.  By requiring that customers who purchased Ubiquiti radio transmission products to also use shielded, earth-grounded cable in order to be covered under the Ubiquiti warranty for their purchases, Streakwave knew that it would sell more TOUGHCable.   This strategy was successful, in that Streakwave sold thousands of boxes TOUGHCable to businesses and members of the public.

MATERIALITY:

116.    Defendant Ubiquiti's representations regarding Ubiquiti TOUGHCable that:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with
  Ubiquiti's industrial-grade shielded Ethernet cable,
  TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and
  overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest
  weather and environments.

**ESD Damage Protection**

- Protect your networks from devastating electrostatic discharge
  (ESD) attacks.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power
  handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:
  Level 1 Shielding Protection and Level 2 Shielding Protection.
- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable
  that features an Anti-Crosstalk Divider, additional shielding
  and is rated to provide optimal performance on Gigabit
  Ethernet networks.

led users to believe that TOUGHCable:

- was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Would allow users to realize "Increase[d] Performance" by using

TOUGHCable;

- That the use of TOUGHCable would "Dramatically improve your Ethernet link states, speeds, and overall performance";

- Was appropriate for "Extreme Weatherproof" environments;

- Was "built to perform even in the harshest weather and environments";

- Was "developed to have increased power handling performance for extended cable run lengths";

- Would "Bulletproof [their] networks";

- Was available in two versions, both of which offered Shielding Protection.

- Was a Category 5e outdoor carrier-class shielded cable.

These selling points are all highly material to the decision to spend upwards of $109 per box (1,000 feet) of cable. Defendant Streakwave profited by selling TOUGHCable to thousands of unsuspecting users.

At a minimum, all Class members were at least exposed to the misrepresentations appropriate for "outdoor" use, and "extreme weatherproof" environments.

117. Had Plaintiff and the members of the Class known that the Ubiquiti TOUGHCable was not suitable for outdoor use and was not weatherproof, they would not have purchased it.

## CLASS ALLEGATIONS

118. Plaintiffs bring this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the Classes defined as follows:

All persons and entities that purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable Level 2.

And

All persons and entities that purchased Ubiquiti TOUGHCable Level 1 or

Ubiquiti TOUGHCable Level 2 from Streakwave.

121.    Plaintiffs, in the alternative, propose the following subclasses:

All persons and entities located in Arizona who purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable Level 2.

And

All persons and entities located in Colorado who purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable Level 2.

Excluded from the Class and Subclass ("Classes") definitions are:

    i.   Defendants, any entity in which any Defendant has a controlling interest or which has a controlling interest in any Defendant, and any Defendant's legal representatives, predecessors, successors, assigns, and employees:

    ii.  the judge and staff to whom this case is assigned, and any member of the judge's immediate family.

122.    Plaintiffs reserve the right to amend the Class and Subclass definitions if discovery and further investigation reveals that the classes should be expanded or otherwise modified.

123.    Plaintiffs reserve the right to establish sub-classes as appropriate.

124.    Plaintiffs are members of the Classes they seek to represent.  Members of the Classes can be identified using records of retail sales and/or other information that is kept by Defendants in the usual course of business and/or in the control of Defendants.  Class members can also be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by Defendants.

125.    **Numerosity**:  Class members are so numerous that their individual joinder is impracticable.  The precise number of Class members is unknown to Plaintiffs, but it is clear that the number greatly exceeds the number to make joinder impossible.

126.    **Existence and predominance of common questions:**  Common questions of law and fact predominate over the questions affecting only individual Class members.  Some of the common legal and factual questions include:

a.  Whether  TOUGHCable:

- was suitable for outdoor use;

- Was "OUTDOOR CARRIER CLASS SHIELDED;"

- Would "Protect . . . . networks from the most brutal environments;"

- Was actually "industrial-grade shielded Ethernet cable;"

- Was appropriate for "Extreme Weatherproof" environments;

- Was "built to perform even in the harshest weather and environments";

- Was a Category 5e outdoor carrier-class shielded cable.

b.  Whether Ubiquiti and/or Streakwave each had a duty to ensure to Plaintiffs and the Classes that the statements they were making about TOUGHCable actually comported with the facts;

c.  Whether Ubiquiti and/or Streakwave breached their duties to ensure to Plaintiffs and the Classes that the statements they made about TOUGHCable actually comported with the facts;

d.  Whether Ubiquiti's/Streakwave's breach of their duties to ensure the accuracy of their statements about TOUGHCable caused damage to Plaintiffs and the Classes;

e.  Whether the conduct of Ubiquiti constituted a breach of express warranty.

f.  Whether the conduct of Ubiquiti constituted a breach of the implied warranty of merchantability.

g.  Whether the conduct of Streakwave constituted a breach of express warranty.

h.  Whether the conduct of Streakwave constituted a breach of the implied warranty of merchantability.

i.  Whether the conduct of Ubiquiti and/or Streakwave constituted a breach of the Magnuson Moss Warranty Act.

j.  Whether the conduct of Ubiquiti and/or Streakwave constituted a breach of Colorado's Consumer Protection Act.

k.  Whether California law can and should be applied to Plaintiffs and the Classes;

l.  Whether Ubiquiti and/or Streakwave was negligent in making the herein-described representations regarding TOUGHCable;

m.  Whether, as a result of Ubiquiti's/Streakwave's conduct, Plaintiffs and the Classes have suffered damages; and if so the appropriate amount thereof.

127.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and the Classes.  Similar or identical statutory and common law violations, business practices, statements and advertising regarding the product are involved.  Individual questions, if any, pale by comparison to the numerous common questions that predominate.

128.    The injuries sustained by Plaintiffs and the Classes flow, in each instance, from a common nucleus of operative facts.  Between March 2011 and until Ubiquiti stopped shipping its TOUGHCable level 1 and level 2 products, both Ubiquiti and Streakwave continuously and uninterruptedly made the claims that TOUGHCable:

- Was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable.

These claims, identical in their iterations, were broadly disseminated, continuous, and ubiquitous.

129.    Class members have been damaged by Defendants' misconduct.  The claims Ubiquiti and Streakwave made that TOUGHCable:

- Was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable,

were false, and Class members, by virtue of their purchase of TOUGHCable, were harmed

thereby.  Class members would not purchased TOUGHCable and/or paid as much as they did had they known the truth about the TOUGHCable.

130.  **Typicality**:  Plaintiffs' claims are typical of the claims of the other proposed Class members.  Each of the Plaintiffs purchased one or more boxes of Ubiquiti TOUGHCable from Streakwave.  However, the TOUGHCable that Plaintiffs purchased were, contrary to the claims of Ubiquiti and Streakwave, not suitable for outdoor use and not weatherproof, and Plaintiffs suffered damage thereby, and each Plaintiff has had to replace all of the TOUGHCable they installed.  Plaintiffs have been damaged in similar or equivalent manners as each member of the proposed Classes.

