1  Alan Himmelfarb
   consumerlaw1@earthlink.net
2  The Law Offices of Alan Himmelfarb
   80 W. Sierra Madre Blvd. #80
3  Sierra Madre, California 91024
   Telephone: (626) 325-3104
4
5  David C. Parisi (SBN 162248)
   dcparisi@parisihavens.com
6  Suzanne Havens Beckman (SBN 188814)
   shavens@parisihavens.com
7  PARISI & HAVENS LLP
   212 Marine Street, Suite 100
8  Santa Monica, California 90405
   Telephone: (818) 990-1299
9  Facsimile: (818) 501-7852
10
11 Attorneys for Plaintiffs
12
13          IN THE UNITED STATES DISTRICT COURT
14       FOR THE NORTHERN DISTRICT OF CALIFORNIA
15
   TASION COMMUNICATIONS, INC., a   )   CASE No. 3:13-CV-01803-EMC
16 Canadian corporation, dba Planet Telecom,  )
   on behalf of itself and all others similarly  )   **PLAINTIFFS' SECOND AMENDED**
17 situated,                        )   **CLASS ACTION COMPLAINT**
                                    )
18              Plaintiffs,         )   **DEMAND FOR JURY**
                                    )
19         v.                       )
                                    )
20 UBIQUITI NETWORKS, INC. a Delaware  )
   corporation,                     )
21                                  )
                                    )
22              Defendant.          )
                                    )
23                                  )
                                    )
24                                  )
                                    )
25
26
27
28
   ─────────────────────────────────────────────
        PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT
                          1

Plaintiff Tasion Communications Inc., a Canadian corporation, doing business as Planet Telecom ("Planet Telecom"), International Power Systems, LLC, an Arizona limited Liability corporation doing business as Freeway Networks ("Freeway Networks"), and Fundamental Holdings, Corp., a Delaware corporation based in Colorado doing as Peak Internet ("Peak Internet") (collectively, "Plaintiffs") by and through their attorneys, state this Second Amended Complaint (SAC) against Defendant Ubiquiti Networks, Inc., ("Ubiquiti"), and Defendant Streakwave Wireless, Inc. ("Streakwave") (collectively "Defendants"). Plaintiffs' allegations are based on information and belief, except to their own actions, which are based on knowledge.  Plaintiffs' allegations on information and belief are based on the investigation of their counsel and facts that are a matter of public record.

## NATURE OF THE CLAIM

1.      Ubiquiti Networks, Inc. ("Ubiquiti") is a communications technology company. Ubiquiti designs, manufactures, and sells broadband wireless products.

2.      Streakwave Wireless, Inc. ("Streakwave") is a seller/distributor of wireless broadband networking equipment, including equipment manufactured by Ubiquiti.

3.      In late 2010, Ubiquiti announced a new shielded cable product, which it called "TOUGHCable."  TOUGHCable was designed by Ubiquiti to provide the wired connections necessary for the installation of its radio transceiver equipment.

4.      Ubiquiti heavily promoted its TOUGHCable to its customers. Contemporaneous with the introduction of its TOUGHCable product, Ubiquiti required that all of its products be installed with the use of shielded Ethernet cable and earth grounding (both of which were features of its TOUGHCable product), as a condition of its product warranty for its radio and transceiver products.  If a customer did not use shielded Ethernet cable and earth grounding in the installation, Ubiquiti stated it would not honor the warranty on the installed product.

5.      Both Ubiquiti and Streakwave made representations that TOUGHCable was "Category 5e outdoor carrier-class shielded cable" that was "built to withstand harsh outdoor environments," was "built to perform even in the harshest weather and environments," was encased in a "weatherproof jacket," and was "extreme weatherproof."

6.     These representations, as well as other, additional representations made by Ubiquiti and Streakwave, were false.

7.     Contrary to Ubiquiti's and Streakwave's representations, TOUGHCable could not be used as outdoor cable.  It was not able to withstand outdoor environments of any kind, would fail if exposed to outdoors for an unconscionably short amount of time, and was not at all weatherproof.  TOUGHCable was entirely unsuited for any outdoor use whatsoever.

8.     TOUGHCable was defectively manufactured.  Purchasers and installers of TOUGHCable found that, within as little as a year of installation, and sometimes after a period of only several months, TOUGHCable began to corrode, crack, and split.  When the TOUGHCable outer shielding failed, it did exactly the opposite of what it was promoted to do.  Instead of shielding and protecting the inner transmission wires from outside elements, the cable actually became a sponge, wicking up water from the outside, drawing it inside the cable, and, like a straw, providing a channel for the water to flow down directly into sensitive and delicate radio equipment, often destroying the equipment.

9.     Indoor cabling, which is not designed for outdoor use, can often last outdoors for five, or even ten years in extreme outdoor conditions before showing any signs of cracking, wicking, and failing.  Ubiquiti's TOUGHCable, which was represented by Ubiquiti and Streakwave to be shielded outdoor cable, expressly designed for outdoor use, was failing, sometimes within months of installation. In other words, TOUGHCable was completely unsuited for any outdoor use.

10.    Ubiquiti designed, manufactured and sold TOUGHCable, expressly promising that it was ideal for outdoor use.  Streakwave sold and distributed TOUGHCable expressly promising that it was ideal for outdoor use.

11.    Both Ubiquiti and Streakwave had a duty to insure that the cable they sold conformed to these representations.  They both failed in this duty.

12.    Ubiquiti (though its distributors), and Streakwave each sold tens of thousands of feet of cable to customers.  TOUGHCable was installed in installations, businesses, and residential location all over the world, including in the United States.

13.    Because Defendants failed in their duty to insure that TOUGHCable was what they said it was, customers suffered financial harm.  Because TOUGHCable is wholly unsuited for outdoor use, its installation poses an unreasonable and completely foreseeable

1
2
3

risk of harm to the expensive radio transceiver equipment it is connected to.  All TOUGHCable that was installed had to be, and will have to be ripped out and completely replaced.  Installers of TOUGHCable have been forced to go back to the original install location and reinstall new cable.

4
5
6
7
8
9
10
11

14.    Ubiquiti and Streakwave's customers have been forced to expend significant sums of money on an item that never should have cost them anything beyond the initial investment, and will be forced to expend additional sums in the future, until all of the defective TOUGHCable has been replaced.  Ubiquiti's negligence in manufacturing a product that was not suitable for the express purpose for which it was sold, and Streakwave's failure to insure that TOUGHCable it was selling was suitable for the express purpose for which it was sold, was a disaster at each installation in which it was used.  Customers world-wide are paying the price, and have been stuck with the costs of Defendants' errors.

12
13

15.    This action is brought on behalf of a Class of all persons and entities that have purchased TOUGHCable who have sustained losses or damage, including costs of replacement, as a result of the defective nature of the product.

14
15

**VENUE AND JURISDICTION**

16
17
18

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The aggregate claims of plaintiffs and the proposed Class members exceed, for all jurisdictional purposes, the sum or value of $5,000,000.00.

19
20
21

17.    Ubiquiti is a corporation organized and existing under the laws of Delaware, with its principal place of business in San Jose, California, and is a citizen of the state of California.

22
23

18.    Streakwave Wireless, Inc., is a corporation organized and existing under the laws of California, with its principal place of business in San Jose, California, and is a citizen of the state of California.

24

19.    Plaintiff Tasion Communications, Inc. is a citizen of Canada.

25

20.    Plaintiff International Power Systems, LLC is a citizen of Arizona.

26
27

21.    Plaintiff Fundamental Holdings, Corp. is a citizen of both Delaware and Colorado.

28

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

22.     Plaintiffs assert claims on of behalf of the proposed Class whose members are scattered throughout the world.  There is minimal diversity of citizenship between proposed Class members and Defendants.

23.     This Court has personal jurisdiction over Defendants because both Ubiquiti and Streakwave maintain their principal headquarters in San Jose, California, are registered to conduct business in California, have sufficient minimum contacts to California, or otherwise intentionally avail themselves of the markets within California, through manufacturing, production, promotion, marketing, sale, and distribution of their products in California, to render the exercise of jurisdiction by this Court proper and necessary.

24.     This Court also has personal jurisdiction over both Ubiquiti and Streakwave because, on information and belief, the advertising statements that give rise to the causes of action alleged in this complaint were created, reviewed, approved, and/or published in and from Ubiquiti and Streakwave headquarters in San Jose, California.  Also, on information and belief, decisions made by Ubiquiti employees that give rise to Plaintiffs' claims were made in and from its San Jose, California headquarters.  Venue is also proper before this Court under 28 U.S.C. § 1391(b)(2) as a substantial part of the events, circumstances, and omissions giving rise to Plaintiffs' claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

25.     Pursuant to Local Rule 3-5(b) and 3-2(c), this action should be assigned to the Oakland Division of the Northern District of California because Defendants reside in San Jose.

## PARTIES

26.     Plaintiff Tasion Communications, Inc., is a Canadian corporation, doing business as Planet Telecom.  Planet Telecom offers VoIP services and high speed internet connectivity for business and residential subscribers in Panama and Canada.

27.     Plaintiff International Power Systems, LLC, an Arizona limited Liability corporation doing business as Freeway Networks, provides installation services for wireless internet in Arizona.

28.     Plaintiff Fundamental Holdings, Corp., a Delaware corporation based in Colorado doing as Peak Internet, provides internet and telephone connectivity for both home and business in Colorado.

29.     Defendant Ubiquiti Networks, Inc.  ("Ubiquiti" or "Defendant") is a corporation organized and existing under the laws of Delaware, with its principal place of business in San Jose, California.  Ubiquiti designs, manufactures and sells broadband wireless products including high performance radios, antennas, software, and programming tools to manage the hardware.  Ubiquiti's products are designed for wireless networking and other applications in the unlicensed radio frequency (RF) spectrum.  Ubiquiti products and technologies permit companies the ability to provide high speed wireless connections for customers in a wide variety of locations, including markets that are otherwise difficult to service, such as mountainous regions, rural areas, islands, and underdeveloped locations, both within and outside of the United States.

30.     Defendant Streakwave Wireless, Inc., is a corporation organized and existing under the laws of California, with its principal place of business in San Jose, California, and is a seller/distributor of wireless products, including Ubiquiti products.

## FACTUAL ALLEGATIONS

31.     Ubiquiti designs, manufactures, and sells broadband wireless products.  Ubiquiti's hardware products include high performance radios, antenna, and repeaters, and other telecommunications hardware and software, to enable the broadcasts and reception of wireless signals for customers in a wide variety of locations, from cities, to rural areas, to remote and completely undeveloped areas.

32.     The Ubiquiti radio transceiver is a unit that consists of both a transmitter and a receiver.  The unit typically mounts on a roof or other high, exterior high location.  The radio transceiver is connected to electrical power and the customer (or infrastructure equipment) by a power over Ethernet ("POE") injector. This injector has 2 Ethernet connections:  One that goes to the transceiver; and the other that goes to the customer computer or router or infrastructure equipment.  The Ethernet cable that goes to the transceiver provides data signals on 2 wire pairs of the cable and electrical power on 2 wire pairs of the cable.  The Ubiquiti radio transceiver will not function without a hard-wired cable connection.

33.     This hard-wired POE link is typically achieved with Category 5e cable. Category 5e cable (Cat5e) is the current standard cable for computer networks such as Ethernet. The Cat5e provides transmission performance of up to 100 MHz.

34.     A shielded cable is an electrical cable of one or more insulated conductors enclosed by a common conductive layer. The shield may be composed of braided strands of copper (or other metal, such as aluminum), a non-braided spiral winding of copper tape, or a layer of conducting polymer. Usually, this shield is covered with a jacket. The shield acts as a Faraday cage (an enclosure formed by conducting material) to reduce electrical noise from outside the cable (such as lightning) from affecting the signals, and to reduce transient electromagnetic radiation that may interfere with other devices.

35.     Prior to the introduction of its shielded cabling, Ubiquiti conducted a number of failure analyses on Ubiquiti equipment that had been returned to Ubiquiti by its customers. Ubiquiti determined that the largest single cause of failure to its radio equipment was electrostatic discharge ("ESD").  ESD permitted a fatally large spike of electrical charge to be introduced into the radio equipment, shorting it out.

36.     Ubiquiti determined that the primary source of ESD leading to equipment failure could be traced to the cabling powering and connecting the radio transceivers.  With the assumption that its equipment in the field could be better protected from failure caused by ESD if the cabling used was both shielded, and included a drain wire to provide earth grounding, Ubiquiti embarked upon a program to design and manufacture its own shielded, earth-grounded  Cat5e cabling for use with installations of its radio equipment.

37.     In October 2010, Ubiquiti announced a new cable product line which it called TOUGHCable.

38.     TOUGHCable was available in two versions: "TOUGHCable Level 1" and "TOUGHCable Level 2."  Level 2 was advertised as possessing some additional features not included in Level 1, which made Level 2 more costly than Level 1.  Those features are not relevant to this litigation. Because all statements, representations, and descriptions relevant to this litigation identical with respect to both TOUGHCable Level 1 and TOUGHCable Level

2, the two versions of TOUGHCable are hereinafter referred to collectively as **"TOUGHCable,"** unless otherwise noted.

39.    In Ubiquiti's brochures and advertising materials (which it called "Datasheets")  regarding its TOUGHCable products, Ubiquiti made the following representations about TOUGHCable (Exhibit C):

> **TOUGHCable**
> **Outdoor Carrier Class Shielded Ethernet Cable**
>    **Increase Performance**
>    **Extreme Weather-Proof**
> **TOUGHCable**
> **OUTDOOR CARRIER CLASS SHIELDED**
> - Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.
>
> **Increase Performance**
> - Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.
>
> **Extreme Weatherproof**
> - TOUGHCables have been built to perform even in the harshest weather and environments.
>
> **Extended Cable Support**
> - TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.
>
> **Bulletproof your networks**
> - TOUGHCable is currently available in two versions: Level 1 Shielding Protection and Level 2 Shielding Protection.
> - **Level 1** is a Category 5e outdoor carrier-class shielded cable.
> - **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.
> - Weatherproof Jacket*
>
> *(illustrated, labeled diagram)

40.    Hereinafter, the statements and descriptions of Paragraph 39 are referred to throughout this pleading as the "**TOUGHCable Datasheet Representations**."

41.    Ubiquiti also published brochures and advertising materials ("Datasheets") for its other products, including radios, cameras, antennas and switches ("Other Products")

which it also sold.  During the time it was promoting TOUGHCable, each of the Datasheets that Ubiquiti published for its Other Products included a full page Datasheet promotion of its TOUGHCable product.  That is, every product that Ubiquiti promoted at the time was also concurrently promoted with the TOUGHCable product.  See, for example, the Ubiquiti's Datasheet for its Airmax Antenna product.  Exhibit D.

42.     The Datasheets for Ubiquiti's Other Products included the following statements and descriptions concerning TOUGHCable:

**TOUGHCable**
**OUTDOOR CARRIER CLASS SHIELDED**
  • Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.
**Increase Performance**
  • Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.
**Extreme Weatherproof**
  • TOUGHCables have been built to perform even in the harshest weather and environments.
**Extended Cable Support**
  • TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.
**Bulletproof your networks**
  • TOUGHCable is currently available in two versions: Level 1 Shielding Protection and Level 2 Shielding Protection.
  • **Level 1** is a Category 5e outdoor carrier-class shielded cable.
  • **Level 2** is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.
  • Weatherproof Jacket*

    *(illustrated, labeled diagram)

43.     Hereinafter, the statements and descriptions of Paragraph 42 are referred to throughout this pleading as the "**TOUGHCable Datasheet Attachment Representations**."

