Alan Himmelfarb (SBN 90480)
consumerlaw1@earthlink.net
THE LAW OFFICES OF ALAN HIMMELFARB
80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

David C. Parisi (SBN 162248)
dcparisi@parisihavens.com
Suzanne Havens Beckman (SBN 188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
212 Marine Street, Suite 100
Santa Monica, California 90405
Telephone: (818) 990-1299
Facsimile: (818) 501-7852

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Tasion Communications Inc., a Canadian corporation, dba Planet Telecom, on behalf of itself and all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>UBIQUITI NETWORKS, INC. a Delaware corporation,<br><br>             Defendant. | CASE No. CV 13-1803-EMC<br><br>**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT (CAUSES OF ACTION THREE THROUGH TEN) PURSUANT TO F.R.C.P. 12(B)(6)**<br><br>Date:     June 12, 2014<br>Time:    1:30 p.m.<br>Judge:  Hon. Edward Chen<br>Ctrm:   5 (17th Floor) |

# **TABLE OF CONTENTS**

I.   The Timely Notice Requirement Has Been Satisfied. ........................................................ 1

II.  Tasion's Notice Was Timely. ........................................................................................... 2

III. Freeway Networks' Notice Was Timely.......................................................................... 3

IV.  Notice from Peak Internet to Ubiquiti was Not Required................................................ 4

    A.   Ubiquiti's Express Warranty To Peak Arose Independently of the Contract of Sale. ..................................................................................................................... 4

    B.   *Fieldstone* Does Not Require Notice to the Manufacturer Unless the Companies Involved Are Sophisticated Commercial Entities (Relative Equals). ...................................................................................................................... 5

    C.   The Court's Determination That Tasion Qualifies As A "Sophisticated Purchaser" Is Based Upon Allegations That Have Been Superseded.................... 7

    D.   Peak Internet Cannot Be Held To The Standard of a "Sophisticated Purchaser" Under *Fieldstone*. ................................................................................ 9

    E.   Peak Internet Gave Timely Notice to Streakwave. ................................................ 10

V.   The Timing of "Reasonable Notice" is a Question of Fact Inappropriate for a Motion to Dismiss. ....................................................................................................... 10

VI.  TOUGHCable Contained an Inherent Defect Which Was Substantially Certain To Result In Malfunction. ................................................................................................. 11

VII. "Puffing." .................................................................................................................... 12

    A.   "Weatherproof" / "Weather-Proof" ...................................................................... 13

    B.   "Built to perform in even the harshest weather and environments" / "Built to withstand harsh outdoor environments" .......................................................... 15

    C.   "Outdoor". ............................................................................................................ 16

    D.   "Carrier class" ..................................................................................................... 17

    E.   "Increase performance" / "Improve link states" / "Improve Ethernet link states, speeds, and performance" ........................................................................ 18

VIII. Plaintiffs Adequately Allege Reliance............................................................................ 20

IX.  Plaintiffs Adequately Contract Formation Based Upon Definite Terms. ......................... 20

X.   Conclusion. .................................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Italian Pasta Co. v. New World Pasta Co.*,
  371 F.3d 387 (8th Cir. 2004) ...................................................12

*Anunziato v. eMachines, Inc.*,
  402 F. Supp. 2d 1133 (CD. Cal. 2005) ....................................11, 14, 15

*Apodaca v. Whirlpool Corp.*,
  2013 U.S. Dist. LEXIS 176363 (C.D. Cal. Nov. 8, 2013).....................18

*Belden Techs. Inc. v. Superior Essex Communs. LP*,
  733 F. Supp. 2d 517 (D. Del. 2009).........................................16, 17

*Bouygues Telecom, S.A. v. Tekelec*,
  472 F. Supp. 2d 722 (E.D.N.C. 2007).........................................17

*Castrol, Inc. v. Pennzoil Co.*,
  987 F.2d 939 (3d Cir. N.J. 1993) ..............................................19

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) .................................................12

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,
  343 F.3d 1000 (9th Cir. 2003) ...............................................12

*Hall v. Bed Bath & Beyond, Inc.*,
  705 F.3d 1357 (Fed. Cir. 2013)...............................................19

*Keegan v. Am. Honda Motor Co*,
  284 F.R.D. 504 (C.D. Cal. 2012) .............................................11

*Keegan v. Am. Honda Motor Co*,
  838 F. Supp. 2d 929 (C.D. Cal. 2012) ......................................6, 11

*Langer Juice Co. v. Stonhard, Stoncor Group, Inc.*,
  2014 U.S. Dist. LEXIS 11818 (C.D. Cal. 2014).................................6

*Lipton v. Nature Co.*,
  71 F.3d 464 (2d Cir. 1995)...................................................12

*Newcal Industries, Inc. v. Ikon Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) ...............................................12

*Rasmussen v. Apple Inc.*,
   2014 U.S. Dist. LEXIS 35352 (N.D. Cal. Mar. 14, 2014)......................................18

*In re Reliability & Continuity of Communs. Networks*,
   26 FCC Rcd 5614 (FCC 2011) ...............................................................................17

*Sanders v. Apple, Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ......................................................................6

*Shaker v. Nature's Path Foods, Inc.*,
   2013 U.S. Dist. LEXIS 180476 (C.D. Cal. Dec. 16, 2013) ....................................18

*Smith v. LG Elecs. U.S.A., Inc.*,
   2014 U.S. Dist. LEXIS 31577 (N.D. Cal. Mar. 11, 2014) ......................................18

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) .................................................................................12

*Stearns v. Select Comfort Retail Corp.*,
   2009 U.S. Dist. LEXIS 112971 (N.D. Cal. Dec. 4, 2009) ......................................10

*Stearns v. Select Comfort Retail Corp.*,
   2009 WL 1635931 (N.D. Cal June 5, 2009) ...........................................................12

*Stiffel Co. v. Westwood Lighting Group*,
   658 F. Supp. 1103 (D.N.J. 1987) .............................................................................12

*Tomek v. Apple, Inc.*,
   2013 U.S. Dist. LEXIS 104503 (E.D. Cal. July 23, 2013) ......................................18

*Toro Co. v. Textron, Inc.*,
   499 F. Supp. 241 (D. Del. 1980)..............................................................................19

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &*
   *Prods. Liab. Litig.*,
   754 F. Supp. 2d 1145 (C.D. Cal. 2010) .....................................................................7

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
   522 F. Supp. 1238 (D. Ariz. 1981) ..........................................................................12

*Williams v. County of Alameda*,
   2014 U.S. Dist. LEXIS 17589 (N.D. Cal. Feb. 10, 2014) ........................................2