131.  **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs are familiar with the basic facts that form the bases of the proposed Class members' claims.  Plaintiffs' interests do not conflict with the interests of the other Class members that they seek to represent.  Plaintiffs have retained counsel competent and experienced in class action litigation who will prosecute this action vigorously.  Plaintiffs' counsel has successfully prosecuted complex actions including consumer protection class actions.  Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class members.

132.  **Superiority**:  The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the proposed Class members.  The relief sought per individual member of the Classes is relatively small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants.  Furthermore, it would be virtually impossible for the Class members to seek redress on an individual basis.  Even if the Class members themselves could afford such individual litigation, the court system could not.

133.  Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.

134.    Given the similar nature of the Class members' claims and the absence of material differences in the state statutes upon which the Class members' claims are based, a class will be easily managed by the court and the parties.

135.    The court may be requested to also incorporate additional subclasses of plaintiffs, defendants, or both, in the interest of justice and judicial economy.

136.    In the alternative, the Class may be certified because:

a.    the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct by Defendants;

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

**FIRST CAUSE OF ACTION**
**Against Defendant Ubiquiti**
**(Negligence)**

137.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

138.    Defendant Ubiquiti had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacturing, production, marketing, and distribution of its TOUGHCable.

139.    Defendant Ubiquiti breached its duty by inadequately formulating and designing its defective TOUGHCable product to Plaintiffs and the Class.

140.    Defendant Ubiquiti breached its duty by manufacturing, producing, and selling a defective product to Plaintiffs and the Class.

141.     Defendant Ubiquiti breached its duty by inadequately testing, or not testing at all, its TOUGHCable to ascertain if the TOUGHCable actually conformed to the statements and representations Ubiquiti made in describing TOUGHCable.

142.     Defendant Ubiquiti breached its duty by representing to the Class that TOUGHCable was suitable for outdoor use, when in fact, it was not.

143.     Defendant Ubiquiti breached its duty by representing to the Class that TOUGHCable was "outdoor carrier class shielded" when in fact, it was not.

144.     Defendant Ubiquiti breached its duty by representing to the Class that TOUGHCable would "Protect . . . . networks from the most brutal environments," when in fact, it would not.

145.     Defendant Ubiquiti breached its duty by representing to the Class that TOUGHCable was "industrial-grade shielded Ethernet cable" when in fact, it was not.

146.     Defendant Ubiquiti breached its duty by representing to the Class that TOUGHCable was appropriate for "Extreme Weatherproof" environments when in fact, it was not.

147.     Defendant Ubiquiti breached its duty by representing to the Class that TOUGHCable was "built to perform even in the harshest weather and environments" when in fact, it was not.

148.     Defendant Ubiquiti breached its duty by representing to the Class that TOUGHCable was "Category 5e outdoor carrier-class shielded cable" when in fact, it was not.

149.     As described herein, Ubiquiti's defective TOUGHCable failed when used as directed in outdoor use, by cracking and splitting, and allowing the TOUGHCable to wick up water, and pool the water down into sensitive electronic equipment, placing that equipment at risk of failure, or destroying it.

150.     Ubiquiti further breached its duty by failing to notify Plaintiffs and the Class of the defects in the TOUGHCable they were purchasing.

151.     Ubiquiti had complete control over its manufacturing, testing, production, and distribution facilities and knew or should have known that its TOUGHCable was defective.

152.     It was also completely foreseeable to Ubiquiti that Plaintiffs and the Class would rely upon Ubiquiti's marketing claims that TOUGHCable:

- • was suitable for outdoor use;
- • Was "OUTDOOR CARRIER CLASS SHIELDED;"
- • Would "Protect . . . . networks from the most brutal environments;"
- • Was actually "industrial-grade shielded Ethernet cable;"
- • Was appropriate for "Extreme Weatherproof" environments;
- • Was "built to perform even in the harshest weather and environments";
- • Was a Category 5e outdoor carrier-class shielded cable.

153.    Deleted.  .

154.    Neither Plaintiffs nor other Class members contributed to the failure of TOUGHCable to conform with the representations Ubiquiti made about its TOUGHCable products.

## SECOND CAUSE OF ACTION
### Against Defendant Ubiquiti
### (Negligent Misrepresentation)

155.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

156.    Defendant Ubiquiti represented to Plaintiffs and the Class that TOUGHCable:

- • was suitable for outdoor use;
- • Was "OUTDOOR CARRIER CLASS SHIELDED;"
- • Would "Protect . . . . networks from the most brutal environments;"
- • Was actually "industrial-grade shielded Ethernet cable;"
- • Was appropriate for "Extreme Weatherproof" environments;
- • Was "built to perform even in the harshest weather and environments";
- • Was a Category 5e outdoor carrier-class shielded cable.

and was merchantable and fit for its intended use.

157.    These representations were not true because Ubiquiti's TOUGHCable was defective and completely unsuited for outdoor use.

158.    Defendant Ubiquiti had no reasonable grounds for believing these representations to be true, or alternatively Defendant Ubiquiti failed to ascertain if the representations were true before making them.

159.    Defendant Ubiquiti intended for Plaintiffs and members of the Class to rely on its representations regarding the quality and attributes of its TOUGHCable.

160.    Defendant Ubiquiti owed Plaintiffs and the Class a duty to: (a) act with reasonable care in preparing the information contained in its advertisements, brochures, and marketing materials, and disseminated to Plaintiffs and the Class, and which Plaintiffs and the Class relied upon in deciding to purchase TOUGHCable; and (b) use reasonable care in determining the accuracy of the information contained therein.

161.    Defendant Ubiquiti breached its duty to Plaintiffs and the Class by failing to investigate, test, confirm, and review with reasonable care the information contained in its advertisements, brochures, and marketing materials, and in failing to correct the misstatements,  omissions and inaccuracies contained therein.

162.    Plaintiffs and the Class relied on Defendant's labeling representations set forth herein, and, in reliance thereon, purchased Ubiquiti's TOUGHCable.  The reliance by Plaintiffs and the Class was reasonable and justified in that Defendant Ubiquiti appeared to be, and represented itself to be, a reputable business, and it distributed and sold TOUGHCable through reputable companies.

163.    Defendant Ubiquiti had a legal duty to disclose to Plaintiffs and the Class at all times before the sale of TOUGHCable all facts that would have materially affected the product being utilized to provide the wired communication link between outdoor and indoor equipment.  The complete unsuitability of TOUGHCable for outdoor use was a material fact that would and should have affected the buying and installation decisions of purchasers.

164.    Such knowledge was completely in the possession of Defendant Ubiquiti and was unknown to Plaintiffs and the Class. The failure to disclose such material facts was uniform in the sale of all TOUGHCable.

165.    Defendant Ubiquiti uniformly represented to Plaintiffs and the Class through its written materials that TOUGHCable:

- was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"

- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable.

166.    Defendant Ubiquiti knew, or in the exercise of reasonable diligence should have known, that Plaintiffs and the Class would rely upon such representations.

167.    Plaintiffs and the Class did reasonably rely on those representations. Had Plaintiffs and the Class known about these material facts, they would not have purchased Defendant's TOUGHCable.