44.     Ubiquiti packaged TOUGHCable in coiled lengths of 1,000 feet.  All TOUGHCable was sold in a box designed and packaged by Ubiquiti.  The TOUGHCable

box was white lettering on an all black background (sample image, see page 1 of Exhibit C).

Imprinted on each TOUGHCable box were the following statements and descriptions (for

both Level 1 and Level 2):

- "OUTDOOR CARRIER CLASS SHIELDED"
- "Outdoor carrier-class shielded cable"
- "Improved Ethernet link states, speeds, and performance"
- "Built to withstand harsh outdoor environments"
- "Weatherproof Jacket"

45.     Hereinafter, the statements and descriptions of Paragraph 44 are referred to

throughout this pleading as the "**TOUGHCable Box Representations**."

46.     TOUGHCable introduced a small drain wire that was built into the cable. A

separate drain wire is not normally present in ordinary shielded cable. The drain wire works

by connecting to the transceiver (attaching it to the metal Cat5e connector body, a metal

component) and connecting it to the same type of connector on the premise end to the POE

injector.  This connection provides electrical power to the radio.

47.      The POE injector is connected to the premise electrical supply and has a

grounded plug.  This design permitted any static collecting in the radio, cable, or connectors

to be drained away to ground, thereby protecting the sensitive components in the radio from

electrostatic discharge (ESD) and resulting damage.

48.     Contemporaneous with the introduction of its TOUGHCable product, Ubiquiti

informed its customers that it would no longer honor warranties on its radio equipment unless

the customer utilized "Shielded Ethernet cable and earth grounding" as a condition of

product warranty.

49.     Ubiquiti began shipping its TOUGHCable in or around March 2011.

50.     Many customers including Plaintiffs began utilizing Ubiquiti's TOUGHCable

on all its new installations, and also, in many cases, replaced previously installed non-

shielded cable installations with shielded TOUGHCable.

51.     Ubiquiti's TOUGHCable began failing -- in some cases, within months of

installation.

52.     Contrary to all representations as to the suitability of TOUGHCable for outdoor and harsh weather use, TOUGHCable proved to be highly unsuitable for any outdoor use whatsoever.  TOUGHCable was defectively manufactured, and the defect, on information and belief, was a complete lack of UV (ultraviolet) protection.  After several months of outdoor exposure, TOUGHCable changed color, became brittle, developed cracks, and exposed the unprotected interior of cable to the outside elements.  The interior material of TOUGHCable, once exposed to outside elements, instead of keeping water out of the cable, did exactly the opposite and wicked up water into the interior of the cable.

53.     Rather than protect delicate and expensive radio equipment, Ubiquiti's TOUGHCable instead became the equipment's greatest liability.

54.     Radio installations are generally set up in a simple paradigm:  The antenna is located as high as possible to both broadcast and receive signals clear of obstructions, and the equipment which processes those signals is located near ground level.

55.     When the wicked up water began to pool inside the cable, the water followed its natural propensity to flow downhill – directly into the expensive radio equipment, corroding connections, shorting out and destroying the equipment.

56.     TOUGHCable was installed in thousands of installations worldwide.  Wireless service providers installed thousands of feet of TOUGHCable to power and connect their broadcast facilities to the broadcast dishes on top of antennas.  An antenna could be many hundreds of feet high, and there must be a hard-wired connection between the broadcasting station and the broadcast dish at the top of the antenna.

57.     Providers of wireless services also installed thousands of feet of TOUGHCable at customer locations.  The customer's radio transceiver would usually be placed on a rooftop or other elevated location.  A hard-wired cable connection would then pass the signal to the indoor processing equipment.  In a given rural area, there might be hundreds of customers, each with their own individual installation, which utilized TOUGHCable as the link between the outdoor transceiver and the customer's indoor equipment.

58.     Independent subcontractors provide installation of wired and wireless broadcast equipment on behalf of both providers and recipients of broadcast services.  Based upon the recommendations and representations of Ubiquiti, these independent subcontractors

recommended the use of Ubiquiti's TOUGHCable for installations that required outdoor cabling. Independent installers installed thousands of feet of Ubiquiti's TOUGHCable at thousands of locations throughout the world, both at broadcast companies transmission points, and at the receiving locations of the customers of the broadcast companies.

59.     When TOUGHCable began to fail, users would discover that their connection was down.  Investigation revealed that the TOUGHCable jacket was changing color, cracking, disintegrating, and water had been introduced into installation components that should never be exposed to water.

60.     TOUGHCable was completely unsuited for outdoor use.  Wherever it has been installed, it must be completely replaced.  Not replacing the TOUGHCable subjects delicate and expensive radio and transmission equipment to certain and inevitable failure. Broadcasters risk complete cessation of broadcast capacity.  Each customer's location must be completely rewired – all of the defective TOUGHCable completely removed and replaced – to protect the equipment at each location where the TOUGHCable was used.

## PLAINTIFF PLANET TELECOM'S EXPERIENCE

61.     Planet Telecom is a telecommunications provider with operations in Canada and Panama.

62.     In Panama, Planet Telecom offers high speed internet connectivity for business and residential subscribers.

63.     In Canada, Planet Telecom primarily provides Voice over Internet Protocol (VoIP) services, with a miniscule percentage of services offering (approximately 1%) wireless internet.

64.     The Planet Telecom Canadian operation employs 6 persons (1 general manager, 1 operations manager, 2 technicians, 1 administrative assistant, 1 salesman).  Planet Telecom's Panamanian operations employ 9 persons (1 office manager, 1 operations manager, 1 administrative assistant, 1 store clerk, 1 support technician, 2 installers, 1 outside salesman).

65.     Planet Telecom has a total of 15 employees, not including its president, David Veilleux.

66.     In order to provide for wireless internet connectivity on behalf of its customers, Planet Telecom personnel must go to the customer's location and install the radio receiving and broadcasting equipment.  Cat5e cable is necessary for each installation.  While the Cat5e cable itself is the least expensive physical component of the installation, installing the Cat5e cable is the most expensive and most labor intensive part of the installation process. Ordinarily, one installation of equipment and cable is required to get a customer up and running.

67.     Once the wireless receiving equipment is installed, in exchange for a monthly subscription fee (the amount depending upon the Internet connection speed and other services), Planet Telecom provides uplink for continuous Internet connectivity, telephone services, and/or Internet connectivity for other IP based products.

68.     In order to provide wireless Internet connection to its customers, particularly those in remote locations, Planet Telecom must broadcast the telecommunications signals from a broadcast facility, which includes a radio transceiver which sends and receives the signals to and from its customers.  These signals are usually transmitted and received from the top of a transmission tower, which can be a specially built tower structure for radio transmission, a high point on a natural object such as a tree or rock formation, or a building structure.  Cat5e cable is an integral component in the installation of any broadcast tower.

69.     Most of the radio equipment Planet Telecom utilized in its broadcast and transmission facilities were Ubiquiti products.

70.     Sometime in or around the beginning of 2011, Ubiquiti began to place its customers (the purchasers of Ubiquiti's broadcast and receiving equipment) on notice that, in

---

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

1
2
order for the Ubiquiti equipment to be covered under Ubiquiti's warranty: "Shielded Ethernet cable and earth grounding must be used as conditions of product warranty."

3
4
5
6
71.     Contemporaneous with this announcement, Ubiquiti introduced TOUGHCable, a shielded Cat5e cable product which would satisfy Ubiquiti's new warranty conditions on its hardware.

7
8
9
10
11
12
72.     On March 8, 2011, Planet Telecom placed its first order of TOUGHCable through Streakwave, ordering four boxes of TOUGHCable at 1000 feet per box at a cost of $109.00 per box.  This initial order also included an order for two boxes of Ubiquiti's TOUGHCable cable connectors (100 pieces, $47.00 per box).  With shipping and handling, the total for this initial order came to $639.86.

13
14
15
16
17
18
73.     Over the course of the next year, Planet Telecom made numerous additional purchases of Ubiquiti's TOUGHCable.  In all, Planet Telecom ordered 22 boxes (1000 feet each) of Ubiquiti's TOUGHCable, paying either $109 or $119 per box.  In addition, Planet Telecom purchased additional boxes of TOUGHCable cable connectors, and incurred costs in shipping and handling.

19
20
21
22
23
24
25
26
74.     All purchases of TOUGHCable were effectuated by telephone.  Dave Veilleux, President of Tasion Communications, Inc., called and spoke to Streakwave sales representatives based in San Jose, California.  During the course of each telephone call, Mr. Veilleux made an offer to purchase TOUGHCable Level 1, specifying quantities, and place of delivery.  Streakwave, based in California, accepted Mr. Veilleux's offer, and a binding contract was formed upon acceptance by the Streakwave sales representative of Mr. Veilleux's offer to purchase the TOUGHCable.

27
28

75.     At no time during the purchase and sale of the Ubiquiti TOUGHCable was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral, provided to Mr. Veilleux.

76.     In performance of the contract, Streakwave shipped the boxes of TOUGHCable as directed by Mr. Veilleux, to either Planet Telecom's Canadian office or to Planet Telecom's Florida shipping agent.  In no case did any box of TOUGHCable include any limitation of warranty, limitation of liability, limitation of damage, or reference to any such limitations.

77.     Because purchases of TOUGHCable were sourced from a U.S.-based supplier, and the equipment being purchased was for use outside of the United States, Planet Telecom also incurred additional costs.  Specifically, Planet Telecom paid a U.S.-based shipping company to receive the U.S. originating shipment and then to transship the TOUGHCable boxes to Planet Telecom's overseas operations in Panama.   Planet Telecom further paid duty to Panamanian customs for each box of TOUGHCable it imported into Panama.

78.     Upon receipt of the first shipment of TOUGHCable in or about March 2011, Planet Telecom began using the TOUGHCable for all of its outdoor installations.

79.     Less than a year later, in May 2012, one of Planet Telecom's customers in a remote location in Panama reported that their Planet Telecom internet connection was non-operative.

80.     Planet Telecom sent two employees to the customer's location to investigate why the internet connection was down.  It took the two men approximately two hours to reach the customer's remote location.

81.     When they arrived, they found that the radio receiver was shorted out. Somehow, water had gotten into the radio.

82.     It took the Planet Telecom employees three hours to resolve the problem.
Total travel time to and from the customer's location comprised an additional four hours.
The Planet Telecom employees replaced 60 feet of cable, 2 cable connectors, and the non-
functioning radio.

83.     Later than month, two other Planet Telecom customers also lost internet
connection.  Each outage required two Planet Telecom employees to travel to a remote
customer location, repair the installation and restore internet connectively.

84.     In June 2013, outages occurred at three additional customer locations.  In July,
Planet Telecom experienced one additional customer outage, but this one also  resulted in
damage to the radio; water had somehow been introduced into the connection.

85.     In August 2013, five additional Planet Telecom customers lost internet
connection, including another destroyed radio.

86.     Each time a customer lost connectivity, Planet Telecom was required to send
out technicians to fix the problem and restore communications for the customer.   Because
Planet Telecom provided remote location service, each on-site visit involved many hours of
travel to and from the customer location, sometimes as much as 5 hours each way.  Some of
these locations could only be reached by boat.

87.     Because all of these failures occurred during the heart of the rainy season in
Panama, the Cat5e cable itself was not initially suspected as the cause of the failures.  With
the increasing number of failures however, in September 2012, Planet Telecom's CEO,
David Veilleux, began research on the web to try to determine the cause of the high number
of failures.

88.     On an internet forum hosted by Ubiquiti (http://community.ubnt.com/), Mr.
Veilleux founds posts like "Got Junk ToughCable?" posted on 09-17-2012:

1

2

3

4
> Just wondering how many others have received junk ToughCable Level 1 and
> ToughCable Level 2? Have customers who have ToughCable literally dry
> rotting daily. Not so Tough when it collects water like a great big straw frying
> radios, power supplies, routers and switches as a result. What is Ubiquiti's
> response to junk ToughCable? Costing us trouble calls let alone customers
> daily.

https://community.ubnt.com/t5/Wireless-Networking/Got-Junk-ToughCable/td-p/328751

5

6

7

8

9
89.    It was through this internet research in September 2012, and the reports by other posters on their experiences with TOUGHCable that Mr. Veilleux determined that the TOUGHCable was defective and was the cause of the failures his customers were experiencing in the field.

10

11

12
90.    On October 9, 2012, Mr. Veilleux notified both Ubiquiti and Streakwave that Planet Telecom had experienced problems with the TOUGHCable product.

13

14

15

16
91.    On October 9, 2012, Mr. Veilleux sent the following email to Matt Hardy, Vice President of Technology Applications at Ubiquiti Networks, and Jon Hoeweler, Planet Telecom's Account Manager at Streakwave Wireless:

17
> Subject: defective tough cable

18
> Hello Matt,

19

20
> My name is David Veilleux and I am the President of Planet Telecom.

21

22
> We have in the past purchased many boxes of Ubiquity's level 1 tough cable.
> As you are no doubt aware, this cable was defective and we are now having to
> roll trucks, men and equipment to change out the cable on client installs and
> infrastructure radios.

23

24

25
> I would like to know what your companies' position is to compensate us, not
> only for the defective cable but for our costs to replace the cable and the
> service credits we have had to provide our clients for not having service.

26

27

28
> I would also like to know why, when your company became aware of the
> problem, you did not advise your distribution channel to notify its purchasers
> of this product to the potential problems to provide them with a warning and
> chance to be proactive and replace the cable before it reached a point where
> services were affected.

Same question to Streakwave, why did you not advise your clients of the problem Jon?

Thank you

Yours truly,

David Veilleux

92.     On October 10, 2012, Streakwave provided Planet Telecom with copies of all Planet Telecom's purchase invoices for 22 boxes of TOUGHCable.

93.     On October 16, 2012, Ubiquiti opened up an RMA (Return Merchandise Authorization) with Planet Telecom (RM18963).  As part of the RMA process, Mr. Veilleux was asked for copies of all of his purchase invoices for each of the 22 boxes of TOUGHCable, which he immediately provided.

94.     Between May 2012 and February 2014, at least 55 Planet Telecom customers lost Internet service due to corrosion of the TOUGHCable.   At least 17 radios belonging to Planet Telecom have been damaged by water entering the radios through the TOUGHCable. Each of the destroyed radios had to be replaced at Planet Telecom's cost.  At each location where TOUGHCable failed, Planet Telecom had to replace all of the TOUGHCable, between 25 and 110 feet of cable per customer site, plus two connectors per location.

95.     As of February 2014, Planet Telecom had expended more than 200 hours of employee time fixing the damage caused by the TOUGHCable and replacing the defective TOUGHCable with a different cable.

96.     As of February 2014, Planet Telecom expended more than 450 employee hours in travel time to and from each customer location to repair the Internet connection and replace the TOUGHCable.

97.     Planet Telecom anticipates that there will be additional failures of TOUGHCable installations, necessitating additional expenditures in employee time, resources, equipment, travel time, and replacement of destroyed radios.