**California Cases**

*Cardinal Health 301, Inc. v. Tyco Electronics Corp.*,
   169 Cal. App. 4th 116 (2008) ....................................................................................5

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v.*
    *Cavanaugh*,
    217 Cal. App. 2d 492 (1963) ................................................................5, 6

*Fieldstone Co. v. Briggs Plumbing Prods., Inc.*,
    54 Cal.App.4th 357 (1997) ............................................................ *passim*

*Goldberg v. Rempp*,
    95 Cal.App. 452 (1928) ............................................................................3

*Greenman v. Yuba Power Prods.*,
    59 Cal. 2d 57 (Cal. 1963)..................................................................4, 5, 9

*Greenstone v. Claretian Theological Seminary*,
    173 Cal.App.2d 21 (1959) .........................................................................4

*Hauter v. Zogarts*,
    14 Cal. 3d 104 (1975) .............................................................................12

*Mocek v. Alfa Leisure, Inc.*,
    114 Cal. App. 4th 402 (2003) .................................................................11

**Other State Cases**

*Prutch v. Ford Motor Co.*,
    618 P.2d 657 (Colo. 1980)......................................................................10

*Touchet Valley Grain Growers, Inc. v. Opp & Seibold General Construction, Inc.*,
    119 Wn.2d 334, 831 P.2d 724 (Wash. 1992).........................................15

**California Statutes**

Cal Civ. Code
    § 3532.........................................................................................................3

Cal. Com. Code
    § 2607(3)(A) ..............................................................................................4

Cal U Com Code
    § 2607......................................................................................................10

UCC
    § 2-607 ....................................................................................................10
    § 2-607, comment 4 ................................................................................10

**Other Authorities**

24 CFR 3280.802 (41) ....................................................................................14

29 CFR 1910.66 ................................................................................................14

40 Federal Register 26930 ...............................................................................14

40 Federal Register 40261 ...............................................................................14

40 Federal Register 58752 ...............................................................................14

50 Federal Register 2890 .................................................................................14

54 Federal Register 31408 .........................................................................13, 14

1976 OSAHRC LEXIS 829 .............................................................................13

1 Witkin Sum. Cal. Law (10th ed. 2005), Contracts § 774...............................4

http://community.ubnt.com/t5/Installation-Troubleshooting/ToughCable-Total-
      crap-Refund/td-p/409314/page/3 (last visited May 12, 2014)....................3

http://en.wikipedia.org/wiki/Carrier_grade (last visited May 9, 2014.) .........17

http://quickfacts.census.gov/qfd/states/08/0816000.html (Last visited May 9,
      2014) ...........................................................................................................9

http://quickfacts.census.gov/qfd/states/08/0886090.html (Last visited May 9,
      2014) ...........................................................................................................9

http://www.merriam-webster.com/dictionary/weatherproof (Last visited May 9,
      2014) .........................................................................................................13

**I.     The Timely Notice Requirement Has Been Satisfied.**

The Second Amended Complaint ("SAC") specifically alleges: (1) the date of discovery by each plaintiff that the TOUGHCable they had purchased was defective; (2) the facts and circumstances underlying discovery; and (3) the date and manner of communication of "notice" to Ubiquiti and Streakwave, where required.

**Tasion**

| | | | |
|---|---|---|---|
| Date of Discovery | (mid)- September 2012 | | SAC, ¶¶ 87-89 |
| Notice to Ubiquiti | October 9, 2012 | | SAC, ¶¶ 90, 91 |
| Notice to Streakwave | October 9, 2012 | | SAC, ¶¶ 90, 91 |
| Elapsed Time | | 22 days (at most) | |

**Freeway Networks**

| | | | |
|---|---|---|---|
| Date of Discovery | March 2013 | | SAC, ¶ 125 |
| Notice to Ubiquiti | March 8, 2013 | | SAC, ¶ 126 |
| Notice _from_ Streakwave | April 8, 2012 | | SAC, ¶ 123 |
| Elapsed Time (Ubiquiti) | | 6 days (at most) | |

**Peak Internet**

| | | | |
|---|---|---|---|
| Date of Discovery | June 2012 | | SAC, ¶ 149 |
| Notice to Ubiquiti | (Not required) | | SAC, ¶¶ 135, 151 |
| Notice to Streakwave | June 2012 | | SAC, ¶ 150 |
| Elapsed Time (Streakwave) | | 30 days (at most) | |

As these charts lay out, the interval from each plaintiff's date of discovery to the date each provided notice (where required), is measured in days.

Ubiquiti argues an alternate interpretation of the allegations of the SAC.  Ubiquiti argues time from "discovery" to "notice" with respect to Tasion and Freeway Networks was months, not days.  Excerpting selective allegations from the SAC, and improperly relying upon allegations of the superseded FAC, Ubiquiti constructs timelines that extend the discovery/notice interval:  Tasion - 5 months; Freeway Networks - 11 months.  Ubiquiti achieves this months-long calculation by rewriting the plain allegations of the SAC.

## II.     Tasion's Notice Was Timely.

Tasion experienced its first outage involving an installation that utilized TOUGHCable in May 2012.  SAC, ¶¶ 79-82.  Tasion experienced other outages at other installations in June, July, and August.  SAC, ¶¶ 83-86.  But it was not until September that Tasion determined that the cause was defective TOUGHCable.  SAC, ¶¶ 87-89.

Defendants' argument that the initial installation failure in May constitutes "discovery" is dependent upon a superseded allegation in the First Amended Complaint.  Under Ninth Circuit law, an amended complaint supersedes any prior complaints, which are then treated as "nonexistent." *See*, e.g; *Williams v. County of Alameda*, 2014 U.S. Dist. LEXIS 17589, 10-11 (N.D. Cal. Feb. 10, 2014).  The defendant in *Williams*, just as Ubiquiti does here, sought to rely upon superseded pleading in a Rule 12(b)(6) motion by submitting the superseded complaint through a request for judicial notice.  The court in *Williams* properly refused to consider any facts in the first amended complaint not pled in the SAC.  Ubiquiti's argument that Tasion's discovery in September 2012 (SAC) is contradicted by allegations in the prior complaint (FAC) suggesting an earlier date of discovery cannot properly be considered.  Plaintiffs object to Ubiquiti's introduction of the FAC through a Request for Judicial Notice.