168.    As a result of the conduct of Defendant, Plaintiffs and the Class have been damaged.

169.    Deleted.

## THIRD CAUSE OF ACTION
### Breach of Express Warranty against Defendant Ubiquiti

170.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

171.    Defendant Ubiquiti made the following written representations regarding TOUGHCable Level 1 and TOUGHCable Level 2:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

172.    Each of the above statements was a factual description by Ubiquiti of the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2.

173.    Plaintiffs and the Classes relied in good faith upon Defendant Ubiquiti's written representations concerning the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2 in making their determination to purchase TOUGHCable.   The representations listed above were material to Plaintiffs and the Class, and became at least part of the basis of the bargain, if not the entire basis of the bargain, entered into by Plaintiffs and the Classes to purchase TOUGHCable.  Plaintiffs and the Classes would not have purchased TOUGHCable if they had been informed that TOUGHCable Level 1 and/or TOUGHCable Level 2 was not in conformance with these factual affirmations, assurances, and descriptions put forward by Ubiquiti.

174.    Defendant Ubiquiti  breached its express warranties to Plaintiffs and the Classes in that TOUGHCable Level 1 and TOUGHCable Level 2:

- Was not suitable for outdoor use;
- Was not "OUTDOOR CARRIER CLASS SHIELDED;"

- Would not "Protect . . . . networks from the most brutal environments;"

    - Was not actually "industrial-grade shielded Ethernet cable;"

    - Would not allow users to realize "Increase[d] Performance" by using TOUGHCable;

    - Would not "Dramatically improve your Ethernet link states, speeds, and overall performance";

    - Was not appropriate for "Extreme Weatherproof" environments;

    - Was not "built to perform even in the harshest weather and environments";

    - Was not "developed to have increased power handling performance for extended cable run lengths";

    - Would not "Bulletproof [their] networks";

    - Was not available in two versions which offered Shielding Protection.

    - Was not a Category 5e outdoor carrier-class shielded cable.

175.    Defendant Ubiquiti's conduct in manufacturing, marketing, and selling defective TOUGHCable constituted a breach of express warranty, as well as a breach of Defendant Ubiquiti's obligation of good faith and fair dealing.

176.    Plaintiffs and the Classes have performed all conditions, covenants and promises required to be performed on their part in accordance with the express warranties made by Defendant Ubiquiti.

177.    As a direct and proximate result of Defendant Ubiquiti's breach of the express warranty, Plaintiffs and the Classes have been damaged in an amount to be determined at trial but in excess of an aggregate amount of $5,000,000.

178.    Affording Defendant Ubiquiti a reasonable opportunity to cure its breach of express warranty would be unnecessary and futile. At the time of sale of the defective TOUGHCable Defendant Ubiquiti should have known, or was reckless in not knowing of TOUGHCable's defects, but nonetheless failed to rectify the situation and/or disclose the defects. Under the circumstances, affording Defendant Ubiquiti notice and a reasonable opportunity to cure its breach of warranty is excused and thereby deemed satisfied.

179.    In the alternative, prior complaints by Plaintiffs and all other purchasers of TOUGHCable sufficed to give Defendant Ubiquiti notice and an opportunity to cure, however Defendant Ubiquiti failed to cure the breaches of the express warranty.

180.    In the alternative, Plaintiffs and the Classes did not deal directly with defendant Ubiquiti in their purchases of TOUGHCable, but rather, made their purchases of TOUGHCable from third party distributors and resellers.  Therefore, notice from the ultimate purchasers (Plaintiffs and the Class) to the manufacturer (Ubiquiti) was not required.

181.    In the alternative, Plaintiffs, on behalf of themselves and the Classes, provided Defendant Ubiquiti with notice of their and the putative Class members' warranty claims by virtue of letters sent to Defendant Ubiquiti on October 13, 2013, and October 18, 2013, and October 25, 2013, copies of which are attached hereto collectively as Exhibit A.

182.    As of the date of filing of this amended pleading, damage is still manifesting and accruing as previously installed TOUGHCable continues to degrade, disintegrate, and fail.

183.    As a direct and proximate result of Defendant Ubiquiti's breach of its express warranties, Plaintiffs and the Classes have suffered or will suffer damages, which include, without limitation:

     a.  Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

     b.  Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

     c.  Cost of cover cable;

     d.  Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

     e.  Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

     f.  Employee/subcontractor travel time and expenses to replace defective cable;

     g.  Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

     h.  Lost customers, and compensation to damaged customers;

     i.  Lost profits, and

1

2

      j.   Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

3

4

5

**FOURTH CAUSE OF ACTION**

**Breach of Implied Warranty against Defendant Ubiquiti**

6

7

184.   Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

8

9

10

11

12

185.   Defendant Ubiquiti had direct dealings with Plaintiffs and the Classes through its marketing efforts in promoting its TOUGHCable products.  As a result of the direct dealings with Defendant Ubiquiti, Plaintiffs and the Classes purchased Ubiquiti's TOUGHCable from Ubiquiti authorized retailers and distributors.  Plaintiffs and the Classes relied on Ubiquiti's statements regarding the promotional materials, which touted TOUGHCable as:

13

14

15

16

17

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

18

19

20

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

21

22

23

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

24

25

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

26

27

28

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

186.    Plaintiffs also relied on Defendant Ubiquiti's reputation and brand name in selecting Ubiquiti TOUGHCable. Plaintiffs believed Defendant Ubiquiti would exercise skill and judgment to design, manufacture and place in the stream of commerce cable suitable for the purposes for which they were advertised.

187.    Defendant Ubiquiti impliedly warranted that their TOUGHCable was fit for the purpose for which it was intended, and free of defects.  Plaintiffs and the Classes are the intended beneficiaries of Defendant Ubiquiti's implied warranties.

188.    Plaintiffs and the Classes have performed all conditions, covenants and promises required to be performed on their part in accordance with the warranties.

189.    Defendant breached the warranties by undertaking the wrongful acts herein alleged.

190.    As a result of Defendant's breach of the warranty, Plaintiffs and the Classes have suffered economic losses and other general, consequential and specific damages, including, but not limited to the following:

a.   Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

b.   Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

c.   Cost of cover cable;

d.   Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

e.   Employee/ subcontractor time and expenses (and benefits) associated with replacement of defective cable;

f.   Employee / subcontractor travel time and expenses to replace defective cable;

g.  Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

h.  Lost customers, and compensation to damaged customers;

i.  Lost profits, and

j.  Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Breach of Express Warranty against Defendant Streakwave**

191.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

192.    Defendant Streakwave made the following written representations regarding TOUGHCable Level 1 and TOUGHCable Level 2:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

193.     Each of the above statements was a factual description by Streakwave of the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2.

194.     Plaintiffs and the Classes relied in good faith upon Defendant Streakwave's written representations concerning the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2 in making their determination to purchase TOUGHCable.   The representations listed above were material to Plaintiffs and the Class, and became at least part of the basis of the bargain, if not the entire basis of the bargain, entered into by Plaintiffs and the Classes to purchase TOUGHCable.  Plaintiffs and the Classes would not have purchased TOUGHCable if they had been informed that TOUGHCable Level 1 and/or TOUGHCable Level 2 was not in conformance with these factual affirmations, assurances, and descriptions put forward by Streakwave.