98.     Planet Telecom has also lost customers as a result of lost Internet service due to the failure of the TOUGHCable installations.

99.     Planet Telecom also installed TOUGHCable on its towers in 2011.  The towers are essential to broadcast Planet Telecom's signal to an area of coverage, and additional towers are needed to act as repeaters to extend Planet Telecom's coverage to ever more remote locations.  Each tower installation may utilize as many as 9 radios, multiple connectors, and up to 1,080 feet of Cat5e cabling.

100.    Between January and March 2013, Planet Telecom ripped out and replaced all of the TOUGHCable it had previously installed (at significant initial installation cost) on 12 of its broadcast or repeating towers in Panama. Many of these towers were located in remote, difficult to access regions, including antennas on the top of mountains and antennas located in areas only accessible by boat.  The rewiring of a tower is a complex and time-consuming operation, requiring anywhere between 20 and 36 man-hours per tower.   Planet Telecom expended 333 hours in employee time to undertake this rewiring of 12 towers, plus an additional 93 hours in travel time for each employee to get to and from the towers, and incurred additional travel costs (such as water taxis at $20.00 per trip) in order to repair the towers which were rendered vulnerable to failure due to the defective Ubiquiti TOUGHCable.

101.    Ubiquiti stopped shipping TOUGHCable Level 1 and TOUGHCable Level 2 in 2012.   On or about July 2012, Ubiquiti introduced its upgraded shielded Cat5e cable

products which it called TOUGHCable Pro and TOUGHCable Carrier (discontinuing TOUGHCable Level 1 and TOUGHCable Level 2).

102.    Ubiquiti, through the RMA process, authorized previous purchasers of TOUGHCable Level 1 and TOUGHCable Level 2 to obtain its new cable products without charge, box for box, to replace the defective TOUGHCable Level 1 and TOUGHCable Level 2 with its Cat5e cable replacement products:  TOUGHCable Pro and TOUGHCable Carrier.

103.    To obtain the replacement Cat5e cable, Planet Telecom was forced to incur additional costs, including shipping costs and customs duties, in order to get the replacement cable to the locations in Panama where the TOUGHCable had been initially installed.

104.    In no instance has Ubiquiti offered or agreed to pay for damage caused by the defective cable, costs of obtaining, shipping, installing the replacement cable, ripping out the defective cable, or other consequential damages incurred by Planet Telecom that resulted from the installation of defective TOUGHCable.

105.    On October 3, 2013, Planet Telecom provided written notice of breach of warranty on behalf of a class to both Ubiquiti and Streakwave.

### PLAINTIFF FREEWAY NETWORKS' EXPERIENCE

106.    Freeway Networks is a telecommunications provider with operations in Arizona.

107.    Freeway Networks is a dba for International Power Systems, LLC, an Arizona LLC formed in 2004.  International Power Systems, LLC is owned by 2 persons, including the president of Freeway Networks, Benjamin Wold.

108.    Freeway Networks offers high speed internet connectivity for business and residential subscribers.

109.     Freeway Networks has no full-time employees, but utilizes independent contractors on an as-needed basis.

110.     In order to provide for wireless internet connectivity on behalf of its customers, Freeway Networks personnel must go to the customer's location and install the radio receiving and broadcasting equipment.  Cat5e cable is necessary for each installation. While the Cat5e cable itself is the least expensive physical component of the installation, installing the Cat5e cable is the most expensive and most labor intensive part of the installation process. Ordinarily, one installation of equipment and cable is required to get a customer up and running.

111.     Once the wireless receiving equipment is installed, in exchange for a monthly subscription fee (the amount depending upon the Internet connection speed and other services), Freeway Networks provides uplink for continuous Internet connectivity, telephone services, and/or Internet connectivity for other IP based products.

112.     In order to provide wireless Internet connection to its customers, particularly those in remote locations, Freeway Networks must broadcast the telecommunications signals from a broadcast facility, which includes a radio transceiver which sends and receives the signals to and from its customers.  These signals are usually transmitted and received from the top of a transmission tower, which can be a specially built tower structure for radio transmission, a high point on a natural object such as a tree or rock formation, or a building structure.  Cat5e cable is an integral component in the installation of any broadcast tower.

113.     Most of the radio equipment Freeway Networks utilized in its broadcast and transmission facilities were Ubiquiti products.

114.     Sometime in or around the beginning of 2011, Ubiquiti began to place its customers (the purchasers of Ubiquiti's broadcast and receiving equipment) on notice that, in

order for the Ubiquiti equipment to be covered under Ubiquiti's warranty: "Shielded Ethernet cable and earth grounding must be used as conditions of product warranty."

115.    Contemporaneous with this announcement, Ubiquiti introduced TOUGHCable, a shielded Cat5e cable product which would satisfy Ubiquiti's new warranty conditions on its hardware.

116.    On February 21, 2011, Freeway Networks placed its first order of TOUGHCable through Streakwave, ordering one box of TOUGHCable Level 1 (1000 feet) at a cost of $109.00 for the box.  This initial order also included an order for one box of Ubiquiti's TOUGHCable cable connectors (100 pieces, $47.00 per box).

117.    All purchases of TOUGHCable were effectuated by telephone or by email. Mr. Wold, President of Freeway Networks initiated communications with Streakwave sales representatives based in San Jose, California.  During the course of communication, Mr. Wold made an offer to purchase TOUGHCable Level 1 or Level 2, specifying quantities, and place of delivery.  Streakwave, based in California, accepted Mr. Wold's offer, and a binding contract was formed upon acceptance by the Streakwave sales representative of Mr. Wold's offer to purchase the TOUGHCable.

118.    At no time during the purchase and sale of the Ubiquiti TOUGHCable was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral, provided to Mr. Wold.

119.    In performance of the contract, Streakwave shipped the boxes of TOUGHCable as directed by Mr. Wold to Freeway Networks' offices located in Cave Creek, Arizona.  In no case did any box of TOUGHCable include any limitation of warranty, limitation of liability, limitation of damage, or reference to any such limitations.

120.    Upon receipt of the first shipment of TOUGHCable in or about February 2011, Freeway Networks began using the TOUGHCable for its outdoor installations.

121.    On September 21, 2011, Freeway Networks ordered one box of TOUGHCable Level 2 (1,000 feet) at $149.00 for the box.  Additional purchases of TOUGHCable level 2 at $149 per box were made by Freeway Networks on September 22, 2011, October 24, 2011, and February 7, 2012.

122.    In April 2012, Mr. Wold sought to order more TOUGHCable from Streakwave, but he was informed by Streakwave that TOUGHCable was not available.  On April 25, Mr. Wold offered to purchase an alternative Cat5e cable product from Streakwave.

123.    Adam Nessler, Streakwave sales representative, replied:  "[link]  Your cost is around $141.  This is in stock and doesn't turn green in sunlight."

124.    This statement from Mr. Nessler to Mr. Wold constituted notification from Streakwave to Freeway Networks that there was a problem with TOUGHCable.  As of April 25, 2012, as between Freeway Networks and Streakwave:  (1) Streakwave had notice that the TOUGHCable item was problematic, (2) Streakwave had an opportunity to repair the defective cable Streakwave had provided to Freeway Networks (3) Streakwave had an opportunity to reduce damages by advising Freeway Networks to rip out the bad cable before it damaged expensive radio equipment, (4) Streakwave had the ability to halt further sales of bad cable to Freeway Networks (and other customers), (5) Streakwave had an opportunity to negotiate with Freeway Networks over damages resulting from Streakwave's sale of defective TOUGHCable to Freeway Networks.

125.    Mr. Wold discovered that the TOUGHCable he purchased from Streakwave was defective in March 2013.  Mr. Wold described his discovery of the defective nature of TOUGHCable on an internet forum hosted by Ubiquiti (http://community.ubnt.com/), in a

post entitled "ToughCable: Total crap! Refund?  (started March 2, 2013).  Mr. Wold posted

the following on March 7, 2013:

> 03-07-2013 08:20 AM
>
> While I had read on the forum way back when about the cable turning green and then seeing it first hand last summer we figured so what, it's green. But yesterday we were in SHOCK when doing some post winter maintenance at one of our P2P link locations and saw the outer jacket having fallen off exposing the braid on the Tough Cable! Even on north facing surfaces (no directly sun light) the jacket is failing. So today I went on the forum and saw this post which seems to confirm that it's the whole batch of original tough cable that is defective. I can't even write how frustrated (and more) we feel at this point about this situation. We've deployed boxes of that stuff where you need lift trucks, 4x4 trucks, ladder lugging, climbing gear, safety spotters, etc. What an absolute mess!
>
> Additionally we're very upset at our several large UBNT distributors who have records of our purchases of this cable and not one of them had the courtesy or fortitude to send out a notice of eminent failure of this cable in exposed environments and an offer to do anything to right it.
>
> So now, we're doing our logistic planning on how we're going to replace all this cable this spring/summer. Needless to say, we will tracking material cost, labor, mileage, equipment logs as well as taking lots of photos for documentation. It's now clear to us why the cable became unavailable. All we heard when checking with the distributors is that there were supply issues. We were forced (fortunately in hind sight) to move to an alternative supplier.
>
> We're not the type to jump and unjustly point fingers or look for big payouts; but this isn't right. We believe we were installing a lot of Tough Cable after the point UBNT discovered there was a problem which could have easily been avoided if we were given notice.

http://community.ubnt.com/t5/Installation-Troubleshooting/ToughCable-Total-crap-Refund/td-p/409314

126.    On March 8, 2013 Mr. Wold telephoned Ubiquiti and spoke with Kevin Perry,

a Ubiquiti employee, notifying him of the problem with the disintegrating TOUGHCable and

requesting reimbursement for Freeway Networks' costs and damages caused by the defective

cable.

127.    On May 17, 2013, Mr. Wold followed up with an email to Mr. Perry detailing losses incurred as a result of the defective TOUGHCable, including pictures and attachments, and a demand for compensation.

128.    Ubiquiti offered to replace the TOUGHCable with its newer TOUGHCable product, and also offered a Ubiquiti radio product in compensation (one that was not of use to Freeway Networks).  Mr. Wold declined this offer.

129.    Mr. Wold followed up his negotiations of May 17 by sending additional emails to Ubiquiti on May 29 and July 26, 2013.  No response from Ubiquiti was forthcoming.

130.    Upon learning that TOUGHCable was defective, Freeway Networks replaced all TOUGHCable with cable manufactured by another manufacturer.  Cable was replaced at tower sites and customer locations.  Replacement work and circumstances included replacement of cable at remote mountain locations, in heavy forest, structure climbing, conduit pulling, and roof and ladder work.

131.    Freeway Networks spent in excess of $13,000 to replace the defective Cat5e TOUGHCable with alternative (non-defective) Cat5e cable.

132.    In no instance has Ubiquiti offered or agreed to pay for damage caused by the defective cable, costs of obtaining, shipping, installing the replacement cable, ripping out the defective cable, or other consequential damages incurred by Freeway Networks as a result of the initial installation of the defective TOUGHCable.

133.    On October 18, 2013, Freeway Networks provided written notice of breach of warranty on behalf of a class to both Ubiquiti and Streakwave.

**PLAINTIFF PEAK INTERNET'S EXPERIENCE**

132.     Peak Internet is a telecommunications provider which operates in Woodland Park and Colorado Springs, Colorado.

133.     The owner and president of Peak Internet is Jayson Baker.

134.     Peak Internet offers high speed internet connectivity for business and residential subscribers.

135.     As of the summer of 2012, Peak Internet had two-and-a-half employees: a full time receptionist, a full-time contractor, and one part-time contractor.  Peak Internet was a small operation, ordering stock and supplies as needed, keeping no excess inventory.

136.     In order to provide for wireless internet connectivity on behalf of its customers, Peak Internet must go to the customer's location and install the radio receiving and broadcasting equipment.  Cat5e cable is necessary for each installation.  While the Cat5e cable itself is the least expensive physical component of the installation, installing the Cat5e cable is the most expensive and most labor intensive part of the installation process. Ordinarily, one installation of equipment and cable is required to get a customer up and running.

137.     Once the wireless receiving equipment is installed, in exchange for a monthly subscription fee (the amount depending upon the Internet connection speed and other services), Peak Internet provides uplink for continuous Internet connectivity, telephone services, and/or Internet connectivity for other IP based products.

138.     In order to provide wireless Internet connection to its customers, particularly those in remote locations, Peak Internet must broadcast the telecommunications signals from a broadcast facility, which includes a radio transceiver which sends and receives the signals to and from its customers.  These signals are usually transmitted and received from the top of

1
2
3

a transmission tower, which can be a specially built tower structure for radio transmission, a high point on a natural object such as a tree or rock formation, or a building structure.  Cat5e cable is an integral component in the installation of any broadcast tower.

4
5
6

139.    Most of the radio equipment Peak Internet utilized in its broadcast and transmission facilities were Ubiquiti products.

7
8
9
10

140.    Sometime in or around the beginning of 2011, Ubiquiti began to place its customers (the purchasers of Ubiquiti's broadcast and receiving equipment) on notice that, in order for the Ubiquiti equipment to be covered under Ubiquiti's warranty:  "Shielded Ethernet cable and earth grounding must be used as conditions of product warranty."

11
12
13
14

141.    Contemporaneous with this announcement, Ubiquiti introduced TOUGHCable, a shielded Cat5e cable product which would satisfy Ubiquiti's new warranty conditions on its hardware.

15
16
17

142.    On October 12, 2011, Peak Internet placed its first order of TOUGHCable through Streakwave, ordering two boxes of TOUGHCable Level 1 (1000 feet each) at a cost of $109.00 for each box.

18
19
20
21
22
23
24
25
26

143.    All purchases of TOUGHCable were effectuated by telephone.  Mr. Baker, President of Peak Internet, initiated communications with Streakwave sales representatives based in San Jose, California.  During the course of his communication, Mr. Baker made an offer to purchase TOUGHCable Level 1, specifying quantity, and place of delivery.  Streakwave, based in California, accepted Mr. Baker's offers, and a binding contract was formed upon acceptance by the Streakwave sales representative of Mr. Baker's offer to purchase the TOUGHCable.

27
28

144.     At no time during the purchase and sale of the Ubiquiti TOUGHCable was any limitation of warranty, limitation of liability, or limitation of damage, either written or oral, provided to Mr. Baker.

145.     In performance of the contract, Streakwave shipped the boxes of TOUGHCable as directed by Mr. Baker, to Peak Internet's offices in Woodland Park, Colorado.  In no case did any box of TOUGHCable include any limitation of warranty, limitation of liability, limitation of damage, or reference to any such limitations.

146.     Upon receipt of the first shipment of TOUGHCable in or about October 2011, Peak Internet began using the TOUGHCable for its outdoor installations, including both customer locations and Peak Internet's broadcast towers.

147.     During the spring of 2012, Peak Internet sought to purchase more TOUGHCable from Streakwave, but Mr. Baker was told by Streakwave it was not available.

148.     During the summer of 2012, Peak Internet received reports of customer outages. Water was observed inside equipment, and in one case, water had entered a customer's house though the internet installation.

149.     On or about June 2012, after between ten and fifteen customer failures, Mr. Baker determined that the TOUGHCable was the cause of the customer failures and the source of the water showing up in equipment and customer locations.