Defendants attempt to equate Tasion's first installation failures with "discovery" of the "allegedly defective nature of TOUGHCable" is belied not only by direct and contrary allegations of the SAC, but also by Ubiquiti's own motion.  Tasion states:  "Because all of these failures occurred during the heart of the rainy season in Panama, the Cat5e cable itself was not initially suspected as the cause of the failures."  SAC, ¶ 87.  Ubiquiti's argument supports this.  Ubiquiti itself observes:  "Rather than considering installer error, installer negligence, environmental conditions, user error, or a myriad of other reasons, Plaintiffs instead blame those problems on the TOUGHCable."  Dkt. No. 87, 4:14-16.  As Ubiquiti expressly acknowledges, there are many reasons for installation failure, and many alternate causes for installation failure.  Indeed, that something so elemental as Cat5e cable purchased from a highly reputable manufacturer could have been defectively manufactured might well be one of the last things a reasonable consumer would consider.

**III.    Freeway Networks' Notice Was Timely.**

Ubiquiti also attempts a factual overreach with respect to an email from Streakwave to Freeway Networks in April 2012.  The email in question included a single statement: "This is in stock and doesn't turn green in sunlight" ("This" referring to an alternate cable product).  SAC, ¶ 123.  From the email, it is clear that <u>Streakwave</u> knew of problems with TOUGHCable.  But it defies credulity that such a statement would or should have put Freeway legally 'on notice' that the TOUGHCable product it previously purchased from Streakwave was in breach of warranties and contract.

The SAC describes in detail Freeway Networks' discovery of the defective nature of TOUGHCable in March 2013, and why Streakwave's oblique statement that TOUGHCable turns green made almost a year earlier had no obvious significance to the recipient of the email.  The president of Freeway Networks wrote on March 7, 2013 in a website post in part as follows:

> While I had read on the forum way back when about the cable turning green and then seeing it first hand last summer we figured so what, it's green. But yesterday we were in SHOCK when doing some post winter maintenance at one of our P2P link locations and saw the outer jacket having fallen off exposing the braid on the Tough Cable! Even on north facing surfaces (no directly sun light) the jacket is failing. So today I went on the forum and saw this post which seems to confirm that it's the whole batch of original tough cable that is defective. I can't even write how frustrated (and more) we feel at this point about this situation. We've deployed boxes of that stuff where you need lift trucks, 4x4 trucks, ladder lugging, climbing gear, safety spotters, etc. What an absolute mess! SAC, ¶ 125.

After posting about its experience of the discovery of the defective nature of TOUGHCable, Freeway Networks contacted Ubiquiti the very next day.  SAC, ¶ 126.  Freeway Networks did not need to send notice to Streakwave, since Streakwave itself had apprised Freeway Networks almost a year before that the TOUGHCable product had issues.

Indeed, Streakwave itself, the originator of the statement that Ubiquiti uses to leapfrog to an early discovery date, declines to take the leap Ubiquiti attempts here.  Streakwave's argument on timely notice is pegged (properly) to the March 2013 allegation (Dkt. No. 86, 4:25-26), acknowledging Freeway Networks' allegation of the date of discovery in March 2013.

California courts have consistently held that the law does not require the performance of

useless acts. Cal Civ. Code § 3532; *Goldberg v. Rempp,* 95 Cal.App. 452, 455 (1928). Streakwave informed Freeway Networks that it knew of problems with TOUGHCable long before Freeway discovered what those problems actually meant in terms of its own installations. Freeway Networks was not obligated to turn around and parrot those words back to Streakwave or be forever barred from suing for breach of contract /warranty.  The law "does not impose... the observance of a fruitless or idle ceremony...." *Greenstone v. Claretian Theological Seminary*, 173 Cal.App.2d 21, 32 (1959) (citations omitted), *overruled on other grounds*, *Ellis v. Mihelis*, 60 Cal.2d 206 (1963); see also 1 Witkin Sum. Cal. Law (10th ed. 2005), Contracts § 774.

**IV.     Notice from Peak Internet to Ubiquiti was Not Required.**

Although Peak Internet sent notice of breach (on behalf of a class) to Ubiquiti on October 25, 2013 (SAC, ¶ 157, and Ex. A), Peak does not rely upon that notice to perfect its right to sue Ubiquiti for breach of express warranty.  The statute in question, Cal. Com. Code § 2607(3)(A), governs only the relationship between the buyer and the seller:  "[t]he buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the *seller* of breach or be barred from any remedy." (emphasis added).  In this case, that would comprise two parties:  Peak (buyer); and Streakwave (seller).  Ubiquiti's involvement with the transaction subject to the breach was as manufacturer of the product which it distributed to Streakwave, with whom Peak did not deal.

**A.     Ubiquiti's Express Warranty to Peak Internet Arose Independently of the Contract of Sale.**

Timely notice of a breach under California law is not required where the action is against a manufacturer on a warranty that arises independently of a contract of sale, such as a manufacturer's express warranty. *Greenman v. Yuba Power Prods*., 59 Cal. 2d 57, 61 (Cal. 1963).  In *Greenman*, the California Supreme Court explained that "[t]he notice requirement . . . is not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt." *Id*. The court also explained that the notice requirement "becomes a booby-trap for the unwary. The injured consumer is seldom steeped in the business practice which justifies the rule, and at least until he has had legal advice it will not

occur to him to give notice to one whom he has had no dealings." *Id*. (citations and internal quotations omitted). In the instant case, Plaintiffs bought TOUGHCable from retail sellers, not the manufacturer. As between Ubiquiti and Peak Internet, Ubiquiti's express warranties were not contained in the contract of sale between Plaintiffs and the retail sellers but instead were created independently in Ubiquiti's brochures and packaging.  Thus, even if Peak Internet did not give timely notice of the breach to Ubiquiti, the claim is not barred.  See *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh*, 217 Cal. App. 2d 492, 514-15 (1963) (finding that "even if the plaintiff did not give timely notice of breach of warranty to the manufacturer the cause of action should not be held to have been barred").

**B.**    ***Fieldstone* Does Not Require Notice to the Manufacturer Unless the Companies Involved Are Sophisticated Commercial Entities (Relative Equals).**

In the case of *Fieldstone Co. v. Briggs Plumbing Prods., Inc*., 54 Cal.App.4th 357, 369-70 (1997), the Court of Appeal held the plaintiff was required to provide notice on the basis of its finding that the plaintiff was "sophisticated." In so doing, the court distinguished *Greenman*, which did not involve a sophisticated plaintiff.  *Id*. at 369.