195.     Defendant Streakwave  breached its express warranties to Plaintiffs and the Classes in that TOUGHCable Level 1 and TOUGHCable Level 2:

- Was not suitable for outdoor use;
- Was not "OUTDOOR CARRIER CLASS SHIELDED;"
- Would not "Protect . . . . networks from the most brutal environments;"
- Was not actually "industrial-grade shielded Ethernet cable;"
- Would not allow users to realize "Increase[d] Performance" by using TOUGHCable;
- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance";
- Was not appropriate for "Extreme Weatherproof" environments;
- Was not "built to perform even in the harshest weather and

environments";

- Was not "developed to have increased power handling performance for extended cable run lengths";
- Would not "Bulletproof [their] networks";
- Was not available in two versions which offered Shielding Protection.
- Was not a Category 5e outdoor carrier-class shielded cable.

196.    Defendant Streakwave's conduct in marketing and selling defective TOUGHCable constituted a breach of express warranty, as well as a breach of Defendant Streakwave's obligation of good faith and fair dealing.

197.    Plaintiffs and the Classes have performed all conditions, covenants and promises required to be performed on their part in accordance with the express warranties made by Defendant Streakwave.

198.    As a direct and proximate result of Defendant Streakwave's breach of the express warranty, Plaintiffs and the Classes have been damaged in an amount to be determined at trial but in excess of an aggregate amount of $5,000,000.

199.    Affording Defendant Streakwave a reasonable opportunity to cure its breach of express warranty would be unnecessary and futile. At the time of sale of at least some of the defective TOUGHCable, Defendant Streakwave should have known, or was reckless in not knowing of TOUGHCable's defects, but nonetheless failed to rectify the situation and/or disclose the defects. Under the circumstances, affording Defendant Streakwave notice and a reasonable opportunity to cure its breach of warranty is excused and thereby deemed satisfied.

200.    In the alternative, prior complaints by Plaintiffs and all other purchasers of TOUGHCable sufficed to give Defendant Streakwave notice and an opportunity to cure, however Defendant Streakwave failed to cure the breaches of the express warranty.

201.    In the alternative, Plaintiffs, on behalf of themselves and the Classes, provided Defendant Streakwave with notice of their and the putative Class members' warranty claims by virtue of letters sent to Defendant Streakwave on October 13, 2013, and October 18, 2013, and October 25, 2013, copies of which are attached hereto collectively as Exhibit B.

202.    As of the date of filing of this amended pleading, damage is still manifesting

and accruing as previously installed TOUGHCable continues to degrade, disintegrate, and fail.

203.    As a direct and proximate result of Defendant Streakwave's breach of its express warranties, Plaintiffs and the Classes have suffered or will suffer damages, which include, without limitation:

      a.   Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

      b.   Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

      c.   Cost of cover cable;

      d.   Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

      e.   Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

      f.   Employee/subcontractor travel time and expenses to replace defective cable;

      g.   Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

      h.   Lost customers, and compensation to damaged customers;

      i.   Lost profits, and

      j.   Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**Breach of Implied Warranty against Defendant Streakwave**

204.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

205.    Defendant Streakwave had direct dealings with Plaintiffs and the Classes through its marketing efforts in promoting its TOUGHCable products.  As a result of the direct dealings with Defendant Streakwave, Plaintiffs and the Classes purchased Ubiquiti's TOUGHCable from Streakwave.  Plaintiffs and the Classes relied on Streakwave's publication of Ubiquiti's promotional materials, which touted TOUGHCable as:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

206.     Plaintiffs also relied on Defendant Streakwave's reputation and brand name in selecting Ubiquiti TOUGHCable as a product to offer for sale and distribution. Plaintiffs believed Defendant Streakwave would exercise skill and judgment to in the selection, marketing and sale of cable suitable for the purposes for which they were advertised.

207.     Defendant Streakwave impliedly warranted that their TOUGHCable was fit for the purpose for which it was intended, and free of defects.  Plaintiffs and the Classes are the intended beneficiaries of Defendant Streakwave's implied warranties.

208. Plaintiffs and the Classes have performed all conditions, covenants and promises required to be performed on their part in accordance with the warranties.

209. Defendant breached the warranties by undertaking the wrongful acts herein alleged.

210. As a result of Defendant's breach of the warranty, Plaintiffs and the Classes have suffered economic losses and other general, consequential and specific damages, including, but not limited to the following:

    k. Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

    l. Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

    m. Cost of cover cable;

    n. Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

    o. Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

    p. Employee/subcontractor travel time and expenses to replace defective cable;

    q. Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

    r. Lost customers, and compensation to damaged customers;

    s. Lost profits, and

Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Against All Defendants**
**(Breach of Written Warranty Pursuant To**
**The Magnuson-Moss Warranty Act)**

216. Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

217. Plaintiffs and the other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

218.    Defendants are "suppliers" and "warrantors" within the meaning of sections 2301(4)-(5).

219.    TOUGHCable is a "consumer product" within the meaning of section 2301(1).

220.    Defendants' descriptive statements concerning TOUGHCable constitute a "written warranty" within the meaning of section 2301(6).

221.    Defendants breached the express warranty by providing TOUGHCable to Plaintiffs and the Classes that:

- Was not suitable for outdoor use;
- Was not "OUTDOOR CARRIER CLASS SHIELDED;"
- Would not "Protect . . . . networks from the most brutal environments;"
- Was not actually "industrial-grade shielded Ethernet cable;"
- Would not allow users to realize "Increase[d] Performance" by using TOUGHCable;
- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance";
- Was not appropriate for "Extreme Weatherproof" environments;
- Was not "built to perform even in the harshest weather and environments";
- Was not "developed to have increased power handling performance for extended cable run lengths";
- Would not "Bulletproof [their] networks";
- Was not available in two versions which offered Shielding Protection.
- Was not a Category 5e outdoor carrier-class shielded cable.

222.    Defendants' breach of the express warranty has deprived the Plaintiffs and the other Class members of the benefit of their bargain.

223.    The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

224.    At no time during the purchase and sale the Ubiquiti TOUGHCable, was any limitation of warranty, limitation of liability, limitation of damage, or requirement for alternative dispute procedures communicated to Plaintiffs or members of the Class.

225.    Defendants have been afforded a reasonable opportunity to cure its breach of written warranty.

226.    As a direct and proximate result of Defendants' breach of its express written warranties, Plaintiffs and the Classes members have suffered damages and other losses in an amount to be determined at trial. Accordingly, Plaintiffs and the Classes are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.


**EIGHTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**Asserted by Plaintiff Peak Internet On Behalf of the Colorado Class Members**

227.    Plaintiff Peak Internet, on behalf of itself and the Colorado Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

228.    Pursuant to COLO. REV. STAT. § 4-2-313(1)(a), "any affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Additionally, "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Id*. at § 4- 2-313(1)(b). "It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty . . . ." *Id*. at § 4-2-313(2).