150.      In June 2012, during a telephone conversation between Mr. Baker and Peak Internet's Streakwave sales representative, Steve Braden, Mr. Baker told Mr. Braden that the TOUGHCable Peak Internet had purchased from Streakwave was bad.

151.     Peak Internet did not order any TOUGHCable directly from Ubiquiti.  Peak Internet did not notify Ubiquiti directly that the TOUGHCable it purchased from Streakwave was bad.

152.    From June 2012 to February 2014, between twenty-five and fifty customer sites at which Peak Internet had installed TOUGHCable went offline due to the defects in TOUGHCable.  Each call to a customer location due to a failure cost Peak Internet $65.00 per call, plus any parts that needed replacement to bring the customer back online.

153.    Peak Internet had also installed TOUGHCable in some of its tower sites. Two towers have thus far been rewired, each job taking between one and two days to complete, with two employees per job, each at a cost of $80 per hour.

154.    TOUGHCable is presently installed at three additional Peak Internet towers and has yet to be replaced.  TOUGHCable is also installed at additional customer locations and has yet to be replaced.

155.    Peak Internet anticipates that there will be additional failures of TOUGHCable installations, necessitating additional expenditures in employee time, resources, equipment, travel time, and replacement of equipment.

156.    Ubiquiti has not offered or agreed to pay for damage caused by the defective cable, costs of obtaining, shipping, installing the replacement cable, ripping out the defective cable, or other consequential damages incurred by Peak Internet as a result of the initial installation of the defective TOUGHCable.

157.    On October 25, 2013, Peak Internet provided written notice of breach of warranty on behalf of a class to both Ubiquiti and Streakwave. Exhibits A & B.

**RULE 9(b) ALLEGATIONS AGAINST DEFENDANT UBIQUITI**

158.    Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  As detailed in the paragraphs above, Plaintiff has satisfied the

requirements of Rule 9(b) by establishing the following elements with sufficient particularity with respect to Ubiquiti:

WHAT:

159.    Ubiquiti made the following material misrepresentations regarding its Ubiquiti TOUGHCable Level 1 and TOUGHCable Level 2 Cat5e Cables: TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

WHEN:

160.    On or about October 2011, Ubiquiti announced that it was introducing a new product it identified as a Category 5e outdoor carrier-class shielded cable.  It called these products TOUGHCable Level 1 and TOUGHCable Level 2.  Thereafter, and for the entire period for which TOUGHCable was available on the market, Ubiquiti continuously and uninterruptedly made identical representations regarding the qualities and attributes of its TOUGHCable product.

WHERE:

161.    The TOUGHCable Datasheet Representations (¶39), and the TOUGHCable Datasheet Attachment Representations (¶42), were made, *inter alia:* in the brochures Ubiquiti printed to advertise and promote its Ubiquiti products; on Ubiquiti's home page website which advertised and promoted its Ubiquiti TOUGHCable; and throughout the internet as promoted and propagated by Ubiquiti on thousands of web pages located on third-party websites.  The TOUGHCable Box Representations (¶44) were made on each box of TOUGHCable sold and delivered.

WHO:

162.    Ubiquiti, acting through its employees, created, reviewed, approved, and published each of the above-identified statements.  The individual employees at Ubiquiti who had responsibility for the statements are unknown at this time, however internal records of

the corporation will permit specific individuals to be identified through discovery.  The specific employees of Ubiquiti who had specific responsibility can be identified as those individuals who created, reviewed, approved, and directed or participated in the publication of the statements, and those individuals who had authority to correct, retract, or amend the statement, but did not.

HOW:

163.    Ubiquiti's written material misrepresentations were published in advertisements, in brochures, and in promotional materials for Ubiquiti products.  Once Ubiquiti introduced TOUGHCable, every brochure that Ubiquiti published included an additional page at the end of the brochure which touted its TOUGHCable products.  So, even its brochures for its radios, antennas, dishes, cameras, etc., also included a description page for TOUGHCable.  Every page describing TOUGHCable included, verbatim, the representations listed on the TOUGHCable Datasheet Attachment Representations (¶42). Ubiquiti further distributed its material misrepresentations through digital advertisements, promotions, web pages, and through links to its home web pages, promoting its Ubiquiti TOUGHCable products.  Any person researching information on any Ubiquiti products would have necessarily been exposed to these material statements, since the statements appear prominently in all advertisements Ubiquiti made available during the pertinent time period.  Given the combination of cost, the specialized design, manufacture, and marketing, and the expert application of Ubiquiti's Other Products, it is unreasonable to assume that any purchaser would have made their purchase without having conducted research.  The most minimal research on any of Ubiquiti's Other Products invariably exposes the prospective purchaser to the TOUGHCable statements listed above, which were identical in all publications.

WHY:

164.    Ubiquiti engaged in the material misrepresentation detailed herein for the express purpose of inducing Plaintiffs and other reasonable buyers to purchase Ubiquiti TOUGHCable.  By requiring that customers who purchased radio transmission products from Ubiquiti to also use shielded, earth-grounded cable in order to be covered under the Ubiquiti

warranty for their Other Product purchases, Ubiquiti hoped that it would sell more TOUGHCable.  This strategy was successful, in that Ubiquiti has sold thousands of boxes TOUGHCable to businesses and members of the public.

MATERIALITY:

165.    Ubiquiti's representations regarding Ubiquiti TOUGHCable identified as the TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44), led users to believe that TOUGHCable:

- Was "Outdoor Carrier Class Shielded Ethernet Cable";
- Would "Increase Performance";
- Was "Extreme Weather-Proof";
- Was "OUTDOOR CARRIER CLASS SHIELDED";
- Would "Protect your networks from the most brutal environments. . .";
- Would "Increase Performance"
- Would "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";
- Was "Extreme Weatherproof";
- Was ". . . built to perform even in the harshest weather and environments";
- Was ". . . developed to have increased power handling performance for extended cable run lengths";
- Would "Bulletproof your networks";
- Was "Category 5e outdoor carrier-class shielded cable";
- Was encased in a "Weatherproof Jacket";
- Was "Outdoor carrier-class shielded cable";
- Would "Improve[] Ethernet link states, speeds, and performance"; and
- Was "Built to withstand harsh outdoor environments."

166.    These selling points are all highly material to the decision to spend between of $109 and $149 per box for 1,000 feet of cable. Ubiquiti profited by selling its TOUGHCable to thousands of unsuspecting users.

167.    At a minimum, all Class members were at least exposed to the representations that TOUGHCable was that TOUGHCable was "Category 5e outdoor carrier-class shielded cable" that was "built to withstand harsh outdoor environments," was "built to perform even in the harshest weather and environments," was encased in a "weatherproof jacket," and was "extreme weatherproof."

168.    Had Plaintiff and the members of the Class known that the Ubiquiti TOUGHCable was not suitable for outdoor use and was not weatherproof, they would not have purchased it.

**RULE 9(b) ALLEGATIONS AGAINST DEFENDANT STREAKWAVE**

169.    Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  As detailed in the paragraphs above, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity with respect to Streakwave:

WHAT:

170.    Streakwave made the following material misrepresentations regarding its Ubiquiti TOUGHCable Level 1 and TOUGHCable Level 2 Cat5e Cables: TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

WHEN:

171.    During the entire time Streakwave offered TOUGHCable for sale, Streakwave published on its website all of the representations listed above.  For the entire period for which TOUGHCable was available for sale through Streakwave, Streakwave continuously and uninterruptedly made identical representations regarding the qualities and attributes of the TOUGHCable product.

1
2
3
4
5
6

172.     At some point, but no later than February 1, 2012 (the precise date is determinable though discovery of records internal to Streakwave and through deposition of Streakwave personnel), Streakwave learned that TOUGHCable Level 1 and TOUGHCable Level 2 were defective products.  Nevertheless, Streakwave continued to sell TOUGHCable Level 1 and TOUGHCable Level 2.  Every sale of Streakwave product after that date to Plaintiffs and members of the class was a fraudulent sale.  Planet Telecom's last purchase of TOUGHCable Level 1 from Streakwave was made on February 2, 2012.

7
8

WHERE:

9
10
11
12
13
14
15

173.     The TOUGHCable Datasheet Representations (¶39), and the TOUGHCable Datasheet Attachment Representations (¶42), were made, *inter alia:*  in the brochures Streakwave printed and/or reprinted to advertise and promote its Ubiquiti products; on Streakwave's home page website which advertised and promoted Ubiquiti TOUGHCable; and throughout the internet as promoted and propagated by Streakwave on its web site.  The TOUGHCable Box Representations (¶44) were made on each box of TOUGHCable sold and delivered by Streakwave.

16
17

WHO:

18
19
20
21
22
23

174.     Streakwave, acting through its employees, published each of the above-identified statements.  The individual employees at Streakwave who had responsibility for the statements are unknown at this time, however internal records of the corporation will permit specific individuals to be identified through discovery.  The specific employees of Streakwave who had specific responsibility can be identified as those individuals who reviewed, approved, and directed or participated in the publication of the statements, and those individuals who had authority to correct, retract, or amend the statement, but did not.

24
25

HOW:

26
27
28

175.     Streakwave's written material misrepresentations were published on Streakwave's website.  Every Datasheet (brochure) of Ubiquiti's Other Products was also published by Streakwave.  Each of Streakwave's publications for Ubiquiti Other Products

included an additional page at the end of the Datasheet which touted Ubiquiti's TOUGHCable products.  Even Ubiquiti's brochures advertising Ubiquiti radios, antennas, dishes, cameras, etc., also included a description page for TOUGHCable which Streakwave published.  Every description page for Ubiquiti's TOUGHCable included, verbatim, the TOUGHCable Datasheet Attachment Representations (¶42).   Every box of TOUGHCable Streakwave delivered included the TOUGHCable Box Representations (¶44).

176.    Each of these product brochures, including the brochures for TOUGHCable itself, and all of the contemporaneous Ubiquiti product brochures, were published by Streakwave on the Streakwave website.  Streakwave further distributed these material misrepresentations through digital advertisements, promotions, web pages, and through links to its web pages promoting the TOUGHCable products.  Any person researching a TOUGHCable purchase though Streakwave would have necessarily been exposed to these material statements, since the statements appear prominently in all advertisements Streakwave made available for Ubiquiti products during the pertinent time period.  Given the combination of cost, the specialized design, manufacture, and marketing, and the expert application of the Ubiquiti products, it is unreasonable to assume that any purchaser would have made their purchase without having conducted research.  The most minimal research on any of Ubiquiti's products through Streakwave invariably exposes the prospective purchaser to the TOUGHCable statements listed above, which were identical in all publications.

WHY:

177.    Streakwave engaged in the material misrepresentation detailed herein for the express purpose of inducing Plaintiff and other reasonable buyers to purchase TOUGHCable from Streakwave.  By requiring that customers who purchased Ubiquiti radio transmission products to also use shielded, earth-grounded cable in order to be covered under the Ubiquiti warranty for their purchases, Streakwave knew that it would sell more TOUGHCable.   This strategy was successful, in that Streakwave sold thousands of boxes TOUGHCable to businesses and members of the public.

MATERIALITY:

178.    Streakwave's representations regarding Ubiquiti TOUGHCable identified as the TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44), led users to believe that TOUGHCable:

- Was "Outdoor Carrier Class Shielded Ethernet Cable";

- Would "Increase Performance";

- Was "Extreme Weather-Proof";

- Was "OUTDOOR CARRIER CLASS SHIELDED";

- Would "Protect your networks from the most brutal environments. . .";

- Would "Increase Performance"

- Would "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";

- Was "Extreme Weatherproof";

- Was ". . . built to perform even in the harshest weather and environments";

- Was ". . . developed to have increased power handling performance for extended cable run lengths";

- Would "Bulletproof your networks";

- Was "Category 5e outdoor carrier-class shielded cable";

- Was encased in a "Weatherproof Jacket";

- Was "Outdoor carrier-class shielded cable";

- Would "Improve[] Ethernet link states, speeds, and performance"; and

- Was "Built to withstand harsh outdoor environments."

179.    These selling points are all highly material to the decision to spend between of $109 and $149 per box for 1,000 feet of cable. Streakwave profited by selling TOUGHCable to thousands of unsuspecting users.

180.    At a minimum, all Class members were at least exposed to the representations that TOUGHCable was that TOUGHCable was "Category 5e outdoor carrier-class shielded

cable" that was "built to withstand harsh outdoor environments," was "built to perform even in the harshest weather and environments," was encased in a "weatherproof jacket," and was "extreme weatherproof."

181.    Had Plaintiffs and the members of the Class known that the Ubiquiti TOUGHCable was not suitable for outdoor use and was not weatherproof, they would not have purchased it.

## CLASS ALLEGATIONS

182.    Plaintiffs bring this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the Classes defined as follows:

> All persons and entities who purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable Level 2.

183.    Plaintiffs propose the following subclasses:

> All persons and entities who purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable Level 2 from Streakwave.

and

> All persons and entities located in Arizona who purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable Level 2.

and

> All persons and entities located in Colorado who purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable Level 2.

Excluded from the Class and Subclass ("Classes") definitions are:

> i.    Defendants, any entity in which any Defendant has a controlling interest or which has a controlling interest in any Defendant, and any Defendant's legal representatives, predecessors, successors, assigns, and employees:

ii.   the judge and staff to whom this case is assigned, and any member of
the judge's immediate family.

184.   Plaintiffs reserve the right to amend the Class and Subclass definitions if discovery and further investigation reveals that the classes should be expanded or otherwise modified.

185.   Plaintiffs reserve the right to establish sub-classes as appropriate.

186.   Plaintiffs are members of the Classes they seek to represent.  Members of the Classes can be identified using records of retail sales and/or other information that is kept by Defendants in the usual course of business and/or in the control of Defendants.  Class members can also be notified of the class action through publication and direct mailings to address lists maintained in the usual course of business by Defendants.

187.   **Numerosity**:  Class members are so numerous that their individual joinder is impracticable.  The precise number of Class members is unknown to Plaintiffs, but it is clear that the number greatly exceeds the number to make joinder impossible.

188.   **Existence and predominance of common questions:**  Common questions of law and fact predominate over the questions affecting only individual Class members.  Some of the common legal and factual questions include:

a.   Whether  TOUGHCable:

- Was "Outdoor Carrier Class Shielded Ethernet Cable";
- Would "Increase Performance";
- Was "Extreme Weather-Proof";
- Was "OUTDOOR CARRIER CLASS SHIELDED";
- Would "Protect your networks from the most brutal environments. . .";
- Would "Increase Performance"
- Would "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";
- Was "Extreme Weatherproof";
- Was ". . . built to perform even in the harshest weather and environments";
- Was ". . . developed to have increased power handling performance for extended cable run lengths";

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

38

- Would "Bulletproof your networks";
- Was "Category 5e outdoor carrier-class shielded cable";
- Was encased in a "Weatherproof Jacket";
- Was "Outdoor carrier-class shielded cable";
- Would "Improve[] Ethernet link states, speeds, and performance"; and
- Was "Built to withstand harsh outdoor environments."

b. Whether Ubiquiti and/or Streakwave each had a duty to ensure to Plaintiffs and the Classes that the statements they were making about TOUGHCable actually comported with the facts;

c. Whether Ubiquiti and/or Streakwave breached their duties to ensure to Plaintiffs and the Classes that the statements they made about TOUGHCable actually comported with the facts;

d. Whether Ubiquiti's/Streakwave's breach of their duties to ensure the accuracy of their statements about TOUGHCable caused damage to Plaintiffs and the Classes;

e. Whether the conduct of Ubiquiti constituted a breach of express warranty;

f. Whether the conduct of Streakwave constituted a breach of express warranty;

g. Whether the conduct of Streakwave constituted a breach of the implied warranty of merchantability;

h. Whether the conduct of Streakwave constituted a breach of contract;

i. Whether California law can and should be applied to Plaintiffs and the Classes;

j. Whether Ubiquiti and/or Streakwave was negligent in making the herein-described representations regarding TOUGHCable;

k. Whether, as a result of Ubiquiti's/Streakwave's conduct, Plaintiffs and the Classes have suffered damages; and if so the appropriate amount thereof.