*Fieldstone's* requirement of pre-suit notice to a distant manufacturer does not appear to be based upon a strict commercial-vs.-consumer distinction, but rather appears to be a weighing of the relative sophistication of the end-user as compared to the manufacturer.  *Fieldstone* ruled against the purchasing party because it found that the purchaser was "a sophisticated development company which has built many thousands of homes over the last two decades." *Id.* at 369.  Contemporary sources show that the Fieldstone Company was well-known as a very significant player in the California business community (producing more than a thousand homes each year; Southern California's largest privately owned home-building company; revenues of $2.5 billion).  *See* Request for Judicial Notice, Exhibit E.

When the court in *Fieldstone* casts The Fieldstone Company as a "sophisticated development company," that term connotes a company that is or should be on relatively equal bargaining terms with the other party, with an implicit understanding of the commercial rules

governing their relationship, or at least an expectation that such a company *should* understand those commercial rules. *Cardinal Health 301, Inc. v. Tyco Electronics Corp*., 169 Cal. App. 4th 116, 136 (2008).  See also, *Langer Juice Co. v. Stonhard, Stoncor Group, Inc.,* 2014 U.S. Dist. LEXIS 11818 (C.D. Cal. 2014) ("There is, for example, no indication that there is a great disparity in bargaining power or sophistication between the Parties. Rather, both Parties appear to be relatively sophisticated commercial parties.")  *Fieldstone* reasoned that The Fieldstone Company, a multi-billion dollar commercial entity, should have been aware of its legal and commercial rights against the manufacturer even before it had received legal advice.

In contrast, plaintiffs in the present action are small companies with a single operations guy, who manage a small workforce (in Peak's case; two-and-one-half employees) in the newly developing, wild-west field of wireless Internet.  SAC, ¶¶ 64, 65, 109, 135.  Such companies are quite unlikely to be possessed of in-house counsel, or experienced in the ins-and-outs of commercial litigation.

The instant case is far closer in its factual predicate to *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Cavanaugh*, 217 Cal.App.2d 492, 514-15 (1963). The trial court in *Bishop* determined that the manufacturer "made express and implied warranties" to the contractor that "#110 Plastipipe" was as good and suitable as copper tubing in radiant heating systems, that such warranties were untrue, and that the contractor repeated the warranties to the plaintiff (just like Ubiquiti and Streakwave in this action).  The *Bishop* case determined that early failure of the system was inevitable, and that the damages suffered by the plaintiff were directly caused by the unsuitability of the product for use in a heating system.  The *Bishop* court concluded:

> In the present case the plaintiff did not deal directly with the manufacturer. A person in the position of the plaintiff ordinarily would not be aware of his rights as against the manufacturer until he had received legal advice predicated upon an adequate investigation of the facts as to the manufacturer's participation in the chain of events culminating in damage to the plaintiff.  *Id*. at 515.

The *Fieldstone* notice requirement does not turn on whether the purchaser knows the identity of the manufacturer as Ubiquiti argues.  Dkt. No. 87, 8:20.  The plaintiff in *Keegan*

certainly "knew" the manufacturer of his product was Honda. *Keegan v. Am. Honda Motor Co*, 838 F. Supp. 2d 929, 950 (C.D. Cal. 2012). Sanders could not but "know" that the manufacturer of his product was Apple. *Sanders v. Apple, Inc.,* 672 F. Supp. 2d 978, 989 (N.D. Cal. 2009) ("[T]imely notice of a breach of an express warranty is not required where the action is against a manufacturer and is brought "by injured consumers against manufacturers with whom they have not dealt."") All plaintiffs in the *Toyota Acceleration* cases likewise "knew" the identity, location, and contact numbers for Toyota. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,* 754 F. Supp. 2d 1145, 1180 (C.D. Cal. 2010)("Except as to those relatively few Plaintiffs (such as at least one non-consumer Plaintiff) who allege they purchased their vehicles directly from Defendants, this requirement is excused as to a manufacturer with which the purchaser did not deal.")[1] Thus the language: "the plaintiff ordinarily would not be aware of his rights as against the manufacturer until he had received legal advice predicated upon an adequate investigation of the facts as to the manufacturer's participation in the chain of events culminating in damage to the plaintiff" does not turn upon knowledge or not of the *identity* of the manufacturer, but rather upon knowledge of one's legal rights – something unlikely to be known by unsophisticated purchasers.

### C. This Court's Determination That Tasion Qualifies As a "Sophisticated Purchaser" Is Based Upon Allegations That Have Been Superseded.

In the Order of March 14, 2014, this Court ruled that Tasion was "sufficiently sophisticated" to require timely notice to Ubiquiti pursuant to the *Fieldstone* rule. Dkt. No. 80, 10-11. The operative language cited in the Order from the First Amended Complaint upon which this determination was made included:

> Tasion is a Canadian corporation which provides "high speed internet connectivity for business and residential subscribers in locations *around the world*, including Panama." FAC ¶ 26 (emphasis added). Their services include installation and servicing of equipment – including in remote locations. *Id.* ¶¶ 53, 54. Further, Plaintiffs allege interactions with Ubiquiti – for example, they allege that "Ubiquiti began to place

---

[1]     Note that, in *In re Toyota Motor Corp. Unintended Acceleration,* the court is excusing notice as to non-consumer plaintiffs.

customers (the purchasers of Ubiquiti's broadcast and receiving equipment) on notice that, in order for the Ubiquiti equipment to be covered under Ubiquiti's warranty" shielded ethernet cables would need to be used. *Id.* ¶ 56.
Docket 80 11:1-10 (emphasis in original Order).

These allegations from the FAC, while technically accurate, unfortunately served to provide an incomplete and unintendedly misleading characterization of the size and complexity of Tasion's business.  These characterizations have been corrected in the SAC:

> 61.     Planet Telecom is a telecommunications provider with operations in Canada and Panama.
> 62.     In Panama, Planet Telecom offers high speed internet connectivity for business and residential subscribers.
> 63.     In Canada, Planet Telecom primarily provides Voice over Internet Protocol (VoIP) services, with a miniscule percentage of services offering (approximately 1%) wireless internet.
> 64.     The Planet Telecom Canadian operation employs 6 persons (1 general manager, 1 operations manager, 2 technicians, 1 administrative assistant, 1 salesman). Planet Telecom's Panamanian operations employ 9 persons (1 office manager, 1 operations manager, 1 administrative assistant, 1 store clerk, 1 support technician, 2 installers, 1 outside salesman).