229.    Plaintiff is informed and believes, and thereon alleges, that Defendants engaged in extensive marketing and advertising, including, but not limited to, print, electronic media, internet, and direct marketing through agents, to promote and sell TOUGHCable as:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

230.  Each of the above statements was a factual description by Defendants of the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2.

231.  Plaintiff Peak Internet and the Colorado Subclass relied in good faith upon Defendants written representations concerning the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2 in making their determination to purchase TOUGHCable.   The representations listed above were material to Plaintiff Peak Internet and the Colorado Subclass, and became at least part of the basis of the bargain, if not the entire

basis of the bargain, entered into by Plaintiffs and the Classes to purchase TOUGHCable. Plaintiff Peak Internet and the Colorado Subclass would not have purchased TOUGHCable if they had been informed that TOUGHCable Level 1 and/or TOUGHCable Level 2 was not in conformance with these factual affirmations, assurances, and descriptions put forward by Defendants.

232.   The TOUGHCable did not conform to Defendant's representation because:

- Was not suitable for outdoor use;

- Was not "OUTDOOR CARRIER CLASS SHIELDED;"

- Would not "Protect . . . . networks from the most brutal environments;"

- Was not actually "industrial-grade shielded Ethernet cable;"

- Would not allow users to realize "Increase[d] Performance" by using TOUGHCable;

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance";

- Was not appropriate for "Extreme Weatherproof" environments;

- Was not "built to perform even in the harshest weather and environments";

- Was not "developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof [their] networks";

- Was not available in two versions which offered Shielding Protection.

- Was not a Category 5e outdoor carrier-class shielded cable.

233.   The defects in the description of TOUGHCable constitute a breach of the express warranties.

234.   Plaintiff Peak Internet, on behalf of itself and the Colorado Subclass, has satisfied all conditions precedent necessary to bring this action.

235.   Defendants have received sufficient and timely notice of the breaches of warranty alleged herein. Despite this notice and Defendants' knowledge of the defects in the

TOUGHCable, Defendants have failed and refused to honor their warranty, even though they know of the defect inherent in the TOUGHCable.

236.    Plaintiff Peak Internet and the Colorado Subclass have given Defendants a reasonable opportunity to cure their failures with respect to their warranty, and Defendants have failed to do so.

237.    The failure of the TOUGHCable to perform as expressly warranted by Defendants has caused Plaintiff Peak Internet and the Colorado Subclass economic damages as herein described.

238.    Plaintiff Peak Internet, on behalf of itself and the Colorado Subclass, seek all available remedies and damages for Defendants' breach of express warranty.

**NINTH CAUSE OF ACTION:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Asserted by Plaintiff Peak Internet On Behalf of the Colorado Class Members**

239.    Plaintiff Peak Internet, on behalf of itself and the Colorado Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

240.    Pursuant to COLO. REV. STAT. § 4-2-314(1)-(2), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

241.    "Goods to be merchantable must be at least such as: (a) Pass without objection in the trade under the contract description; and (b) In the case of fungible goods, are of fair average quality within the description; and (c) Are fit for the ordinary purposes for which such goods are used; and (d) Run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and (e) Are adequately contained, packaged, and labeled as the agreement may require; and (f) Conform to the promises or affirmations of fact made on the container or label if any."

242.    Here, Defendants are considered merchants with respect to the sale of TOUGHCable.

243.    Plaintiff is informed and believes, and thereon alleges, that Defendants engaged in extensive marketing and advertising, including, but not limited to, print, electronic media, internet, and direct marketing through agents, to promote and sell TOUGHCable as:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

244.     TOUGHCable, however, did not pass without objection in the trade under the contract description; and was not fit for the ordinary purposes for which such goods are used; and was not of even kind, quality, and quantity within each unit and among all units involved; and was not adequately contained, packaged, and labeled as the agreement may require; and did not conform to the promises or affirmations of fact made on the container or label, in that TOUGHCable:

- Was not suitable for outdoor use;
- Was not "OUTDOOR CARRIER CLASS SHIELDED;"

- Would not "Protect . . . . networks from the most brutal environments;"

- Was not actually "industrial-grade shielded Ethernet cable;"

- Would not allow users to realize "Increase[d] Performance" by using TOUGHCable;

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance";

- Was not appropriate for "Extreme Weatherproof" environments;

- Was not "built to perform even in the harshest weather and environments";

- Was not "developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof [their] networks";

- Was not available in two versions which offered Shielding Protection.

- Was not a Category 5e outdoor carrier-class shielded cable.

245. Based on the forgoing, TOUGHCable did not conform to Defendants' statements, assurances, and descriptions.

246. The above discussed defects constitute a breach of the implied warranty of merchantability.

247. The failure of the TOUGHCable, as expressly and impliedly warranted by Defendants has caused Plaintiff Peak Internet and the Colorado Subclass economic damages as herein described.

248. Plaintiff Peak Internet, on behalf of itself and the Colorado Subclass, has satisfied all conditions precedent necessary to bring this action, including Notice.

249. Therefore, Plaintiff Peak Internet, on behalf of itself and the Colorado Subclass, seeks all available remedies and damages for Defendants breach of implied warranty.

**TENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**Asserted by Plaintiff Freeway Networks On Behalf of the Arizona Class Members**

250.   Plaintiff Freeway Networks, on behalf of itself and the Arizona Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

251.   Pursuant ARIZ. REV. STAT. § 47-2313(A)(1), "any affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Additionally, "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Id*. at § 47-2313(A)(2). "It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty . . . ." *Id*. at § 47-2313(B).

252.   Plaintiff is informed and believes, and thereon alleges, that Defendants engaged in extensive marketing and advertising, including, but not limited to, print, electronic media, internet, and direct marketing through agents, to promote and sell TOUGHCable as:

> **TOUGHCable**
>
> **OUTDOOR CARRIER CLASS SHIELDED**
>
> - Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.
>
> **Increase Performance**
>
> - Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.
>
> **Extreme Weatherproof**
>
> - TOUGHCables have been built to perform even in the harshest weather and environments.
>
> **Extended Cable Support**
>
> - TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

253.    Each of the above statements was a factual description by Defendants of the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2.

254.    Plaintiff Freeway Networks and the Arizona Subclass relied in good faith upon Defendants written representations concerning the characteristics, properties, and qualities of TOUGHCable Level 1 and TOUGHCable Level 2 in making their determination to purchase TOUGHCable.   The representations listed above were material to Plaintiff Freeway Networks and the Arizona Subclass, and became at least part of the basis of the bargain, if not the entire basis of the bargain, entered into by Plaintiffs and the Classes to purchase TOUGHCable.  Plaintiff Freeway Networks and the Arizona Subclass would not have purchased TOUGHCable if they had been informed that TOUGHCable Level 1 and/or TOUGHCable Level 2 was not in conformance with these factual affirmations, assurances, and descriptions put forward by Defendants.