189.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs and the Classes.  Similar or identical statutory and

common law violations, business practices, statements and advertising regarding the product are involved.  Individual questions, if any, pale by comparison to the numerous common questions that predominate.

190.     The injuries sustained by Plaintiffs and the Classes flow, in each instance, from a common nucleus of operative facts.  Between March 2011 and until Ubiquiti stopped shipping its TOUGHCable Level 1 and Level 2 products, both Ubiquiti and Streakwave continuously and uninterruptedly made the claims that TOUGHCable:

- Was "Outdoor Carrier Class Shielded Ethernet Cable";
- Would "Increase Performance";
- Was "Extreme Weather-Proof";
- Was "OUTDOOR CARRIER CLASS SHIELDED";
- Would "Protect your networks from the most brutal environments. . .";
- Would "Increase Performance"
- Would "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";
- Was "Extreme Weatherproof";
- Was ". . . built to perform even in the harshest weather and environments";
- Was ". . . developed to have increased power handling performance for extended cable run lengths";
- Would "Bulletproof your networks";
- Was "Category 5e outdoor carrier-class shielded cable";
- Was encased in a "Weatherproof Jacket";
- Was "Outdoor carrier-class shielded cable";
- Would "Improve[] Ethernet link states, speeds, and performance"; and
- Was "Built to withstand harsh outdoor environments."

191.      These claims, identical in their iterations, were broadly disseminated, continuous, and ubiquitous.

192.     Class members have been damaged by Defendants' misconduct.  The claims Ubiquiti and Streakwave made that TOUGHCable:

- Was "Outdoor Carrier Class Shielded Ethernet Cable";

- Would "Increase Performance";

- Was "Extreme Weather-Proof";

- Was "OUTDOOR CARRIER CLASS SHIELDED";

- Would "Protect your networks from the most brutal environments. .";

- Would "Increase Performance"

- Would "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";

- Was "Extreme Weatherproof";

- Was ". . . built to perform even in the harshest weather and environments";

- Was ". . . developed to have increased power handling performance for extended cable run lengths";

- Would "Bulletproof your networks";

- Was "Category 5e outdoor carrier-class shielded cable";

- Was encased in a "Weatherproof Jacket";

- Was "Outdoor carrier-class shielded cable";

- Would "Improve[] Ethernet link states, speeds, and performance"; and

- Was "Built to withstand harsh outdoor environments."

were false, and Class members, by virtue of their purchase of TOUGHCable, were harmed thereby.  Class members would not purchased TOUGHCable and/or paid as much as they did had they known the truth about the TOUGHCable.

193.  **Typicality**:  Plaintiffs' claims are typical of the claims of the other proposed Class members.  Each of the Plaintiffs purchased one or more boxes of Ubiquiti TOUGHCable from Streakwave.  However, the TOUGHCable that Plaintiffs purchased were, contrary to the claims of Ubiquiti and Streakwave, not suitable for outdoor use and not weatherproof, and Plaintiffs suffered damage thereby, and each Plaintiff has had to replace all of the TOUGHCable they installed.  Plaintiffs have been damaged in similar or equivalent manners as each member of the proposed Classes.

194.   **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs are familiar with the basic facts that form the bases of the proposed Class members' claims.  Plaintiffs' interests do not conflict with the interests of the other Class members that they seek to represent.  Plaintiffs have retained counsel competent and experienced in class action litigation who will prosecute this action vigorously.  Plaintiffs' counsel has successfully prosecuted complex actions including consumer protection class actions.  Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class members.

195.   **Superiority**:  The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the proposed Class members.  The relief sought per individual member of the Classes is relatively small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by the conduct of Defendants.  Furthermore, it would be virtually impossible for the Class members to seek redress on an individual basis.  Even if the Class members themselves could afford such individual litigation, the court system could not.

196.   Individual litigation of the legal and factual issues raised by the conduct of Defendants would increase delay and expense to all parties and to the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.

197.   Given the similar nature of the Class members' claims and the absence of material differences in the state statutes upon which the Class members' claims are based, a class will be easily managed by the court and the parties.

198.   The court may be requested to also incorporate additional subclasses of plaintiffs, defendants, or both, in the interest of justice and judicial economy.

199.   In the alternative, the Class may be certified because:

a.   the prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct by Defendants;

b.   the prosecution of separate actions by individual Class members would

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

42

create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.      Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

**FIRST CAUSE OF ACTION**
**Against Ubiquiti**
**(Negligence)**

200.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

201.    Ubiquiti had a duty to Plaintiffs and the Class to exercise reasonable and ordinary care in the formulation, testing, design, manufacturing, production, marketing, and distribution of its TOUGHCable.

202.    Ubiquiti breached its duty by inadequately formulating and designing its defective TOUGHCable product to Plaintiffs and the Class.

203.    Ubiquiti breached its duty by manufacturing, producing, and selling a defective product to Plaintiffs and the Class.

204.    Ubiquiti breached its duty by inadequately testing, or not testing at all, its TOUGHCable to ascertain if the TOUGHCable actually conformed to the statements and representations Ubiquiti made in describing TOUGHCable.

205.    Ubiquiti breached its duty by representing to the Class that TOUGHCable was suitable for outdoor use, when in fact, it was not.

206.    Ubiquiti breached its duty by representing to the Class that TOUGHCable was "outdoor carrier class shielded" when in fact, it was not.

207.    Ubiquiti breached its duty by representing to the Class that TOUGHCable would "Protect . . . . networks from the most brutal environments," when in fact, it would not.

208.    Ubiquiti breached its duty by representing to the Class that TOUGHCable was "industrial-grade shielded Ethernet cable" when in fact, it was not.

209.    Ubiquiti breached its duty by representing to the Class that TOUGHCable was appropriate for "Extreme Weatherproof" environments when in fact, it was not.

210.    Ubiquiti breached its duty by representing to the Class that TOUGHCable was "built to perform even in the harshest weather and environments" when in fact, it was not.

211.    Ubiquiti breached its duty by representing to the Class that TOUGHCable was "Category 5e outdoor carrier-class shielded cable" when in fact, it was not.

212.    As described herein, Ubiquiti's defective TOUGHCable failed when used as directed in outdoor use, by cracking and splitting, and allowing the TOUGHCable to wick up water, and pool the water down into sensitive electronic equipment, placing that equipment at risk of failure, or destroying it.

213.    Ubiquiti further breached its duty by failing to notify Plaintiffs and the Class of the defects in the TOUGHCable they were purchasing.

214.    Ubiquiti had complete control over its manufacturing, testing, production, and distribution facilities and knew or should have known that its TOUGHCable was defective.

215.    It was also completely foreseeable to Ubiquiti that Plaintiffs and the Class would rely upon Ubiquiti's marketing claims that TOUGHCable:

- was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable.

216.    Neither Plaintiffs nor other Class members contributed to the failure of TOUGHCable to conform with the representations Ubiquiti made about its TOUGHCable products.

**SECOND CAUSE OF ACTION**
**Against Ubiquiti**
**(Negligent Misrepresentation)**

217.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

218.    Ubiquiti represented to Plaintiffs and the Class that TOUGHCable:

- was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable.

and was merchantable and fit for its intended use.

219.    These representations were not true because Ubiquiti's TOUGHCable was defective and completely unsuited for outdoor use.

220.    Ubiquiti had no reasonable grounds for believing these representations to be true, or alternatively Ubiquiti failed to ascertain if the representations were true before making them.

221.    Ubiquiti intended for Plaintiffs and members of the Class to rely on its representations regarding the quality and attributes of its TOUGHCable.

222.    Ubiquiti owed Plaintiffs and the Class a duty to: (a) act with reasonable care in preparing the information contained in its advertisements, brochures, and marketing materials, and disseminated to Plaintiffs and the Class, and which Plaintiffs and the Class relied upon in deciding to purchase TOUGHCable; and (b) use reasonable care in determining the accuracy of the information contained therein.

223.    Ubiquiti breached its duty to Plaintiffs and the Class by failing to investigate, test, confirm, and review with reasonable care the information contained in its advertisements, brochures, and marketing materials, and in failing to correct the misstatements, omissions and inaccuracies contained therein.

224.    Plaintiffs and the Class relied on Defendant's labeling representations set forth herein, and, in reliance thereon, purchased Ubiquiti's TOUGHCable.  The reliance by Plaintiffs and the Class was reasonable and justified in that Ubiquiti appeared to be, and

represented itself to be, a reputable business, and it distributed and sold TOUGHCable
through reputable companies.

225.    Ubiquiti had a legal duty to disclose to Plaintiffs and the Class at all times
before the sale of TOUGHCable all facts that would have materially affected the product
being utilized to provide the wired communication link between outdoor and indoor
equipment.  The complete unsuitability of TOUGHCable for outdoor use was a material fact
that would and should have affected the buying and installation decisions of purchasers.

226.    Such knowledge was completely in the possession of Ubiquiti and was
unknown to Plaintiffs and the Class. The failure to disclose such material facts was uniform
in the sale of all TOUGHCable.

227.    Ubiquiti uniformly represented to Plaintiffs and the Class through its written
materials that TOUGHCable:

- was suitable for outdoor use;
- Was "OUTDOOR CARRIER CLASS SHIELDED;"
- Would "Protect . . . . networks from the most brutal environments;"
- Was actually "industrial-grade shielded Ethernet cable;"
- Was appropriate for "Extreme Weatherproof" environments;
- Was "built to perform even in the harshest weather and environments";
- Was a Category 5e outdoor carrier-class shielded cable.

228.    Ubiquiti knew, or in the exercise of reasonable diligence should have known,
that Plaintiffs and the Class would rely upon such representations.

229.    Plaintiffs and the Class did reasonably rely on those representations. Had
Plaintiffs and the Class known about these material facts, they would not have purchased
Defendant's TOUGHCable.

230.    As a result of the conduct of Defendant, Plaintiffs and the Class have been
damaged.

**THIRD CAUSE OF ACTION**
**Breach of Express Warranty against Ubiquiti**
**(By All Plaintiffs on Behalf of Themselves and a Class)**

231.     Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

232.     Ubiquiti made the following written representations regarding TOUGHCable: TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

233.     Each of the above statements was a factual description by Ubiquiti of the characteristics, properties, and qualities of TOUGHCable.

234.     Plaintiffs and the Classes relied in good faith upon Ubiquiti's written representations concerning the characteristics, properties, and qualities of TOUGHCable in making their determination to purchase TOUGHCable.   The representations listed above were material to Plaintiffs and the Class, and became at least part of the basis of the bargain, if not the entire basis of the bargain, entered into by Plaintiffs and the Classes to purchase TOUGHCable.  Plaintiffs and the Classes would not have purchased TOUGHCable if they had been informed that TOUGHCable was not in conformance with these factual affirmations, assurances, and descriptions put forward by Ubiquiti.

235.     Ubiquiti  breached its express warranties to Plaintiffs and the Classes in that TOUGHCable:

- Was not "Outdoor Carrier Class Shielded Ethernet Cable";

- Would not "Increase Performance";

- Was not "Extreme Weather-Proof";

- Was not "OUTDOOR CARRIER CLASS SHIELDED";

- Would not "Protect your networks from the most brutal environments. .";

- Would not "Increase Performance"

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";

- Was not "Extreme Weatherproof";

- Was not ". . . built to perform even in the harshest weather and environments";

- Was not ". . . developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof your networks";

- Was not "Category 5e outdoor carrier-class shielded cable";

- Was not encased in a "Weatherproof Jacket";

- Was not "Outdoor carrier-class shielded cable";

- Would not "Improve[] Ethernet link states, speeds, and performance"; and

- Was not "Built to withstand harsh outdoor environments."

236.    Ubiquiti's conduct in manufacturing, marketing, and selling defective TOUGHCable constituted a breach of express warranty, as well as a breach of Ubiquiti's obligation of good faith and fair dealing.

237.    Plaintiffs and the Classes have performed all conditions, covenants and promises required to be performed on their part in accordance with the express warranties made by Ubiquiti.

238.    As a direct and proximate result of Ubiquiti's breach of the express warranty, Plaintiffs and the Classes have been damaged in an amount to be determined at trial but in excess of an aggregate amount of $5,000,000.

239.    Plaintiffs, on behalf of themselves, have provided timely Notice to Ubiquiti.

240.     Alternatively, for all Plaintiffs and Class members who can be categorized as "unsophisticated purchasers" for purposes of notice of breach to a manufacturer who was not a party to the transaction by which TOUGHCable was purchased (TOUGHCable purchased from third party distributors and resellers) are excused from notice as to Ubiquiti.  In such cases, notice from the ultimate purchasers (Plaintiffs and Class members) to the manufacturer (Ubiquiti) was not required.

241.     Plaintiffs, on behalf of themselves and the Classes, provided Ubiquiti with notice of their and the putative Class members' warranty claims by virtue of letters sent to Ubiquiti on October 3, 2013, and October 18, 2013, and October 25, 2013, copies of which are attached hereto collectively as Exhibit A.

242.     As of the date of filing of this amended pleading, damage is still manifesting and accruing as previously installed TOUGHCable continues to degrade, disintegrate, and fail.

243.     As a direct and proximate result of Ubiquiti's breach of its express warranties, Plaintiffs and the Classes have suffered or will suffer damages, which include, without limitation:

    a.   Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

    b.   Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

    c.   Cost of cover cable;

    d.   Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

    e.   Employee/subcontractor time and expenses (and benefits) associated with

replacement of defective cable;

f.   Employee/subcontractor travel time and expenses to replace defective cable;

g.   Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

h.   Lost customers, and compensation to damaged customers;

i.   Lost profits, and

j.   Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**Breach of Express Warranty against Streakwave**
**(By Peak Internet and Freeway Networks**
**on Behalf of Themselves and the Streakwave Subclass)**

244.   Peak Internet and Freeway Networks incorporate by reference each allegation set forth in the preceding paragraphs.

245.   Streakwave made the following written representations regarding TOUGHCable:  TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

246.   Each of the above statements was a factual description by Streakwave of the characteristics, properties, and qualities of TOUGHCable.

247.   Peak Internet and Freeway Networks and the Classes relied in good faith upon Streakwave's written representations concerning the characteristics, properties, and qualities of TOUGHCable in making their determination to purchase TOUGHCable.   The representations listed above were material to Peak Internet and Freeway Networks and the Class, and became at least part of the basis of the bargain, if not the entire basis of the

bargain, entered into by Peak Internet and Freeway Networks and the Classes to purchase TOUGHCable.  Peak Internet and Freeway Networks and the Classes would not have purchased TOUGHCable if they had been informed that TOUGHCable was not in conformance with these factual affirmations, assurances, and descriptions put forward by Streakwave.