The second facet supporting the Court's finding that Tasion was "sufficiently sophisticated" is similarly problematic: "Plaintiffs allege interactions with Ubiquiti" is derived from the following language of the FAC:  "Ubiquiti began to place customers (the purchasers of Ubiquiti's broadcast and receiving equipment) on notice that, in order for the Ubiquiti equipment to be covered under Ubiquiti's warranty" shielded ethernet cables would need to be used." FAC ¶ 56.  That statement is derived, not from any kind of direct communication between Tasion and Ubiquiti, but rather from general brochure language that Ubiquiti placed in all of its brochures about the same time it introduced its TOUGHCable product.  *See, e.g.*, Ubiquiti's Datasheet for its Airmax Antenna product, Exhibit D to the SAC. (Dkt. No. 85, page 93 of 93)  On the last page (bottom) of the brochure (as with all Ubiquiti brochures), the following language appears:

> TERMS OF USE: The Ubiquiti radio device must be professionally installed. Shielded Ethernet cable and earth grounding must be used as conditions of product warranty.

When this language began appearing in all of Ubiquiti's radio brochures, that constituted notice to users of Ubiquiti radio products that they needed to use shielded cable if their expensive

radios should fail.  Thus, the finding that "Plaintiffs allege interactions with Ubiquiti" is based upon little more than; 'Class members saw Ubiquiti's brochures.'

Given the above, the grounds on which this Court determined Tasion to be a "sufficiently sophisticated" purchaser might suggest an alternate result if the same determination were being made based upon the allegations in the SAC, rather than the imperfect, and now superseded, FAC. [2]

The question of whether the purchaser is "sophisticated" or not is no longer pertinent to Tasion.  However, that issue is relevant to Peak Internet, as Peak is relying upon the doctrine of "unsophisticated purchaser" to excuse the absence of notice from Peak Internet to Ubiquiti prior to October 25, 2013.

**D.    Peak Internet Cannot Be Held To the Standard of a "Sophisticated Purchaser" Under _Fieldstone._**

As enunciated by the California Supreme Court in _Greenman v. Yuba Power Prods_., 59 Cal. 2d 57, 61 (Cal. 1963) "[t]he notice requirement . . . is not an appropriate one for the court to adopt in actions by injured consumers against manufacturers with whom they have not dealt." _Id_. Facts supporting a finding that Peak Internet should not be held to the standard of a "sophisticated purchaser" are alleged at SAC, ¶¶ 132-135:

132.    Peak Internet is a telecommunications provider which operates in Woodland Park and Colorado Springs, Colorado.
133.    The owner and president of Peak Internet is Jayson Baker.
134.    Peak Internet offers high speed internet connectivity for business and residential subscribers.
135.    As of the summer of 2012, Peak Internet had two-and-a-half employees: a full time receptionist, a full-time contractor, and one part-time contractor. Peak Internet was a small operation, ordering stock and supplies as needed, keeping no excess inventory.

It should be noted that both Woodland Park and Colorado Springs, the areas in which

---

[2]    Also corrected in the SAC are the facts showing that Tasion gave individual directly to Ubiquiti and Streakwave on October 9, 2012 -- a year earlier than the October 3, 2012 date "notice _on behalf of a class_" was alleged in the FAC.   SAC, ¶¶ 90-91.  The reasons that the FAC only alleged the October 3, 2012 "notice on behalf of a class" are discussed at length in the Declaration of Alan Himmelfarb in Response to Order to Show Cause, Docket 82.

Peak Internet provides internet services, are both relatively small communities:  Woodland Park

has an estimated population of 7,189 (United States Census Bureau

(http://quickfacts.census.gov/qfd/states/08/0886090.html, last accessed May 11, 2014), and

Colorado Springs, 431,834 (United States Census Bureau estimated population,

http://quickfacts.census.gov/qfd/states/08/0816000.html,last accessed May 11, 2014).

There is nothing in *Fieldstone* to suggest that the industry of the purchaser (e.g.

"telecommunications providers" - Dkt. No. 87, 8:10) is in any way determinative.  There is no

logical or legal correlation that can be drawn that if someone works in a field of advanced

technology, they are therefore familiar with the sophisticated nuances of contract negotiation and

warranty law.

### E.       Peak Internet Gave Timely Notice to Streakwave.

Streakwave argues that Peak Internet did not give written notice of breach until October

25, 2013.  Written notice is not necessary to be in compliance with the statute.  During a

telephone conversation between the owner of Peak Internet, Mr. Baker, and a Streakwave sales

representative in June 2012, Mr. Baker told Streakwave that the TOUGHCable Peak Internet had

purchased from Streakwave was bad.  SAC, ¶ 150.  This is sufficient notice pursuant to Cal U

Com Code § 2607.   *Stearns v. Select Comfort Retail Corp*., 2009 U.S. Dist. LEXIS 112971

(N.D. Cal. Dec. 4, 2009) ("See UCC § 2-607 Official Comment 4;  "The content of the

notification need merely be sufficient to let the seller know that the transaction is still

troublesome and must be watched."")

The standard is the same under Colorado law.  *Prutch v. Ford Motor Co*., 618 P.2d 657,

661 (Colo. 1980) ("UCC § 2-607, comment 4, makes clear that, where notice is given, no formal

requisites must be met. It is sufficient if the notice lets "the seller know that the transaction is still

troublesome and must be watched." A leading text states that "a scribbled note on a bit of toilet

paper will do . . . .").

### V.    The Timing of "Reasonable Notice" is a Question of Fact Inappropriate for a Motion to Dismiss.

Both Defendants' Motions to Dismiss argue that notices of breach were not timely, and

"where but one inference can be drawn from undisputed facts, the issue may be determined as a matter of law." (Dkt. No. 87, 6:26; Dkt. No. 86, 5:10).  However, it is manifestly clear that this issue is *not* "undisputed."  The SAC alleges one date for discovery and Defendants argue another.  The SAC alleges an early date for notice and Defendants argue a late date.  The term "undisputed" clearly has no application to the issues placed in contention by the Motions.

The question of whether pre-suit notice was provided within a "reasonable time" is a question for the fact finder and beyond the scope of a motion to dismiss for failure to state a claim.  *Keegan v. Am. Honda Motor Co*, 838 F. Supp. 2d 929, 951 (C.D. Cal. 2012) ("Whether or not notice was given within a reasonable time, however, is a fact question that cannot be determined in the context of a motion to dismiss.")