255.    The TOUGHCable did not conform to Defendant's representation because:

- Was not suitable for outdoor use;
- Was not "OUTDOOR CARRIER CLASS SHIELDED;"
- Would not "Protect . . . . networks from the most brutal environments;"
- Was not actually "industrial-grade shielded Ethernet cable;"
- Would not allow users to realize "Increase[d] Performance" by using TOUGHCable;
- Would not "Dramatically improve your Ethernet link states, speeds,

and overall performance";

- Was not appropriate for "Extreme Weatherproof" environments;

- Was not "built to perform even in the harshest weather and environments";

- Was not "developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof [their] networks";

- Was not available in two versions which offered Shielding Protection.

- Was not a Category 5e outdoor carrier-class shielded cable.

250.    The defects in the description of TOUGHCable constitute a breach of the express warranties.

251.    Plaintiff Freeway Networks, on behalf of itself and the Arizona Subclass, has satisfied all conditions precedent necessary to bring this action.

252.    Defendants have received sufficient and timely notice of the breaches of warranty alleged herein. Despite this notice and Defendants' knowledge of the defects in the TOUGHCable, Defendants have failed and refused to honor their warranty, even though they know of the defect inherent in the TOUGHCable.

253.    Plaintiff Freeway Networks and the Arizona Subclass have given Defendants a reasonable opportunity to cure their failures with respect to their warranty, and Defendants have failed to do so.

254.    The failure of the TOUGHCable to perform as expressly warranted by Defendants has caused Plaintiff Freeway Networks and the Arizona Subclass economic damages as herein described.

255.    Plaintiff Freeway Networks, on behalf of itself and the Arizona Subclass, seek all available remedies and damages for Defendants' breach of express warranty.

## ELEVENTH CAUSE OF ACTION:
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Asserted by Plaintiff Freeway Networks On Behalf of the Arizona Class Members

256.    Plaintiff Freeway Networks, on behalf of itself and the Arizona Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

257.     Pursuant to ARIZ. REV. STAT. § 47-2314(A)-(2), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

258.     "Goods to be merchantable must be at least such as: (a) Pass without objection in the trade under the contract description; and (b) In the case of fungible goods, are of fair average quality within the description; and (c) Are fit for the ordinary purposes for which such goods are used; and (d) Run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and (e) Are adequately contained, packaged, and labeled as the agreement may require; and (f) Conform to the promises or affirmations of fact made on the container or label if any."

259.     Here, Defendants are considered merchants with respect to the sale of TOUGHCable.

260.     Plaintiff is informed and believes, and thereon alleges, that Defendants engaged in extensive marketing and advertising, including, but not limited to, print, electronic media, internet, and direct marketing through agents, to promote and sell TOUGHCable as:

**TOUGHCable**

**OUTDOOR CARRIER CLASS SHIELDED**

- Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**

- Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**

- TOUGHCables have been built to perform even in the harshest weather and environments.

**Extended Cable Support**

- TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

**Bulletproof your networks**

- TOUGHCable is currently available in two versions:

Level 1 Shielding Protection and Level 2 Shielding Protection.

- **Level 1** is a Category 5e outdoor carrier-class shielded cable.
- **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

261.    TOUGHCable, however, did not pass without objection in the trade under the contract description; and was not fit for the ordinary purposes for which such goods are used; and was not of even kind, quality, and quantity within each unit and among all units involved; and was not adequately contained, packaged, and labeled as the agreement may require; and did not conform to the promises or affirmations of fact made on the container or label, in that TOUGHCable:

- Was not suitable for outdoor use;
- Was not "OUTDOOR CARRIER CLASS SHIELDED;"
- Would not "Protect . . . . networks from the most brutal environments;"
- Was not actually "industrial-grade shielded Ethernet cable;"
- Would not allow users to realize "Increase[d] Performance" by using TOUGHCable;
- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance";
- Was not appropriate for "Extreme Weatherproof" environments;
- Was not "built to perform even in the harshest weather and environments";
- Was not "developed to have increased power handling performance for extended cable run lengths";
- Would not "Bulletproof [their] networks";
- Was not available in two versions which offered Shielding Protection.
- Was not a Category 5e outdoor carrier-class shielded cable.

262.    Based on the forgoing, TOUGHCable did not conform to Defendants' statements, assurances, and descriptions.

263.    The above discussed defects constitute a breach of the implied warranty of merchantability.

264.    The failure of the TOUGHCable, as expressly and impliedly warranted by Defendants has caused Plaintiff Freeway Networks and the Arizona Subclass economic damages as herein described.

265.    Plaintiff Freeway Networks, on behalf of itself and the Arizona Subclass, has satisfied all conditions precedent necessary to bring this action, including Notice.

266.    Therefore, Plaintiff Freeway Networks, on behalf of itself and the Arizona Subclass, seeks all available remedies and damages for Defendants breach of implied warranty.

**TWELFTH CAUSE OF ACTION:**
**(Violation of Colorado's Consumer Protection Act**
**("CCPA") C.R.S. §§6-1-101, *et seq.*)**
**Asserted by Plaintiff Peak Internet against all Defendants On Behalf of the**
**Colorado Class Members**

267.    Plaintiff Peak Internet, on behalf of itself and the Colorado Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

268.    Defendants' business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the CCPA.

269.    At all relevant times, Defendants were a "person" engaged in "trade or commerce" within the meaning of the CCPA and its actions and inactions significantly impacted the public as consumers of TOUGHCable.

270.    The practices of Defendants violate the CCPA for, *inter alia*, one or more of the following reasons:

a.    Defendants represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

b.    Defendants provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements and other information to consumers regarding the performance, reliability, quality and nature of the TOUGHCable;

c.    Defendants represented that TOUGHCable was of a particular standard, quality, or grade, when it was of another;

d.    Defendants engaged in unconscionable commercial practices in failing to reveal

material facts and information about the TOUGHCable, which did, or tended to, mislead Plaintiff Peak Internet and the Colorado Class about facts that could not reasonably be known by the consumer;

e.   Defendants failed to disclose material information concerning the TOUGHCable, the omission of which would tend to mislead or deceive consumers, including Plaintiff Peak Internet and the Colorado Class.

271.   The foregoing acts, omissions and practices proximately caused Peak Internet and other members of the Colorado Class to suffer an ascertainable loss in the form of monies spent to replace the TOUGHCable, and are entitled to recover such damages, together with attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of itself and the Class, prays for judgment against Defendant granting the following relief:

a.   An order certifying this case as a class action and appointing Plaintiffs' counsel to represent the Class;

b.   All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

d.   Pre-judgment and post-judgment interest on any amounts;

g.   Payment of reasonable attorneys' fees and costs as may be allowable under applicable law; and

h.   Such other relief as the Court may deem just and proper.