248.    Streakwave  breached its express warranties to Peak Internet and Freeway Networks and the Classes in that TOUGHCable:

- Was not "Outdoor Carrier Class Shielded Ethernet Cable";

- Would not "Increase Performance";

- Was not "Extreme Weather-Proof";

- Was not "OUTDOOR CARRIER CLASS SHIELDED";

- Would not "Protect your networks from the most brutal environments. . .";

- Would not "Increase Performance"

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";

- Was not "Extreme Weatherproof";

- Was not ". . . built to perform even in the harshest weather and environments";

- Was not ". . . developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof your networks";

- Was not "Category 5e outdoor carrier-class shielded cable";

- Was not encased in a "Weatherproof Jacket";

- Was not "Outdoor carrier-class shielded cable";

- Would not "Improve[] Ethernet link states, speeds, and performance"; and

- Was not "Built to withstand harsh outdoor environments."

249.    Streakwave's conduct in marketing and selling defective TOUGHCable constituted a breach of express warranty, as well as a breach of Streakwave's obligation of good faith and fair dealing.

250.    Peak Internet and Freeway Networks and the Classes have performed all conditions, covenants and promises required to be performed on their part in accordance with the express warranties made by Streakwave.

251.    As a direct and proximate result of Streakwave's breach of the express warranty, Peak Internet and Freeway Networks and the Classes have been damaged in an amount to be determined at trial but in excess of an aggregate amount of $5,000,000.

252.    Peak Internet, on behalf of itself, provided timely notice to Streakwave.

253.    Streakwave provided timely notice to Freeway Networks, and, on information and belief, Streakwave provided timely notice to other members of the Class, that there was a problem with the TOUGHCable product it had sold.

254.    Plaintiff Peak Internet and Freeway Networks provided Streakwave with notice of breach on behalf of themselves and the Classes by virtue of letters sent to Streakwave on October 18, 2013, and October 25, 2013, copies of which are attached hereto collectively as Exhibit B.

255.    As of the date of filing of this amended pleading, damage is still manifesting and accruing as previously installed TOUGHCable continues to degrade, disintegrate, and fail.

256.    As a direct and proximate result of Streakwave's breach of its express warranties, Peak Internet and Freeway Networks and the Classes have suffered or will suffer

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

damages, which include, without limitation:

    k.  Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

    l.  Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

    m.  Cost of cover cable;

    n.  Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

    o.  Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

    p.  Employee/subcontractor travel time and expenses to replace defective cable;

    q.  Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

    r.  Lost customers, and compensation to damaged customers;

    s.  Lost profits, and

    t.  Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability against Streakwave**
**(By Peak Internet and Freeway Networks**
**on Behalf of Themselves and the Streakwave Subclass)**

257.    Peak Internet and Freeway Networks incorporate by reference each allegation set forth in the preceding paragraphs.

258.    Streakwave had direct dealings with Peak Internet and Freeway Networks and the Classes through its marketing efforts in promoting its TOUGHCable products.

259.    Ubiquiti made the following written representations regarding TOUGHCable: TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

260.    Streakwave republished each of the TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42) in its own promotional materials it made available to the public, its customers, and members of the Classes.

261.    The TOUGHCable Box Representations (¶44) were printed prominently on each box of TOUGHCable Streakwave delivered to its customers.

262.    Each of the TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44) comprised material terms of the contracts entered into by members of the Streakwave Subclass to purchase TOUGHCable.  Streakwave Subclass members would not have purchased TOUGHCable from Streakwave if they had known that TOUGHCable did not conform to those representations, descriptions, and specifications.

263.    TOUGHCable was not fit for the ordinary purpose for which it was marketed, advertised, and sold.

264.    TOUGHCable was represented to be "Category 5e outdoor carrier-class shielded cable" that was "built to withstand harsh outdoor environments," was "built to perform even in the harshest weather and environments," was encased in a "weatherproof jacket," and was "extreme weatherproof."  None of these descriptions of TOUGHCable were true.

265.    Although TOUGHCable was intended for outdoor use, and it was sold expressly for outdoor installations, TOUGHCable possessed a fundamental defect that rendered the product entirely unfit for its intended use.  That defect was its complete

unsuitability for any outdoor use whatsoever:  TOUGHCable would degrade, crack, wick

water, and pose a threat of destruction to any equipment which was connected to it.  Virtually

all of Ubiquiti's radio and transceiver equipment was equipment was designed for use

outdoors – for the sending of signal wirelessly over great distances (miles).

266.   Because TOUGHCable posed an imminent threat of destruction to any

equipment which was connected to it, it did not possess even the most basic degree of

suitability for the use for which it was intended, advertised, and sold.

267.   Commonly available standard indoor Cat5e cable - cable ordinarily not

intended for outdoor use – can be used outdoors for five years, and in some circumstances,

up to ten years, without failure or damage to radios.   TOUGHCable began to fail and cause

damage to equipment in as little as six months after installation. The TOUGHCable product

fell well below the industry standard for "Category 5e outdoor carrier-class shielded cable."

268.   Each of the descriptions of TOUGHCable made on TOUGHCable box (the

TOUGHCable Box Representations (¶44)) were promises or affirmations of fact to which the

product TOUGHCable itself did not conform.

269.   Peak Internet, on behalf of itself, provided timely notice to Streakwave.

270.   Streakwave provided timely notice to Freeway Networks, and, on information

and belief, Streakwave provided timely notice to other members of the Class, that there was a

problem with the TOUGHCable product it had sold.

271.   Peak Internet and Freeway Networks provided Streakwave with notice of their

warranty claims on behalf of themselves and the Classes by virtue of letters sent to

Streakwave on October 18, 2013, and October 25, 2013, copies of which are attached hereto

collectively as Exhibit B.

272.   As a result of Defendant's breach of the implied warranty of merchantability,

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Peak Internet and Freeway Networks and the Streakwave Subclass have suffered economic losses and other general, consequential and specific damages, including, but not limited to the following:

     a.  Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

     b.  Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

     c.  Cost of cover cable;

     d.  Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

     e.  Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

     f.  Employee/subcontractor travel time and expenses to replace defective cable;

     g.  Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

     h.  Lost customers, and compensation to damaged customers;

     i.  Lost profits, and

     j.  Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**Breach of Contract against Streakwave**
**(By All Plaintiffs on Behalf of Themselves and the Streakwave Subclass)**

273.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs.

1

2

3

274.     Plaintiffs and members of the Streakwave Subclass purchased TOUGHCable from Streakwave.  Each sale of TOUGHCable by Streakwave gave rise to a contract between the buyer and seller ("TOUGHCable Sales Contracts").

4

5

6

7

275.     Plaintiffs and members of the Streakwave Subclass each performed all conditions, covenants and promises required to be performed on their part in accordance with the TOUGHCable sales contracts.

8

9

10

276.     Ubiquiti made the following written representations regarding TOUGHCable: TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

11

12

13

14

15

277.     TOUGHCable was represented to be "Category 5e outdoor carrier-class shielded cable" that was "built to withstand harsh outdoor environments," was "built to perform even in the harshest weather and environments," was encased in a "weatherproof jacket," and was "extreme weatherproof."

16

17

18

19

278.     Each of the statements in Paragraph 277 formed part of the basis of the bargain by Plaintiffs and members of the Streakwave Subclass to purchase TOUGHCable from Streakwave.

20

21

279.     Each of the statements in Paragraph 277 were material terms of the contracts between Streakwave and all purchasers of TOUGHCable.

22

23

24

25

26

280.     These terms were material because TOUGHCable's actual failure to conform to those statements required all purchasers who bought and installed TOUGHCable to rip it out and throw it away, and replace it with Cat5e cable that actually did conform to those representations.

27

28

281.     Plaintiffs and the Classes relied on Streakwave's publication of Ubiquiti's promotional materials.  As a result of direct dealings with Streakwave, Plaintiffs and the

Classes purchased Ubiquiti's TOUGHCable from Streakwave.

282.     Plaintiffs also relied on Streakwave's reputation and brand name in selecting Ubiquiti TOUGHCable as a product to offer for sale and distribution. Plaintiffs believed Streakwave would exercise skill and judgment to in the selection, marketing, and sale of cable suitable for the purposes for which they were advertised.

283.     Streakwave impliedly warranted that their TOUGHCable was fit for the purpose for which it was intended, and free of defects.  Plaintiffs and the Classes are the intended beneficiaries of Streakwave's implied warranties.

284.     The TOUGHCable that Streakwave delivered to Plaintiffs and members of the Streakwave Subclass did not conform to Streakwave's descriptions of the TOUGHCable it contracted to sell to them.

285.     The TOUGHCable that Streakwave delivered to Plaintiffs and members of the Streakwave Subclass could not be used for the purposes for which it was sold.

286.     Plaintiffs and the Classes have performed all conditions, covenants and promises required to be performed on their part in accordance with the warranties.

287.     Streakwave breached each and every contract for sale of TOUGHCable in that the TOUGHCable product it sold did not conform with the representations, descriptions, and specifications that Streakwave asserted TOUGHCable possessed.  Each of these representations, descriptions, and specifications constituted a material term of the contracts that Streakwave entered into with purchasers of TOUGHCable.

288.     Plaintiffs, on behalf of themselves, have each provided timely notice of breach to Streakwave.

289.     Plaintiffs provided Streakwave with notice of breach on behalf of themselves and a putative Class by virtue of letters sent to Streakwave on October 3, 2013, and October

18, 2013, and October 25, 2013, copies of which are attached hereto collectively as Exhibit B.

290.    As a result of Streakwave's breach of contract, Plaintiffs and the Classes have suffered economic losses and other general, consequential, and specific damages, including, but not limited to the following:

k.   Expenses incurred in inspection, receipt, transportation, and care of the TOUGHCable;

l.   Expenses incurred in acquisition, inspection, receipt, transportation, and care of the replacement TOUGHCable;

m.  Cost of cover cable;

n.   Cost of replacement parts, such as cable connectors and radios damaged by defective cable;

o.   Employee/subcontractor time and expenses (and benefits) associated with replacement of defective cable;

p.   Employee/subcontractor travel time and expenses to replace defective cable;

q.   Commissions, taxes, fees associated with defective TOUGHCable and the replacement thereof;

r.   Lost customers, and compensation to damaged customers;

s.   Lost profits, and

t.   Other damage caused by the defective TOUGHCable in an amount to be determined at trial.

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SEVENTH CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(By Peak Internet against Ubiquiti and Streakwave**
**on Behalf of the Colorado Subclass)**

290.     Peak Internet, on behalf of itself and the Colorado Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

291.     Pursuant to COLO. REV. STAT. § 4-2-313(1)(a), "any affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Additionally, "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Id*. at § 4- 2-313(1)(b). "It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty . . . ." *Id*. at § 4-2-313(2).

292.     Defendants engaged in extensive marketing and advertising, including, but not limited to, print, electronic media, internet, and direct marketing through agents, to promote and sell TOUGHCable.

293.     Both Ubiquiti and Streakwave made the following written representations regarding TOUGHCable:  TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

294.     Each of the above statements was a factual description by Defendants of the characteristics, properties, and qualities of TOUGHCable.

295.     Peak Internet and members of the Colorado Subclass relied in good faith upon Defendants written representations concerning the characteristics, properties, and qualities of

TOUGHCable in making their determination to purchase TOUGHCable.   The representations listed above were material to Peak Internet and the Colorado Subclass, and became at least part of the basis of the bargain, if not the entire basis of the bargain, entered into by Peak Internet and the Colorado Subclass to purchase TOUGHCable.  Peak Internet and the Colorado Subclass would not have purchased TOUGHCable if they had been informed that TOUGHCable was not in conformance with these factual affirmations, assurances, and descriptions put forward by Defendants.

296.   The TOUGHCable did not conform to Defendant's representation because it:

- Was not "Outdoor Carrier Class Shielded Ethernet Cable";

- Would not "Increase Performance";

- Was not "Extreme Weather-Proof";

- Was not "OUTDOOR CARRIER CLASS SHIELDED";

- Would not "Protect your networks from the most brutal environments";

- Would not "Increase Performance"

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance . . . ";

- Was not "Extreme Weatherproof";

- Was not ". . . built to perform even in the harshest weather and environments";

- Was not ". . . developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof your networks";

- Was not "Category 5e outdoor carrier-class shielded cable";

- Was not encased in a "Weatherproof Jacket";

- Was not "Outdoor carrier-class shielded cable";

- Would not "Improve[] Ethernet link states, speeds, and performance"; and

- Was not "Built to withstand harsh outdoor environments."

297.   The defects in the description of TOUGHCable constitute a breach of the express warranties made by Defendants.

298.   Peak Internet, on behalf of itself and the Colorado Subclass, has satisfied all conditions precedent necessary to bring this action.

299.   Streakwave has received sufficient and timely notice of the breaches of warranty alleged herein.

300.   Although notice to Ubiquiti is not required under Colorado law, Peak Internet has sent pre-suit notice of breach to Ubiquiti (Exhibit A).

301.   Despite this notice and Defendants' knowledge of the defects in TOUGHCable, Defendants have failed and refused to honor their warranty, even though they know of the defect inherent in TOUGHCable.

302.   Peak Internet and the Colorado Subclass have given Defendants a reasonable opportunity to cure their failures with respect to their warranty, and Defendants have failed to do so.

303.   The failure of TOUGHCable to perform as expressly warranted by Defendants has caused Peak Internet and the Colorado Subclass damage as herein described.

304.   Peak Internet, on behalf of itself and the Colorado Subclass, seek all available

1    remedies and damages for Defendants' breach of express warranty.

2                    **EIGHTH CAUSE OF ACTION:**
     **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
3    **(By Peak Internet against Streakwave on Behalf of the Colorado Class)**

4          305.    Peak Internet, on behalf of itself and the Colorado Subclass, incorporate by

5    reference each allegation set forth in the preceding paragraphs.

6          306.    Pursuant to COLO. REV. STAT. § 4-2-314(1)-(2), "a warranty that the goods

7
     shall be merchantable is implied in a contract for their sale if the seller is a merchant with
8
     respect to goods of that kind."  "Goods to be merchantable must be at least such as: (a) Pass
9
     without objection in the trade under the contract description; and (b) In the case of fungible
10
     goods, are of fair average quality within the description; and (c) Are fit for the ordinary
11
     purposes for which such goods are used; and (d) Run, within the variations permitted by the
12
     agreement, of even kind, quality, and quantity within each unit and among all units involved;
13
     and (e) Are adequately contained, packaged, and labeled as the agreement may require; and
14
     (f) Conform to the promises or affirmations of fact made on the container or label if any."
15

16         307.    Here, Streakwave is considered a merchant with respect to the sale of

17   TOUGHCable.

18         308.    Streakwave engaged in extensive marketing and advertising, including, but
19
     not limited to, print, electronic media, internet, and direct marketing through agents, to
20
     promote and sell TOUGHCable.
21
           309.    Streakwave made the following written representations regarding
22
     TOUGHCable:  TOUGHCable Datasheet Representations (¶39), the TOUGHCable
23
     Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations
24
     (¶44).
25
           310.    Each of the above statements was a factual description by Streakwave of the
26

27

28
     _____
     PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

characteristics, properties, and qualities of TOUGHCable.