## VI.   TOUGHCable Contained an Inherent Defect Which Was Substantially Certain To Result In Malfunction.

The SAC alleges that TOUGHCable contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product SAC, ¶¶ 52 – 60.  California law does not require proof of a current malfunction to assert breach of express warranty claims, but does require proof that the defect is "substantially certain to manifest in a future malfunction."  *Keegan v. Am. Honda Motor Co*, 284 F.R.D. 504, 534 (C.D. Cal. 2012) ("[P]roof of breach of warranty does not require proof the product has malfunctioned but only that it contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product. . . .") Further, Defendants' argument that TOUGHCable "worked" (for some period of time) before destroying the equipment it was connected to (SAC ¶¶ 8, 55, 94) connotes a curious definition of the word "worked."  By analogy, a bomb is "perfectly safe". . . . right up until the moment it explodes.  *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 405 (2003) (The electrical system in a travel trailer must provide electricity to a TV and VCR without causing those appliances to go up in smoke.)  Given that TOUGHCable, at pennies per foot, posed a completely unacceptable risk of destruction to radio transceivers worth, in some cases, hundreds of dollars, TOUGHCable was wholly unfit for *any* purpose, even if it could transmit signal and POE for a some limited period of time (prior to its spontaneous destruction of the

equipment it was connected to).

## VII.   "Puffing."

"Generalized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence are not actionable." *Anunziato v. eMachines, Inc.,* 402 F. Supp. 2d 1133, 1139 (CD. Cal. 2005) (citing *Glen Holly Entm't, Inc. v. Tektronix Inc.,* 343 F.3d 1000, 1015 (9th Cir. 2003)). To be actionable, a statement must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 731 (9th Cir. 1999); *see also Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir. 1997) (puffery consists of "product superiority claims that are vague or highly subjective"); *Lipton v. Nature Co.,* 71 F.3d 464, 474 (2d Cir. 1995) ("Subjective claims about products, which cannot be proven either true or false, are not actionable."). A statement that "cannot be reasonably interpreted as providing a benchmark by which the veracity of the statement can be ascertained . . . constitutes puffery." *Am. Italian Pasta Co. v. New World Pasta Co.,* 371 F.3d 387, 391 (8th Cir. 2004).

The touchstone for puffery is whether the statement is generalized and subjective or verifiable. *Stearns v. Select Comfort Retail Corp.,* 2009 WL 1635931, *17 (N.D. Cal June 5, 2009).  Misdescriptions of specific or absolute characteristics of a product are actionable." *Stiffel Co. v. Westwood Lighting Group*, 658 F. Supp. 1103, 1115 (D.N.J. 1987); See also:  *Hauter v. Zogarts,* 14 Cal. 3d 104, 111-13 (1975) (finding statement that allegedly defective training device for golfers was "Completely Safe Ball Will Not Hit Player" was actionable because the plaintiff's son was seriously injured while using the device when a ball hit him in the head thus proving the statement to be false); *Southland Sod Farms,* 108 F.3d at 1145 (finding statement that turfgrass seed would result in "50% less mowing" based on "[t]ests conducted by [defendant's] research farm" was actionable because the claim is "specific and measurable"); *Newcal Industries, Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1053-54 (9th Cir. 2008) (finding statements that Ikon would "deliver 95% up-time service" and that its contracts were "for a fixed

term of sixty (60) months" were actionable because they could be proven true or false, while statement that Ikon's "cost-per-copy" contracts provided "flexibility" was puffery because it "is not a quantifiable claim"); *U-Haul Int'l, Inc. v. Jartran, Inc.,* 522 F. Supp. 1238, 1253 (D. Ariz. 1981) (statement that defendant's vehicles were more fuel efficient than the plaintiff-competitor's vehicles was actionable because it could be proved true or false by comparing the fuel usage of both vehicles).

The Motions to Dismiss assert that all the statements listed in the TOUGHCable Datasheet Representations (¶39), the TOUGHCable Datasheet Attachment Representations (¶42), and the TOUGHCable Box Representations (¶44) statements, made by both Ubiquiti and Streakwave, were "puffery."  As discussed below, this is clearly not the case.

## A.    "Weatherproof" / "Weather-Proof"

The following definition of "weatherproof" appears on the Merriam-Webster online dictionary:

> Weatherproof (*adjective*)
> - not able to be changed or damaged by the effects of the sun, wind, rain, etc.
> - able to protect someone or something from the effects of the sun, wind, rain, etc.
> - able to withstand exposure to weather without damage or loss of function
> -
> http://www.merriam-webster.com/dictionary/weatherproof (Last visited May 9, 2014).

The term "weatherproof" is not a "generalized, vague, unspecified assertion."  It is a "specific and measurable claim, capable of being proved false."  As an adjective, it is subject to verification:  It either possesses the characteristics of "not able to be changed or damaged by the effects of the sun, wind, rain, etc.," or it does not; It is "able to protect something from the effects of the sun, wind, rain, etc.," or it cannot; It either possess the characteristics of being "able to withstand exposure to weather without damage or loss of function," or it does not possess those characteristics.

The question of "weatherproof" may be subjected to judicial scrutiny.  Such was the case in a hearing before an Occupational Safety and Health Review Commission Administrative Law

Judge:

> The issues presented by the foregoing facts and circumstances are: 1. Whether the switch was enclosed in a weatherproof enclosure and so placed or equipped to prevent moisture or water from entering and accumulating within the enclosure.

> 1976 OSAHRC LEXIS 829;, 7, 1976 OSHD (CCH) P20,402 (January 6, 1976) OSHRC Docket No. 14173.

The hearing officer noted that "weatherproof" is indeed, a defined term:

> The definition of weatherproof by Article 100 of the National Electrical Code is: "Weatherproof means so constructed or protected that exposure to the weather will not interfere with successful operation." *Id.*

In that matter, the hearing officer made a "finding" that the switch in question was "not weatherproof." ("This finding that the switch was not weatherproof under the particular and peculiar facts and circumstances existing in this case causes an inquiry into the question of whether respondent knew or should have known of the existing condition. *Id.*) Request for Judicial Notice, Exhibit F.