DATED: December 9, 2013                    PARISI & HAVENS LLP
                                           LAW OFFICES OF ALAN HIMMELFARB


                                           s/Suzanne Havens Beckman
                                           By:   Suzanne Havens Beckman

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

THE LAW OFFICES OF ALAN
HIMMELFARB
80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299

# JURY TRIAL DEMAND

The Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: December 9, 2013

PARISI & HAVENS LLP
LAW OFFICES OF ALAN HIMMELFARB

s/Suzanne Havens Beckman
By:   Suzanne Havens Beckman

THE LAW OFFICES OF ALAN
HIMMELFARB
80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, California 91403
Telephone: (818) 990-1299

Exhibit A

## LAW OFFICES OF ALAN HIMMELFARB

80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA  91024
(626) 325-3104

October 3, 2013

Via:  U.S. Mail: Certified Return Receipt Requested

Ubiquiti Networks
2580 Orchard Parkway
San Jose, CA 95131

## NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of Tasion Communications, Inc., dba Planet Telecom ("Tasion").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Tasion on the following dates:  March 8, 2011; March 18, 2011; April 20, 2011; April 27, 2011; May 3, 2011; May 20, 2011; July 13, 2011; October 24, 2011; and February 3, 2012.

This notification of breach of warranty is brought on behalf of Tasion as an individual entity, and on behalf of a class of all persons and entities who purchased Ubiquiti TOUGHCable Level 1 and/or Ubiquiti TOUGHCable Level 2 (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Tasion and the Class all damages sustained by Tasion and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

## LAW OFFICES OF ALAN HIMMELFARB

**80 W. Sierra Madre Blvd., # 304**
**Sierra Madre, CA 91024**
**(626) 325-3104**

October 18, 2013

Via:  U.S. Mail: Certified Return Receipt Requested

Ubiquiti Networks
2580 Orchard Parkway
San Jose, CA 95131

### NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of International Power Systems, LLC, doing business as Freeway Networks ("Freeway Networks").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Freeway Networks on the following date:  February 21, 2011: and with your sales of Ubiquiti TOUGHCable Level 2 to Freeway Networks on the following dates:  September 21, 2011; September 22, 2011; October 24, 2011; and February 7, 2012.

This notification of breach of warranty is brought on behalf of Freeway Networks as an individual entity, and on behalf of a class of all persons and entities who purchased Ubiquiti TOUGHCable Level 1 and/or Ubiquiti TOUGHCable Level 2 (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Freeway Networks and the Class all damages sustained by Freeway Networks and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

**LAW OFFICES OF ALAN HIMMELFARB**

**80 W. Sierra Madre Blvd., # 304**
**Sierra Madre, CA  91024**
**(626) 325-3104**

October 25, 2013

<u>Via:  U.S. Mail: Certified Return Receipt Requested</u>

Ubiquiti Networks
2580 Orchard Parkway
San Jose, CA 95131

## <u>NOTICE OF BREACH OF WARRANTY</u>

This Notice of Breach of Warranty is made on behalf of Fundamental Holdings, Corp., doing business as Peak Internet ("Peak Internet").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with the sale of Ubiquiti TOUGHCable Level 1 to Peak Internet on the following date (and on other occasions): October 12, 2011.

This notification of breach of warranty is brought on behalf of Peak Internet as an individual entity, and on behalf of a class of all persons and entities who purchased Ubiquiti TOUGHCable Level 1 and/or Ubiquiti TOUGHCable Level 2 (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Peak Internet and the Class all damages sustained by Peak Internet and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

Exhibit B

## LAW OFFICES OF ALAN HIMMELFARB

80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA  91024
(626) 325-3104

October 3, 2013

<u>Via:  U.S. Mail: Certified Return Receipt Requested</u>

Streakwave Wireless Inc.
840 Jury Ct.
San Jose, CA 95112

### NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of Tasion Communications, Inc., dba Planet Telecom ("Tasion").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Tasion on the following dates:  March 8, 2011; March 18, 2011; April 20, 2011; April 27, 2011; May 3, 2011; May 20, 2011; July 13, 2011; October 24, 2011; and February 3, 2012.

This notification of breach of warranty is brought on behalf of Tasion as an individual entity, and on behalf of a class of all persons and entities who purchased TOUGHCable Level 1 and/or TOUGHCable Level 2 from Streakwave Wireless Inc. (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Tasion and the Class all damages sustained by Tasion and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

## LAW OFFICES OF ALAN HIMMELFARB

80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA  91024
(626) 325-3104

October 18, 2013

<u>Via:  U.S. Mail: Certified Return Receipt Requested</u>

Streakwave Wireless Inc.
840 Jury Ct.
San Jose, CA 95112

### NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of International Power Systems,
LLC, doing business as Freeway Networks ("Freeway Networks").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and
implied warranty of merchantability in connection with your sale of Ubiquiti
TOUGHCable Level 1 to Freeway Networks on the following date:  February 21, 2011:
and with your sales of Ubiquiti TOUGHCable Level 2 to Freeway Networks on the
following dates:  September 21, 2011; September 22, 2011; October 24, 2011; and
February 7, 2012.

This notification of breach of warranty is brought on behalf of Freeway Networks as an
individual entity, and on behalf of a class of all persons and entities who purchased
TOUGHCable Level 1 and/or TOUGHCable Level 2 from Streakwave Wireless Inc. (the
"Class").

You are hereby afforded an opportunity to cure by reimbursing to Freeway Networks and
the Class all damages sustained by Freeway Networks and the Class resulting from their
purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of
this matter.

Sincerely yours,

Alan Himmelfarb

# LAW OFFICES OF ALAN HIMMELFARB

80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA  91024
(626) 325-3104

October 25, 2013

<u>Via:  U.S. Mail: Certified Return Receipt Requested</u>

Streakwave Wireless Inc.
840 Jury Ct.
San Jose, CA 95112

## NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of Fundamental Holdings, Corp.,
doing business as Peak Internet ("Peak Internet").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and
implied warranty of merchantability in connection with your sale of Ubiquiti
TOUGHCable Level 1 to Peak Internet on the following date (and on other occasions):
October 12, 2011.

This notification of breach of warranty is brought on behalf of Peak Internet as an
individual entity, and on behalf of a class of all persons and entities who purchased
TOUGHCable Level 1 and/or TOUGHCable Level 2 from Streakwave Wireless Inc. (the
"Class").

You are hereby afforded an opportunity to cure by reimbursing to Peak Internet and the
Class all damages sustained by Peak Internet and the Class resulting from their purchase,
use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of
this matter.

Sincerely yours,

Alan Himmelfarb

**Exhibit C**

Datasheet



# **TOUGH**Cable™

Outdoor Carrier Class Shielded Ethernet Cable

Models: Level 1/Level 2, TOUGHCable Connectors

Increase Performance

Extreme Weather-Proof

ESD Damage Protection

Extended Cable Support



# TOUGHCable
## OUTDOOR CARRIER CLASS SHIELDED

Datasheet

TOUGHCable ™

Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**  Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**  TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**  Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**  TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.



## TOUGHCable Connectors

Specifically designed for use with Ubiquiti TOUGHCables and available in 100 pc. bags, TOUGHCable Connectors protect against ESD attacks and Ethernet hardware damage while allowing rapid field deployment without soldering.

## Bulletproof your networks

TOUGHCable is currently available in two versions: Level 1 Shielding Protection and Level 2 Shielding Protection.