311.   TOUGHCable, however, did not pass without objection in the trade under the contract description; and was not fit for the ordinary purposes for which such goods are used; and did not conform to the promises or affirmations of fact made on the container or label, in that TOUGHCable:

- Was not "Outdoor Carrier Class Shielded Ethernet Cable";

- Would not "Increase Performance";

- Was not "Extreme Weather-Proof";

- Was not "OUTDOOR CARRIER CLASS SHIELDED";

- Would not "Protect your networks from the most brutal environments.";

- Would not "Increase Performance"

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance . . . ";

- Was not "Extreme Weatherproof";

- Was not ". . . built to perform even in the harshest weather and environments";

- Was not ". . . developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof your networks";

- Was not "Category 5e outdoor carrier-class shielded cable";

- Was not encased in a "Weatherproof Jacket";

- Was not "Outdoor carrier-class shielded cable";

- •  Would not "Improve[] Ethernet link states, speeds, and performance";

and

- •  Was not "Built to withstand harsh outdoor environments."

312.  Based on the forgoing, TOUGHCable did not conform to Streakwave's statements, assurances, and descriptions.

313.  The above discussed defects constitute a breach of the implied warranty of merchantability.

314.  The failure of TOUGHCable, as expressly and impliedly warranted by Defendants has caused Peak Internet and the Colorado Subclass damage as herein described.

315.  Peak Internet, on behalf of itself and the Colorado Subclass, has satisfied all conditions precedent necessary to bring this action, including Notice.

316.  Therefore, Peak Internet, on behalf of itself and the Colorado Subclass, seeks all available remedies and damages for Streakwave's breach of implied warranty of merchantability.

### NINTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
**(By Freeway Networks against Ubiquiti and Streakwave
on Behalf of the Arizona Class)**

317.  Freeway Networks, on behalf of itself and the Arizona Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

318.  Pursuant ARIZ. REV. STAT. § 47-2313(A)(1), "any affirmation of fact or promise made by the seller to the buyer which relates to the good and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Additionally, "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the

description." *Id*. at § 47-2313(A)(2). "It is not necessary to the creation of an express

warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a

specific intention to make a warranty . . . ." *Id*. at § 47-2313(B).

319.    Defendants engaged in extensive marketing and advertising, including, but not

limited to, print, electronic media, internet, and direct marketing through agents, to promote

and sell TOUGHCable.

320.    Both Ubiquiti and Streakwave made the following written representations

regarding TOUGHCable:  TOUGHCable Datasheet Representations (¶39), the

TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box

Representations (¶44).

321.    Each of the above statements was a factual description by Defendants of the

characteristics, properties, and qualities of TOUGHCable.

322.    Freeway Networks and the Arizona Subclass relied in good faith upon

Defendants written representations concerning the characteristics, properties, and qualities of

TOUGHCable in making their determination to purchase TOUGHCable.   The

representations listed above were material to Freeway Networks and the Arizona Subclass,

and became at least part of the basis of the bargain, if not the entire basis of the bargain,

entered into by Freeway Networks and the Classes to purchase TOUGHCable.  Freeway

Networks and the Arizona Subclass would not have purchased TOUGHCable if they had

been informed that TOUGHCable was not in conformance with these factual affirmations,

assurances, and descriptions put forward by Defendants.

323.    The TOUGHCable did not conform to Defendant's representation because it:

- Was not "Outdoor Carrier Class Shielded Ethernet Cable";

- Would not "Increase Performance";

- Was not "Extreme Weather-Proof";

- Was not "OUTDOOR CARRIER CLASS SHIELDED";

- Would not "Protect your networks from the most brutal environments.";

- Would not "Increase Performance"

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";

- Was not "Extreme Weatherproof";

- Was not ". . . built to perform even in the harshest weather and environments";

- Was not ". . . developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof your networks";

- Was not "Category 5e outdoor carrier-class shielded cable";

- Was not encased in a "Weatherproof Jacket";

- Was not "Outdoor carrier-class shielded cable";

- Would not "Improve[] Ethernet link states, speeds, and performance"; and

- Was not "Built to withstand harsh outdoor environments."

324.    The defects in the description of TOUGHCable constitute a breach of the express warranties made by Defendants.

325.    Freeway Networks, on behalf of itself and the Arizona Subclass, has satisfied all conditions precedent necessary to bring this action.

326.    Defendants have received sufficient and timely notice of the breaches of warranty alleged herein. Despite this notice and Defendants' knowledge of the defects in TOUGHCable, Defendants have failed and refused to honor their warranty, even though they know of the defect inherent in TOUGHCable.

327.    Freeway Networks and the Arizona Subclass have given Defendants a reasonable opportunity to cure their failures with respect to their warranty, and Defendants have failed to do so.

328.    The failure of TOUGHCable to perform as expressly warranted by Defendants has caused Freeway Networks and the Arizona Subclass damage as herein described.

329.    Freeway Networks, on behalf of itself and the Arizona Subclass, seek all available remedies and damages for Defendants' breach of express warranty.

**TENTH CAUSE OF ACTION:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(By Freeway Networks against Streakwave on Behalf of the Arizona Class)**

330.    Freeway Networks, on behalf of itself and the Arizona Subclass, incorporate by reference each allegation set forth in the preceding paragraphs.

331.    Pursuant to ARIZ. REV. STAT. § 47-2314(A)-(2), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." "Goods to be merchantable must be at least such as: (a) Pass without objection in the trade under the contract description; and (b) In the case of fungible goods, are of fair average quality within the description; and (c) Are fit for the ordinary purposes for which such goods are used; and (d) Run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and (e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any."

332.    Here, Streakwave is considered a merchant with respect to the sale of TOUGHCable.

333.    Streakwave engaged in extensive marketing and advertising, including, but not limited to, print, electronic media, internet, and direct marketing through agents, to promote and sell TOUGHCable.

334.    Streakwave made the following written representations regarding TOUGHCable:  TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44).

335.    Each of the above statements was a factual description by Streakwave of the characteristics, properties, and qualities of TOUGHCable.

336.    TOUGHCable, however, did not pass without objection in the trade under the contract description; and was not fit for the ordinary purposes for which such goods are used; and did not conform to the promises or affirmations of fact made on the container or label, in that TOUGHCable:

- Was not "Outdoor Carrier Class Shielded Ethernet Cable";

- Would not "Increase Performance";

- Was not "Extreme Weather-Proof";

- Was not "OUTDOOR CARRIER CLASS SHIELDED";

- Would not "Protect your networks from the most brutal environments.";

- Would not "Increase Performance"

- Would not "Dramatically improve your Ethernet link states, speeds, and overall performance . . .";

- Was not "Extreme Weatherproof";

- Was not ". . . built to perform even in the harshest weather and environments";

- Was not ". . . developed to have increased power handling performance for extended cable run lengths";

- Would not "Bulletproof your networks";

- Was not "Category 5e outdoor carrier-class shielded cable";

- Was not encased in a "Weatherproof Jacket";

- Was not "Outdoor carrier-class shielded cable";

- Would not "Improve[] Ethernet link states, speeds, and performance"; and

- Was not "Built to withstand harsh outdoor environments."

337.    Based on the forgoing, TOUGHCable did not conform to Streakwave's statements, assurances, and descriptions.

338.    The above discussed defects constitute a breach of the implied warranty of merchantability.

339.    The failure of the TOUGHCable, as expressly and impliedly warranted by Streakwave has caused Peak Internet and the Colorado Subclass damage as herein described.

340.    Freeway Networks, on behalf of itself and the Arizona Subclass, has satisfied all conditions precedent necessary to bring this action, including notice.

341.    Therefore, Freeway Networks, on behalf of itself and the Arizona Subclass,

1  seeks all available remedies and damages for Streakwave's breach of implied warranty of

2  merchantability.

3                           **PRAYER FOR RELIEF**

4          WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and all Subclasses, pray

5  for judgment against Defendants and the granting of the following relief:

6

7          a.       An order certifying this case as a class action and appointing Plaintiffs'

8  counsel to represent the Class and Subclasses;

9          b.       All recoverable compensatory and other damages sustained by Plaintiffs and

10  the Class and Subclasses;

11
12         d.       Pre-judgment and post-judgment interest on any amounts;

13         g.       Payment of reasonable attorneys' fees and costs as may be allowable under

14  applicable law; and

15         h.       Such other relief as the Court may deem just and proper.

16

17

18  DATED this 14th day of April, 2014.

                                    PARISI & HAVENS LLP
19                                   LAW OFFICES OF ALAN HIMMELFARB

20                                   s/Alan Himmelfarb
                                     By:  Alan Himmelfarb
21
                                     David C. Parisi (SBN 162248)
22                                   Suzanne Havens Beckman (SBN 188814)
                                     PARISI & HAVENS LLP
23                                   212 Marine Street, Ste. 100
24                                   Santa Monica, California 90405
                                     Telephone: (818) 990-1299
25
                                     THE LAW OFFICES OF ALAN
26                                   HIMMELFARB
27                                   80 W. Sierra Madre Blvd. #80
                                     Sierra Madre, California 91024
28                                   Telephone: (626) 325-3104

PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT
                                    71

1

2

**JURY TRIAL DEMAND**

3

The plaintiffs hereby demand a trial by jury of all issues so triable.

4

PARISI & HAVENS LLP
LAW OFFICES OF ALAN HIMMELFARB

5

6

s/Alan Himmelfarb
By:  Alan Himmelfarb

7

8

David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)

9

PARISI & HAVENS LLP

10

212 Marine Street, Ste. 100
Santa Monica, California 90405
Telephone: (818) 990-1299

11

12

THE LAW OFFICES OF ALAN HIMMELFARB

13

80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

## LAW OFFICES OF ALAN HIMMELFARB

**80 W. Sierra Madre Blvd., # 304**
**Sierra Madre, CA  91024**
**(626) 325-3104**


October 3, 2013

Via:  U.S. Mail: Certified Return Receipt Requested

Ubiquiti Networks
2580 Orchard Parkway
San Jose, CA 95131

## NOTICE OF BREACH OF WARRANTY


This Notice of Breach of Warranty is made on behalf of Tasion Communications, Inc., dba Planet Telecom ("Tasion").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Tasion on the following dates:  March 8, 2011; March 18, 2011; April 20, 2011; April 27, 2011; May 3, 2011; May 20, 2011; July 13, 2011; October 24, 2011; and February 3, 2012.

This notification of breach of warranty is brought on behalf of Tasion as an individual entity, and on behalf of a class of all persons and entities who purchased Ubiquiti TOUGHCable Level 1 and/or Ubiquiti TOUGHCable Level 2 (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Tasion and the Class all damages sustained by Tasion and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.


Sincerely yours,

Alan Himmelfarb

**LAW OFFICES OF ALAN HIMMELFARB**

80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA  91024
(626) 325-3104

October 18, 2013

Via:  U.S. Mail: Certified Return Receipt Requested

Ubiquiti Networks
2580 Orchard Parkway
San Jose, CA 95131

## NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of International Power Systems, LLC, doing business as Freeway Networks ("Freeway Networks").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Freeway Networks on the following date:  February 21, 2011: and with your sales of Ubiquiti TOUGHCable Level 2 to Freeway Networks on the following dates:  September 21, 2011; September 22, 2011; October 24, 2011; and February 7, 2012.

This notification of breach of warranty is brought on behalf of Freeway Networks as an individual entity, and on behalf of a class of all persons and entities who purchased Ubiquiti TOUGHCable Level 1 and/or Ubiquiti TOUGHCable Level 2 (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Freeway Networks and the Class all damages sustained by Freeway Networks and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

## LAW OFFICES OF ALAN HIMMELFARB
### 80 W. Sierra Madre Blvd., # 304
### Sierra Madre, CA  91024
### (626) 325-3104

October 25, 2013

Via:  U.S. Mail: Certified Return Receipt Requested

Ubiquiti Networks
2580 Orchard Parkway
San Jose, CA 95131

## NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of Fundamental Holdings, Corp., doing business as Peak Internet ("Peak Internet").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with the sale of Ubiquiti TOUGHCable Level 1 to Peak Internet on the following date (and on other occasions): October 12, 2011.

This notification of breach of warranty is brought on behalf of Peak Internet as an individual entity, and on behalf of a class of all persons and entities who purchased Ubiquiti TOUGHCable Level 1 and/or Ubiquiti TOUGHCable Level 2 (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Peak Internet and the Class all damages sustained by Peak Internet and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

Exhibit B

## LAW OFFICES OF ALAN HIMMELFARB

**80 W. Sierra Madre Blvd., # 304**
**Sierra Madre, CA 91024**
**(626) 325-3104**

October 3, 2013

<u>Via:  U.S. Mail: Certified Return Receipt Requested</u>

Streakwave Wireless Inc.
840 Jury Ct.
San Jose, CA 95112

## NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of Tasion Communications, Inc., dba Planet Telecom ("Tasion").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Tasion on the following dates:  March 8, 2011; March 18, 2011; April 20, 2011; April 27, 2011; May 3, 2011; May 20, 2011; July 13, 2011; October 24, 2011; and February 3, 2012.

This notification of breach of warranty is brought on behalf of Tasion as an individual entity, and on behalf of a class of all persons and entities who purchased TOUGHCable Level 1 and/or TOUGHCable Level 2 from Streakwave Wireless Inc. (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Tasion and the Class all damages sustained by Tasion and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

## LAW OFFICES OF ALAN HIMMELFARB

**80 W. Sierra Madre Blvd., # 304**
**Sierra Madre, CA  91024**
**(626) 325-3104**

October 18, 2013

<u>Via:  U.S. Mail: Certified Return Receipt Requested</u>

Streakwave Wireless Inc.
840 Jury Ct.
San Jose, CA 95112

## NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of International Power Systems, LLC, doing business as Freeway Networks ("Freeway Networks").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Freeway Networks on the following date:  February 21, 2011: and with your sales of Ubiquiti TOUGHCable Level 2 to Freeway Networks on the following dates:  September 21, 2011; September 22, 2011; October 24, 2011; and February 7, 2012.

This notification of breach of warranty is brought on behalf of Freeway Networks as an individual entity, and on behalf of a class of all persons and entities who purchased TOUGHCable Level 1 and/or TOUGHCable Level 2 from Streakwave Wireless Inc. (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Freeway Networks and the Class all damages sustained by Freeway Networks and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

## LAW OFFICES OF ALAN HIMMELFARB

80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA  91024
(626) 325-3104

October 25, 2013

<u>Via:  U.S. Mail: Certified Return Receipt Requested</u>

Streakwave Wireless Inc.
840 Jury Ct.
San Jose, CA 95112

### NOTICE OF BREACH OF WARRANTY

This Notice of Breach of Warranty is made on behalf of Fundamental Holdings, Corp., doing business as Peak Internet ("Peak Internet").

YOU ARE HEREBY NOTIFIED that you have breached the express warranty and implied warranty of merchantability in connection with your sale of Ubiquiti TOUGHCable Level 1 to Peak Internet on the following date (and on other occasions): October 12, 2011.