Far from being a "vague, highly subjective term" as Defendants argue, "weatherproof" is specific and measurable term used throughout industry and government to meet uniform, non-subjective criteria. Definitions of the term can be found throughout government regulations. *See, e.g.* 50 FR 2890 ("Weatherproof" means equipment or component protection that is so constructed that exposure to adverse weather conditions will not affect or interfere with the proper use or functions of the equipment or component.")[3]

---

[3]     *See also*: 54 Federal Register 31408 ("Weatherproof"); 50 Federal Register 2890 ("Weatherproof"); 40 Federal Register 58752 ("Weatherproof"); 40 Federal Register 40261 ("Weatherproof"); 40 Federal Register 26930 ("Weatherproof"); 54 Federal Register 31408 ("Weatherproof"); 50 Federal Register 2890 ("Weatherproof"); 40 Federal Register 58752 ("Weatherproof"); 40 Federal Register 40261 ("Weatherproof"); 40 Federal Register 26930 ("Weatherproof").
*See also*: 24 CFR 3280.802 (41) ("Weatherproof"), and 29 CFR 1910.66 ("Weatherproof"), which also includes the following definition:  "Cable" means a conductor, or group of conductors, enclosed in a *weatherproof sheath*, that may be used to supply electrical power and/or control current for equipment or to provide voice communication circuits." (emphasis added).  *Accord:* 54 FR 31408 ("weatherproof sheath" cable definition)

In the use of the term "weatherproof" to describe its TOUGHCable product, Ubiquiti and Streakwave were making representations upon which Plaintiffs and the class were wholly justified in relying as a factual description of the product. TOUGHCable's failure to comport with that description caused significant damage to every purchaser of the product.

**B.    "Built to perform in even the harshest weather and environments" / "Built to withstand harsh outdoor environments"**

Both Motions to Dismiss look to *Annunziato v. eMachines*, 402 F.Supp.2d 1133 (C.D. Cal. 2005) for illustrations of terms generally considered to be non-actionable puffery. However, even the *Annunziato* court found that a manufacturer's use of the phrase "most stringent quality control tests" to be actionable, and not mere puffery. *Annunziato* at 1140-1141. The *Annunziato* court determined that the use of the phrase "most stringent quality control tests" to describe their product was a specific factual assertion which could be established or disproved through discovery, and hence is not mere puffery. Those "stringent quality control tests" were either done by the manufacturer, or they were not done, and whether they were done is determinable as a fact. As in *Annunziato*, Ubiquiti's and Streakwave's use of the phrases "Built to perform in even the harshest weather and environments" / "Built to withstand harsh outdoor environments" are similarly subject to verification.[4] In order to build a product designed to withstand harsh weather (or, indeed, *any* weather), or able to perform in outdoor environments (harsh or not), certain manufacturing steps must be present in the manufacturing process, and there should be an absence of other steps that would negate these claims. Expert testimony is well designed to establish exactly what those steps are. An examination through discovery of the manufacturing processes employed at the TOUGHCable manufacturing plant will reveal whether these statements by Ubiquiti and Streakwave describing the "built" process of TOUGHCable comported with the actual Build processes that were employed at the manufacturing plant.

---

[4]    *Accord: Touchet Valley Grain Growers, Inc. v. Opp & Seibold General Construction, Inc.*, 119 Wn.2d 334, 831 P.2d 724, 731 (Wash. 1992) (The phrase "carefully checked by our quality control department" held to be actionable).

### C.    "Outdoor"

The term "outdoor" is not a term without meaning or consequence.  It is a specific and absolute characteristic of a product.  "Indoor cable" and "outdoor cable" are two very different things.  Indoor cable, logically, is cable designed for indoor use.  Because it is used "indoors, it must be "plenum rated." "Plenum rated" means that the cables have been manufactured to be fire resistant and smoke retardant.   Outdoor cable has different needs and requirements, and need not be designed to be fire resistant and smoke retardant.  Outdoor cable must be manufactured to be capable of being buried underground and/or survive the elements.  These attributes are well-known and understood throughout the cable and electronics industry, and, as such this is another area highly amendable to expert testimony.

United Laboratories (UL) undertakes great effort to ensure that cable (and products in general) are suited for "outdoor" use.   See, e.g.  UL's webpage on "Outdoor Suitability."[5]

United laboratories addresses "marking" and use of "outdoor" cable as a distinct manufactured form of cable, suitable for specific purposes.  *See*  "Marking and Application

---

[5]     "Outdoor suitability"

> A material that is considered suitable for outdoor use has gone through testing in accordance with UL 746C, the Standard for Safety of Polymeric Materials -- Use in Electrical Equipment Evaluations, of ultraviolet (UV) light exposure for 720 hours of twin-enclosed carbon or 1,000 hours of xenon-arc weatherometer conditioning, and/or water exposure or immersion for the seven days at 70 degrees C. The material is tested before and after exposure to these conditions for flammability, mechanical impact and mechanical strength.
> The results may lead to one of the following outcomes:
> (f1) -- Suitable for outdoor use with respect to exposure to ultraviolet light, water exposure and immersion in accordance with UL 746C. The (f1) footnote indicates that the material has met both UV and water exposure or immersion requirements as called out in UL 746C.
> (f2) -- Subjected to one or more of the following tests: UV, water exposure or immersion in accordance with UL 746C, where the acceptability for outdoor use is to be determined by UL. The (f2) footnote indicates that the material has only met or has been tested partially for UV or water exposure or immersion.

http://www.ul.com/global/eng/pages/offerings/industries/chemicals/plastics/testing/outdoor/ (Last visited May 9, 2014).

Request for Judicial Notice, Exhibit C.

Guide for Wire and Cable" January 2014, Plaintiff's Request for Judicial Notice, Exhibit D.  *See also*, Technical Guideline (Superior Essex) "What is Indoor/Outdoor Cable?"  September 15, 2010, Request for Judicial Notice, Exhibit A.  Also, UL Electrical Connections, "Wire and Cable Explained" July 2008, Request for Judicial Notice, Exhibit B.

"Outdoor" cables were the focus of a relatively recent patent infringement case out of Delaware.  *Belden Techs. Inc. v. Superior Essex Communs. LP*, 733 F. Supp. 2d 517, 540 (D. Del. 2009)  (" . . .Outside Plant Products," defined by the license to include "outdoor outside plant cables and outdoor feeder & distribution cables" and "any products that have a substantially similar primary outdoor use.")  There, the *Belden* court undertook an examination of whether the cable in question was "outdoor" cable:

> As previously stated, Superior Essex has designated these products as "outside plant" cables. (Id., exs. 56, 126) Each of the accused OSP products includes a filling compound to inhibit water ingress and a sunlight resistant jacket. (Id.) These cables further include a corrugated copper clad armor which protects the integrity of the cable against rodents and accidental contact during digging. (Id.) Finally, these cables have no UL rating, which renders the OSP products an undesirable candidate for indoor use. (Id.) Each of these factors alone emphasize the outdoor nature of the accused OSP products. Viewing the aforementioned factors together, no reasonable jury could find other than that the OSP products have a "primary  outdoor use" and, as such, fall within the scope of Superior Essex's license under the '491 patent."
> *Belden Techs* at 540.