**Level 1**  is a Category 5e outdoor carrier-class shielded cable.

**Level 2**  is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

**Additional Information:**

• 24 AWG copper conductor pairs
• 26 AWG integrated ESD drain wire to prevent ESD attacks & damage
• PE outdoor-rated weatherproof jacket
• Multi-layered shielding
• Available in 1000 ft (304.8 m) length

ESD attacks are overwhelmingly the leading cause for device failures. The diagram below illustrates the areas vulnerable to ESD attacks in a defenseless network.

By using a grounded Ubiquiti Power over Ethernet (PoE) adapter along with Ubiquiti TOUGHCable and TOUGHCable Connectors, you can effectively protect against ESD attacks.



Unshielded cable with no ESD Drain

POE Adapter with no earth ground



Ubiquiti TOUGHCable

Ubiquiti POE Adapter

www.ubnt.com/toughcable

# Specifications

| Level 1 Specifications | | |
|---|---|---|
| | Cable | CAT5e, Shielded |
| | Ethernet Support | Up to 1 Gbps |
| | Conductor Wire Gauge | 24 AWG |
| | Conductor | Solid bare copper |
| | Conductor Diameter | 0.500±0.005 mm |
| | Insulation Type | Solid PE |
| | Insulation Thickness | AVG: 0.26mm, MIN: 0.25 mm |
| | Insulation Diameter | 1.04±0.03 mm |
| Level 1 Shielding Protection | Separation (Polyester Wrapping) | Thick: 0.025mm, Extent: 20 mm |
| | Anti-Crosstalk Divider | None |
| | Cable Shield (Aluminum Foil) | Thick: 0.060 mm, Extent: 18 mm |
| | ESD Drain Wire | 0.4 CCS |
| | Rip Cord | Yes |
| | Jacket Material | PE |
| | Jacket Thickness | AVG: 0.50mm, MIN: 0.46 mm |
| | Jacket Outer Diameter | 6.0±0.30 mm |
| | Jacket Color | Gray |
| | Reference Standard | ISO/IEC 11801, TIA/EIA568B.2 |

| Level 1 Performance | | | | | |
|---|---|---|---|---|---|
| Frequency (MHz) | RL (dB) min. | Attenuation (dB/100m) | NEXT/PSNEXT (dB) | ACR (dB) | ELFEXT/PSELFEXT (dB/100m) |
| 1 | 17.0 | 2.03 | 62.30 | 60.30 | 60.75 |
| 4 | 18.8 | 4.04 | 53.26 | 49.20 | 48.71 |
| 8 | 19.7 | 5.76 | 48.75 | 43.00 | 42.69 |
| 10 | 20.0 | 6.46 | 47.30 | 40.80 | 40.75 |
| 16 | 20.0 | 8.24 | 44.30 | 36.10 | 36.67 |
| 20 | 20.0 | 9.26 | 42.78 | 33.50 | 34.73 |
| 25 | 19.3 | 10.41 | 41.33 | 30.90 | 32.79 |
| 31.25 | 18.6 | 11.72 | 39.87 | 28.20 | 30.86 |
| 62.5 | 16.5 | 16.99 | 35.36 | 18.40 | 24.83 |
| 100 | 15.1 | 21.97 | 32.29 | 10.30 | 20.75 |
| 150 | 13.80 | 23.40 | 18.60/30.30 | 8.30 | 17.60/18.50 |



# LEVEL 1
### SHIELDING PROTECTION



Conductor
Insulation
ESD Drain Wire
Separation
Cable Shield
Rip Cord
Weatherproof Jacket

www.ubnt.com/toughcable

TOUGHCable™ | Datasheet

3

# Specifications

**TOUGH**Cable ™ | Datasheet

Level 2 Shielding Protection

| Level 2 Specifications | |
|---|---|
| Cable | CAT5e, Shielded |
| Ethernet Support | 1 Gbps |
| Conductor Wire Gauge | 24 AWG |
| Conductor | Solid bare copper |
| Conductor Diameter | 0.500±0.005 mm |
| Insulation Type | Solid PE |
| Insulation Thickness | AVG: 0.295mm, MIN: 0.29 mm |
| Insulation Diameter | 1.16±0.02 mm |
| Separation (Polyester Wrapping) | Thick: 0.025mm, Extent: 20 mm |
| Anti-Crosstalk Divider | LDPE: 4.2*0.3 mm |
| Cable Shield (Aluminum Foil) | Thick: 0.060 mm, Extent: 20 mm |
| ESD Drain Wire | 0.4 TC |
| Rip Cord | Yes |
| Secondary Cable Shield (Braid) | 16*8*0.16AA  Density: 95% |
| Jacket Material | PE |
| Jacket Thickness | AVG: 0.52mm, MIN: 0.46 mm |
| Jacket Outer Diameter | 6.8±0.30 mm |
| Jacket Color | Gray |
| Reference Standard | ISO/IEC 11801, TIA/EIA568B.2 |

| Level 2 Performance | | | | | |
|---|---|---|---|---|---|
| Frequency (MHz) | RL (dB) min. | Attenuation (dB/100m) | NEXT/PSNEXT (dB) | ACR (dB) | ELFEXT/PSELFEXT (dB/100m) |
| 1 | 18.0 | 1.93 | 65.30 | 60.30 | 61.00 |
| 4 | 19.9 | 3.90 | 56.27 | 49.20 | 48.96 |
| 8 | 20.7 | 5.50 | 51.75 | 43.00 | 42.94 |
| 10 | 21.0 | 6.30 | 50.30 | 40.80 | 41.00 |
| 16 | 21.0 | 8.00 | 47.24 | 36.10 | 36.92 |
| 20 | 21.0 | 9.00 | 45.78 | 33.50 | 34.98 |
| 25 | 20.3 | 10.20 | 44.33 | 30.90 | 33.04 |
| 31.25 | 19.5 | 11.50 | 42.88 | 28.20 | 31.10 |
| 62.5 | 19.0 | 16.70 | 38.36 | 18.40 | 25.08 |
| 100 | 18.3 | 21.70 | 35.30 | 10.30 | 21.00 |
| 200 | 16.5 | 32.20 | 30.78/27.78 | 7.60 | 17.78/14.98W |



**LEVEL 2**

SHIELDING PROTECTION

- Conductor
- Insulation
- Anti-Crosstalk Divider
- ESD Drain Wire
- Separation
- Cable Shield
- Secondary Cable Shield
- Rip Cord
- Weatherproof Jacket

www.ubnt.com/toughcable

4

Datasheet

TOUGHCable™



TERMS OF USE: The Ubiquiti radio device must be professionally installed. Shielded ethernet cable and earth grounding must be used as conditions of product warranty. It is the installers responsibility to follow local country regulations including operation within legal frequency channels, output power, and Dynamic Frequency Selection (DFS) requirements.

For further information, please visit www.ubnt.com.

All specifications in this document are subject to change without notice.                    MA072211

© 2011 Ubiquiti Networks, Inc. All rights reserved                                         www.ubnt.com