This notification of breach of warranty is brought on behalf of Peak Internet as an individual entity, and on behalf of a class of all persons and entities who purchased TOUGHCable Level 1 and/or TOUGHCable Level 2 from Streakwave Wireless Inc. (the "Class").

You are hereby afforded an opportunity to cure by reimbursing to Peak Internet and the Class all damages sustained by Peak Internet and the Class resulting from their purchase, use, and replacement of TOUGHCable Level 1 and/or TOUGHCable Level 2.

Please contact the undersigned at your earliest convenience with regard to resolution of this matter.

Sincerely yours,

Alan Himmelfarb

# Exhibit C

Datasheet



# TOUGHCable™

## Outdoor Carrier Class Shielded Ethernet Cable

Models: Level 1/Level 2, TOUGHCable Connectors

Increase Performance

Extreme Weather-Proof

ESD Damage Protection

Extended Cable Support



# TOUGH Cable

### OUTDOOR CARRIER CLASS SHIELDED

Datasheet

**TOUGH**Cable ™

Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**  Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**  TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**  Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**  TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.



## TOUGHCable Connectors

Specifically designed for use with Ubiquiti TOUGHCables and available in 100 pc. bags, TOUGHCable Connectors protect against ESD attacks and Ethernet hardware damage while allowing rapid field deployment without soldering.

## Bulletproof your networks

TOUGHCable is currently available in two versions: Level 1 Shielding Protection and Level 2 Shielding Protection.

**Level 1**  is a Category 5e outdoor carrier-class shielded cable.

**Level 2**  is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

**Additional Information:**

• 24 AWG copper conductor pairs
• 26 AWG integrated ESD drain wire to prevent ESD attacks & damage
• PE outdoor-rated weatherproof jacket
• Multi-layered shielding
• Available in 1000 ft (304.8 m) length

ESD attacks are overwhelmingly the leading cause for device failures. The diagram below illustrates the areas vulnerable to ESD attacks in a defenseless network.



Unshielded cable with no ESD Drain

OUTDOOR

MAIN

POE Adapter with no earth ground

LAN

By using a grounded Ubiquiti Power over Ethernet (PoE) adapter along with Ubiquiti TOUGHCable and TOUGHCable Connectors, you can effectively protect against ESD attacks.



Ubiquiti TOUGHCable

Ubiquiti POE Adapter

www.ubnt.com/toughcable

# Specifications

| Level 1 Specifications | | |
|---|---|---|
| Level 1 Shielding Protection | Cable | CAT5e, Shielded |
| | Ethernet Support | Up to 1 Gbps |
| | Conductor Wire Gauge | 24 AWG |
| | Conductor | Solid bare copper |
| | Conductor Diameter | 0.500±0.005 mm |
| | Insulation Type | Solid PE |
| | Insulation Thickness | AVG: 0.26mm, MIN: 0.25 mm |
| | Insulation Diameter | 1.04±0.03 mm |
| | Separation (Polyester Wrapping) | Thick: 0.025mm, Extent: 20 mm |
| | Anti-Crosstalk Divider | None |
| | Cable Shield (Aluminum Foil) | Thick: 0.060 mm, Extent: 18 mm |
| | ESD Drain Wire | 0.4 CCS |
| | Rip Cord | Yes |
| | Jacket Material | PE |
| | Jacket Thickness | AVG: 0.50mm, MIN: 0.46 mm |
| | Jacket Outer Diameter | 6.0±0.30 mm |
| | Jacket Color | Gray |
| | Reference Standard | ISO/IEC 11801, TIA/EIA568B.2 |

| Level 1 Performance | | | | | |
|---|---|---|---|---|---|
| Frequency (MHz) | RL (dB) min. | Attenuation (dB/100m) | NEXT/PSNEXT (dB) | ACR (dB) | ELFEXT/PSELFEXT (dB/100m) |
| 1 | 17.0 | 2.03 | 62.30 | 60.30 | 60.75 |
| 4 | 18.8 | 4.04 | 53.26 | 49.20 | 48.71 |
| 8 | 19.7 | 5.76 | 48.75 | 43.00 | 42.69 |
| 10 | 20.0 | 6.46 | 47.30 | 40.80 | 40.75 |
| 16 | 20.0 | 8.24 | 44.30 | 36.10 | 36.67 |
| 20 | 20.0 | 9.26 | 42.78 | 33.50 | 34.73 |
| 25 | 19.3 | 10.41 | 41.33 | 30.90 | 32.79 |
| 31.25 | 18.6 | 11.72 | 39.87 | 28.20 | 30.86 |
| 62.5 | 16.5 | 16.99 | 35.36 | 18.40 | 24.83 |
| 100 | 15.1 | 21.97 | 32.29 | 10.30 | 20.75 |
| 150 | 13.80 | 23.40 | 18.60/30.30 | 8.30 | 17.60/18.50 |



LEVEL 1
SHIELDING PROTECTION



Conductor
Insulation
ESD Drain Wire
Separation
Cable Shield
Rip Cord
Weatherproof Jacket

www.ubnt.com/toughcable

TOUGHCable™    Datasheet

# Specifications

| Level 2 Specifications | |
|---|---|
| Cable | CAT5e, Shielded |
| Ethernet Support | 1 Gbps |
| Conductor Wire Gauge | 24 AWG |
| Conductor | Solid bare copper |
| Conductor Diameter | 0.500±0.005 mm |
| Insulation Type | Solid PE |
| Insulation Thickness | AVG: 0.295mm, MIN: 0.29 mm |
| Insulation Diameter | 1.16±0.02 mm |
| Separation (Polyester Wrapping) | Thick: 0.025mm, Extent: 20 mm |
| Anti-Crosstalk Divider | LDPE: 4.2*0.3 mm |
| Cable Shield (Aluminum Foil) | Thick: 0.060 mm, Extent: 20 mm |
| ESD Drain Wire | 0.4 TC |
| Rip Cord | Yes |
| Secondary Cable Shield (Braid) | 16*8*0.16AA  Density: 95% |
| Jacket Material | PE |
| Jacket Thickness | AVG: 0.52mm, MIN: 0.46 mm |
| Jacket Outer Diameter | 6.8±0.30 mm |
| Jacket Color | Gray |
| Reference Standard | ISO/IEC 11801, TIA/EIA568B.2 |

*(Vertical label at left: Level 2 Shielding Protection)*

| Level 2 Performance | | | | | |
|---|---|---|---|---|---|
| Frequency (MHz) | RL (dB) min. | Attenuation (dB/100m) | NEXT/PSNEXT (dB) | ACR (dB) | ELFEXT/PSELFEXT (dB/100m) |
| 1 | 18.0 | 1.93 | 65.30 | 60.30 | 61.00 |
| 4 | 19.9 | 3.90 | 56.27 | 49.20 | 48.96 |
| 8 | 20.7 | 5.50 | 51.75 | 43.00 | 42.94 |
| 10 | 21.0 | 6.30 | 50.30 | 40.80 | 41.00 |
| 16 | 21.0 | 8.00 | 47.24 | 36.10 | 36.92 |
| 20 | 21.0 | 9.00 | 45.78 | 33.50 | 34.98 |
| 25 | 20.3 | 10.20 | 44.33 | 30.90 | 33.04 |
| 31.25 | 19.5 | 11.50 | 42.88 | 28.20 | 31.10 |
| 62.5 | 19.0 | 16.70 | 38.36 | 18.40 | 25.08 |
| 100 | 18.3 | 21.70 | 35.30 | 10.30 | 21.00 |
| 200 | 16.5 | 32.20 | 30.78/27.78 | 7.60 | 17.78/14.98W |



## LEVEL 2
SHIELDING PROTECTION

- Conductor
- Insulation
- Anti-Crosstalk Divider
- ESD Drain Wire
- Separation
- Cable Shield
- Secondary Cable Shield
- Rip Cord
- Weatherproof Jacket

www.ubnt.com/toughcable

*(Left margin: Datasheet | TOUGHCable™)*

4

Datasheet

TOUGHCable™



TERMS OF USE: The Ubiquiti radio device must be professionally installed. Shielded ethernet cable and earth grounding must be used as conditions of product warranty. It is the installers responsibility to follow local country regulations including operation within legal frequency channels, output power, and Dynamic Frequency Selection (DFS) requirements.

For further information, please visit www.ubnt.com.

All specifications in this document are subject to change without notice.                    MA072211

© 2011 Ubiquiti Networks, Inc. All rights reserved                                            www.ubnt.com

Exhibit D

Datasheet

*airMAX* 900 MHz YAGI Antenna





900 MHz airMAX 2x2 MIMO PtP/PtMP YAGI Antenna

Model: AMY-9M16

Ultimate in RF Performance

Easily integrates with Rocket M900 (sold separately)

Incredible Range and Speed



# Overview

### airMAX YAGI Antenna 2x2 MIMO

The airMAX 900 MHz YAGI is a high-gain array antenna designed to seamlessly integrate with the Rocket M900 radio (sold separately). It features incredible range performance (20+km) and breakthrough speed (90+Mbps real TCP/IP).

The Rocket M900 combines the "brains" in one robust unit; it can be paired with the airMAX 900 MHz YAGI (AMY-9M16) or airMax 900 MHz BaseStation (AMS 900-120-13) antennas. This versatility gives architects unparalleled flexibility and convenience to create powerful 2x2 MIMO PtP bridging or 2x2 MIMO PtMP BaseStation solutions.

Below is an example of how the airMAX YAGI antenna can be deployed:



## Integrated airMAX Technology

Unlike the standard WiFi protocol, Ubiquiti's Time Division Multiple Access (TDMA) airMAX protocol allows each client to send and receive data using pre-designated time slots scheduled by an intelligent AP controller.

This "time slot" method eliminates hidden node collisions & maximizes air time efficiency. It provides many magnitudes of performance improvements in latency, throughput, and scalability compared to all other outdoor systems in its class.

**Intelligent QoS** Priority is given to voice/video for seamless access.

**Scalability** High capacity and scalability.

**Long Distance** Capable of high speed 20+km links.

**Latency** Multiple features dramatically reduce noise.

## Easy Installation

The Rocket M900 radio and airMAX YAGI antenna have been designed to seamlessly work together.



Installing the Rocket M900 radio onto the YAGI antenna requires no special tools, you simply snap it securely into place with the mount built into the antenna.

# Model Details

**airMAX YAGI Antenna***

**Model: AMY-9M16** (1690 x 295 x 295 mm)

• 902 - 928 MHz

• 16 dBi, Both Polarizations



**Front View**



**Rear View**



**Side View**



**Front View**   **Side View**   **Rear View**

**Rocket M900****

**Model: M900** (16 x 8 x 3 cm)

• 2x2 MIMO

• Low Latency

• 90+ Mbps Real TCP Throughput

• 20+ km Long Range

*airMAX YAGI Antenna available in 2-pack

**Rocket M900 sold separately

www.ubnt.com/yagi

Datasheet

airMAX 900 MHz YAGI Antenna

3

# Specifications

Datasheet

*airMAX* 900 MHz YAGI Antenna

| Rocket M900 System Information | |
|---|---|
| Processor Specs | Atheros MIPS 24KC, 400 MHz |
| Memory Information | 64MB SDRAM, 8MB Flash |
| Networking Interface | (1) 10/100 Ethernet Port |

| Rocket M900 Regulatory/Compliance Information | |
|---|---|
| Wireless Approvals | FCC Part 15.247, IC RS210 |
| RoHS Compliance | Yes |

| Rocket M900 Physical / Electrical / Environmental | |
|---|---|
| Enclosure Size | 16 x 8 x 3 cm |
| Weight | 0.5 kg |
| Enclosure Characteristics | Outdoor UV Stabilized Plastic |
| Mounting Kit | Pole Mounting Kit Included |
| Max. Power Consumption | 6.5 Watts |
| Power Supply | 24V, 1A PoE Supply included |
| Power Method | Passive Power over Ethernet (pairs 4, 5+; 7, 8 return) |
| Operating Temperature | -30 to 75° C |
| Operating Humidity | 5 to 95% Condensing |
| Shock and Vibration | ETSI300-019-1.4 |

| airMAX 900 MHz YAGI Antenna Characteristics | |
|---|---|
| AMY-9M16 | |
| Frequency Range | 902 - 928 MHz |
| Gain | 16 dBi, Both Polarizations |
| HPOL Beamwidth | 29 to 34° |
| VPOL Beamwidth | 29 to 34° |
| F/B Ratio | 20 dB |
| Max VSWR | <1.5:1 Over Band |
| Dimensions | 1690 x 295 x 295 mm |
| Weight | 4.65 kg |
| Wind Survivability | 120 mph |
| Wind Loading | 35 ft-lbs @ 100 mph |
| Polarization | Dual Linear |
| Cross-pol Isolation | 20 dB |
| ETSI Specification | EN 302 326 DN2 |
| Mounting | M8 U-Bolt Pole Mounting Kit Included |

# TOUGHCable
## OUTDOOR CARRIER CLASS SHIELDED

Protect your networks from the most brutal environments with Ubiquiti's industrial-grade shielded Ethernet cable, TOUGHCable.

**Increase Performance**  Dramatically improve your Ethernet link states, speeds, and overall performance with Ubiquiti TOUGHCables.

**Extreme Weatherproof**  TOUGHCables have been built to perform even in the harshest weather and environments.

**ESD Damage Protection**  Protect your networks from devastating electrostatic discharge (ESD) attacks.

**Extended Cable Support**  TOUGHCables have been developed to have increased power handling performance for extended cable run lengths.

## Bulletproof your networks

TOUGHCable is currently available in two versions: Level 1 Shielding Protection and Level 2 Shielding Protection.

**Level 1**  is a Category 5e outdoor carrier-class shielded cable.

**Level 2**  is a Category 5e outdoor carrier-class shielded cable that features an Anti-Crosstalk Divider, additional shielding and is rated to provide optimal performance on Gigabit Ethernet networks.

### Additional Information:

- 24 AWG copper conductor pairs
- 26 AWG integrated ESD drain wire to prevent ESD attacks & damage
- PE outdoor-rated weatherproof jacket
- Multi-layered shielding
- Available in 1000 ft (304.8 m) length



## TOUGHCable Connectors

Specifically designed for use with Ubiquiti TOUGHCables and available in 100 pc. bags, TOUGHCable Connectors protect against ESD attacks and Ethernet hardware damage while allowing rapid field deployment without soldering.

ESD attacks are overwhelmingly the leading cause for device failures. The diagram below illustrates the areas vulnerable to ESD attacks in a defenseless network.

By using a grounded Ubiquiti Power over Ethernet (PoE) adapter along with Ubiquiti TOUGHCable and TOUGHCable Connectors, you can effectively protect against ESD attacks.



www.ubnt.com/toughcable

airMAX 900 MHz YAGI Antenna | Datasheet

Datasheet

*air*MAX 900 MHz YAGI Antenna



TERMS OF USE: The Ubiquiti radio device must be professionally installed. Shielded Ethernet cable and earth grounding must be used as conditions of product warranty. It is the installers responsibility to follow local country regulations including operation within legal frequency channels, output power, and Dynamic Frequency Selection (DFS) requirements.

For further information, please visit www.ubnt.com.

All specifications in this document are subject to change without notice.   MA/PH100711

© 2011 Ubiquiti Networks, Inc. All rights reserved    www.ubnt.com