The use of the term "Outdoor" as one of the primary descriptors of TOUGHCable ("Outdoor Carrier Class Shielded Ethernet Cable") is not accident, nor generalized, nor unspecified.  By claiming that this product was "OUTDOOR CARRIER CLASS SHIELDED" a reasonable consumer would be led to believe that Ubiquiti had undertaken at least minimal testing to insure that the product was, as claimed, suitable for outdoor use. "Outdoor" is an absolute characteristic of a product, subject to testing, and verification.  The use of "Outdoor" in describing TOUGHCable is clearly a misdescription which is actionable.

**D.    "Carrier class"**

Wikipedia describes "carrier class" as follows:

> In telecommunication, a "carrier grade" or "carrier class" refers to a system, or a

hardware or software component that is extremely reliable, well tested and proven in its capabilities. Carrier grade systems are tested and engineered to meet or exceed "five nines" high availability standards, and provide very fast fault recovery through redundancy (normally less than 50 milliseconds). http://en.wikipedia.org/wiki/Carrier_grade (last visited May 9, 2014.)

The FCC notes:

Although not a precise term of art in the telecommunications field, "carrier grade" generally refers to systems, hardware, or software that are extremely reliable, well tested, and proven in their capabilities.
*In re Reliability & Continuity of Communs. Networks*, 26 FCC Rcd 5614, 5615 fn4 (FCC 2011)

Plaintiffs submit that the term "carrier class" is amendable to expert testimony to establish industry meaning and standard for the term. *See,* e.g. *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 728 (E.D.N.C. 2007) ("Plaintiff asserts that carrier-grade equipment connotes a certain level of reliability within the telecommunications field, and that there are industry standards pertaining to the disclosure of potential issues relating to reliability. Again, assuming only for the purposes of the court's present consideration of this objection, that Lancaster's reports are based upon sound methodology and relevant expertise appropriate for such opinions, expert testimony pertaining to industry standards and defendant's compliance or non-compliance is undoubtedly helpful to the trier of fact in this highly technical and often complex industry, and therefore admissible.")

E.     **"Increase performance" / "Improve link states" / "Improve Ethernet link states, speeds, and performance"**

Ordinarily, terms like "higher performance,"[6] "optimum performance,"[7] "unrivaled performance,"[8] and even "incredible overall performance"[9] are "non-actionable puffery" However, when a representation of fact makes a "specific and measurable claim, capable of

---

[6]     *Smith v. LG Elecs. U.S.A., Inc.*, 2014 U.S. Dist. LEXIS 31577 (N.D. Cal. Mar. 11, 2014)
[7]     *Shaker v. Nature's Path Foods, Inc.*, 2013 U.S. Dist. LEXIS 180476 (C.D. Cal. Dec. 16, 2013)
[8]     *Apodaca v. Whirlpool Corp.*, 2013 U.S. Dist. LEXIS 176363 (C.D. Cal. Nov. 8, 2013)
[9]     *Tomek v. Apple, Inc.*, 2013 U.S. Dist. LEXIS 104503 (E.D. Cal. July 23, 2013)

being proved false or of being reasonably interpreted as a statement of objective fact"[10] that fact moves out of the realm of puffery and into the realm of actionable representation.

When Ubiquiti states that TOUGHCable would "improve your Ethernet link states" it was making a statement of fact that, by using this cable, link states would be "improved."  In fact, as plaintiffs' discovered, using TOUGHCable would actually result in verifiable, measureable, decreased link states - as in "no link state at all."  "Improve" connotes a specific direction (better), while actual use of TOUGHCable results in a link state that is demonstrably and measurably worse.  This is quantifiable and ascertainable though statistical analysis: comparing the link states of those customers who used TOUGHCable as opposed to those who used other cabling.  Because those who used TOUGHCable incurred total failure of their systems, this rate of failure can be objectively measured against the total failure rate (or non-failure rate) of users of competing products.  Where 100% of the users experienced complete product failure, statistical analysis can provide objectively measureable results to determine if the statement "improve  . . . overall performance" is quantifiably false.  *Toro Co. v. Textron, Inc.*, 499 F. Supp. 241, 249-53 & n.23 (D. Del. 1980) (Performance claim which can be comparatively rated is not puffery); *see also*:  *Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 946 (3d Cir. N.J. 1993) (Claims subject to measurement are not puffery).

When the term "performance" is used by a seller or a manufacturer in such a way that the term is subject to measurement, it becomes actionable.  *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1367 (Fed. Cir. 2013) ("[P]erformance that lasts the useful lifetime of the towel" implies that the towel will not fall apart after a single wash or a few washes . . .  A reasonable consumer would expect the "useful lifetime" of a towel to be more than one or a few washes.")

When Ubiquiti and Streakwave advertised that TOUGHCable would "increase" "link states" and "performance," they made claims and assertions that were measurable and testable.  As measured against any other cable product, even indoor cable (SAC, ¶¶ 9, 267), which is not

---

[10]     *Rasmussen v. Apple Inc*., 2014 U.S. Dist. LEXIS 35352 (N.D. Cal. Mar. 14, 2014)

built to withstand outdoor environments) can statistically demonstrate that "link states" and "performance" were in fact decreased by its use. Rather than improvement, users of Ubiquiti's TOUGHCable saw instead degradation in "link states" and "performance."

**VIII.   Plaintiffs Adequately Allege Reliance.**

Plaintiffs adequately allege reliance. *See* SAC, ¶¶ 221, 222, 224, 228, 229, 247, 281, and 282. Plaintiffs adequately allege that their reliance was reasonable and justified. SAC, ¶¶ 224, 234. Each of these paragraphs are incorporated by reference into each successive cause of action.

**IX.   Plaintiffs Adequately Allege Contract Formation Based Upon Definite Terms.**

Each plaintiff lays out the specific terms of the agreement entered into between the parties and the terms of performance which were undertaken by the parties. See SAC, ¶¶ 74, 76, 117, 119, 143, and 145 and 276-287. All elements of contract formation, performance, and breach are adequately alleged.

**X.   Conclusion.**

For the forgoing reasons, Plaintiffs respectfully request that the Court deny Defendants' respective Motions to Dismiss.

DATED this 14th day of May, 2014.

LAW OFFICES OF ALAN HIMMELFARB

/s/ Alan Himmelfarb
By: Alan Himmelfarb
THE LAW OFFICES OF ALAN HIMMELFARB
80 W. Sierra Madre Blvd. #80
Sierra Madre, California 91024
Telephone: (626) 325-3104

David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
PARISI & HAVENS LLP
212 Marine Street, Suite 100
Santa Monica, California 90405
Telephone: (818) 990-1299
Facsimile: (818) 501-7852