N. KATHLEEN STRICKLAND (SBN 64816)
DEVIN C. COURTEAU (SBN 197505)
JUSTIN A. ZUCKER (SBN 284401)
STEPHAN CHOO (SBN 284395)
ROPERS, MAJESKI, KOHN & BENTLEY
150 Spear Street, Suite 850
San Francisco, CA 94105
Telephone:    (415) 543-4800
Facsimile:    (415) 972-6301
Email:        kathleen.strickland@rmkb.com
              devin.courteau@rmkb.com
              justin.zucker@rmkb.com
              stephan.choo@rmkb.com

Attorneys for Defendant
UBIQUITI NETWORKS, INC.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| TASION COMMUNICATIONS, INC., et al., <br><br> Plaintiff, <br><br> v. <br><br> UBIQUITI NETWORKS, INC., et al., <br><br> Defendant. | CASE NO. 3:13-CV-01803-EMC <br><br> **DEFENDANT UBIQUITI NETWORKS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** <br><br> Date:    July 16, 2015 <br> Time:    1:30 p.m. <br> Dept.:   Courtroom 5, 17th Floor <br> Judge:   Hon. Edward M. Chen <br><br> Action Filed:   April 19, 2013 <br> Trial Date:     June 6, 2016 <br><br> **HEARING REQUESTED** |

**Redacted**

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...................................................................................................1

II.  RELEVANT FACTUAL BACKGROUND..........................................................2

     A.   The Plaintiffs Are Different Sophisticated Business Entities, Not
          Consumers ...................................................................................................2

     B.   The OUTDOOR Climates Vary Among Plaintiffs.......................................4

     C.   Differences Exist About What, When, How and By Whom TC Was
          Installed .......................................................................................................5

     D.   All Three Plaintiffs Have Vastly Different Damages ...................................7

     E.   Causation – Individual Issues Predominate .................................................8

III. LEGAL STANDARDS FOR CLASS CERTIFICATION .....................................8

IV.  REQUIREMENTS OF RULE 23(B)(3) NOT MET .............................................9

     A.   Plaintiffs Cannot Show Predominance Because Too Many States' Laws
          Apply ...........................................................................................................9

          1.   The Laws of All Countries and/or States in Which Putative Class
               Members Reside Govern Their Individual Claims .................................9

               a.   California Choice of Law Rules Apply ...................................10

               b.   Step 1 – The Laws Are Different in the 50 States and
                    Multiple Countries that Are Potentially Affected
                    Jurisdictions ...........................................................................10

                    (1)   There are Many Potentially Affected Jurisdictions ...........10

                    (2)   The Laws of the Affected Jurisdictions Are Different ......11

                          (a)   Fraud Claims Materially Differ Among
                                States.................................................................11

                          (b)   Breach of Warranty Claims Differ Among
                                States.................................................................12

               c.   Step 2 – A True Conflict Exists Based on Each
                    Jurisdiction's Interest in the Application of Its Own Laws ..........12

               d.   Step 3 – Other Jurisdictions' Interests Would be More
                    Impaired by Application of California Law .................................13

          2.   Predominance Also Fails Because Plaintiffs' Damages Model is
               Flawed ...............................................................................................13

          3.   Affirmative Defenses – Individual Issues Predominate .......................15

               a.   Accord & Satisfaction..............................................................15

               b.   Ubiquiti's Product Warranty .....................................................16

     B.   Plaintiffs Cannot Establish Superiority ......................................................16

     C.   Ascertainability Not Met ............................................................................18

          1.   Individual Inquiries Required ..............................................................18

          2.   Plaintiffs' Proposed Class is Overbroad As Defined............................20

OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

V. PLAINTIFFS' ALTERNATIVE ARGUMENTS FOR CERTIFICATION OF 12
CLASSES AND/OR 7 ISSUE CLASSES ARE ALSO FLAWED..................................20

   A. Plaintiffs Fail to Meet Their Burden Regarding Certification of Their
Proposed Alternative Classes and Issues Classes .................................................20

   B. Alternative Classes Are Unpermitted "Fail Safe" Classes .................................23

VI. PLAINTIFFS CANNOT MEET THE REQUIREMENTS OF FED .............................23

   A. Plaintiffs Cannot Meet The Commonality Requirement .....................................23

      1. Batch Issue – There is no Common Answer .............................................23

      2. No Common Facts Among Plaintiffs' Claims...........................................25

   B. Plaintiffs' Claims Are Not Typical Of The Proposed Class.................................27

      1. Tasion's Claims are Not Typical ..............................................................28

      2. Freeway's Claims are Not Typical ............................................................28

      3. Camplink's Claims are Not Typical ..........................................................28

      4. Ubiquiti Has Unique Defenses Against Each of these Plaintiffs...............29

   C. Plaintiffs Are Not Adequate Class Representatives .............................................29

VII. CONCLUSION.............................................................................................................30

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Ansari v. New York Univ.*
179 F.R.D. 112 (S.D.N.Y. 1998) ............................................................................21

*Astiana v. Ben & Jerry's Homemade, Inc.*
2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ...............................................................15

*Barnes v. Ross*
926 F. Supp. 2d 499 (S.D.N.Y. 2013) .....................................................................21

*Baxter Healthcare Corp. v. U.S. Dist. Court for Cent. Dist. Of Cal.*
121 F.3d 714 (9th Cir. 1997) ...................................................................................22

*Bersch v. Drexel Firestone, Inc.*
519 F.2d 974 (2nd Cir. 1975) ..................................................................................18

*Bridge v. Phx. Bond & Indem. Co.*
553 U.S. 639 (2008).................................................................................................22

*Castano v. Am. Tobacco Co.*
84 F.3d 734 (5th Cir. 1996) .....................................................................................17

*CL-Alexanders Laing & Cruickshank v. Goldfeld*
127 F.R.D. 454 (S.D.N.Y. 1989) .............................................................................18

*Comcast v. Behrend*
133 S.Ct. 1426 (2013).....................................................................................8, 9, 14

*Curtis v. Extra Space Storage, Inc.*
2013 WL 6073448 (N.D. Cal. 2013) .......................................................................16

*Daimler Chrysler AG Sec. Litig.*
216 F.R.D. 291 (D. Del. 2003) ................................................................................18

*Diacakis v. Comcast Corp.*
2013 WL 1878921 (N.D. Cal. May 3, 2013)......................................................20, 22

*Drimmer v. WD-40 Co.*
2007 WL 2456003 (S.D. Cal. Aug. 24, 2007) aff'd, 343 F. App'x 219 (9th Cir. 2009) ..........30

*Edgar v. MITE Corp.*
457 U.S. 624 (1982).................................................................................................13

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156, 164 (1974).........................................................................................17

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

*Fosmire v. Progressive Max Ins. Co.*
  277 F.R.D. 625 (W.D. Wash. 2011) ...................................................30

*Gene & Gene LLC v. Bio Pay LLC*
  541 F.3d 318 (5th Cir. 2008) ..............................................................9

*Genenbacher v. CenturyTel Fiber Co. II*
  244 F.R.D. 485 (C.D. Ill. 2007)........................................................23

*General Tel. Co. of Northwest, Inc. v. EEOC*
  446 U.S. 318 ....................................................................................21

*Gonzales v. Comcast Corp.*
  2012 WL 10621 (E.D. Cal. Jan. 3, 2012) ...................................6, 9, 15

*Gunnells v. Healthplan Services, Inc.*
  348 F.3d 417 (4th Cir. 2003) ............................................................15

*Haley v. Medtronic, Inc.*
  169 F.R.D. 643 (C.D. Cal. 1996).......................................................22

*Hanlon v. Chrysler Corp.*
  150 F.3d 1011 (9th Cir. 1998) ..................................................2, 16, 27

*Harik v. California Teachers Ass'n*
  326 F.3d 1042 (9th Cir. 2003) ..........................................................21

*In re Agent Orange Prod. Liab. Litig.*
  818 F.2d 145 (2d Cir. 1987) ..............................................................14

*In re Alstom S.A. Sec. Litig.*
  253 F.R.D. 266 (S.D.N.Y. 2008) ......................................................18

*In Re Aqua Dots Prod. Liab. Lit.*
  654 F. 3d 748 (7th Cir. 2011) ...........................................................22

*In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*
  289 F.R.D. 526 (N.D. Cal. 2012)......................................................23

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig.*
  276 F.R.D. 336 (W.D. Mo. 2011).......................................................22

*In re ConAgra Foods, Inc.*
  302 F.R.D. 537 (C.D. Cal. 2014)......................................................22

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

*In re Enron Corp. Securities, Derivative & "ERISA" Litig.*
  490 F. Supp. 2d 784 (S.D.Tex. 2007) (Texas courts do not recognize a "fraud on the
  market theory of reliance for common law claims")..............................................................12

*In re FEMA Trailer Formaldehyde Products Liab. Litig.*
  2008 WL 5423488 (E.D. La. Dec. 29, 2008) ......................................................................27

*In re Flash Memory Antitrust Litig.*
  2010 WL 2332081 (N.D. Cal. June 9, 2010)........................................................................19

*In re High-Tech Employee Antrtrust Litig.*
  985 F. Supp. 2d 1167 (N.D. Cal. 2013)................................................................................9

*In re Hulu Priv. Litig.*
  2014 WL 2758598 (N.D. Cal. June 17, 2014).....................................................................18

*In Re Hydrogen Peroxide Antitrust*
  552 F.3d 305 (3d Cir. 2008) ...............................................................................................29

*In re Northern Dist. Of Calif., Dalkin Shield IUD Products Liab. Litig.*
  693 F.2d 847 (9th Cir. 1982) ...............................................................................................22

*In re Paxil Litig.*
  212 F.R.D. 539 (C.D. Cal. 2003)........................................................................................20

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
  725 F.3d 244, 247(D.C. Cir. 2013) .......................................................................................9

*In re Universal Serv. Fund Tel. Billing Practices Litig.,*
  219 F.R.D. 661, 668 (D. Kan. 2004) ...................................................................................29

*In re Vivendi Universal, S.A. Sec. Litig.*
  242 F.R.D. 76 (S.D.N.Y. 2007) ..........................................................................................18

*Kelley v. Mid-America Racing Stables, Inc.*
  139 F.R.D. 405 (W.D. Ok. 1990) ........................................................................................12

*Krueger v. Wyeth, Inc.*
  2008 WL 481956 (S.D. Cal. Feb. 19, 2008)....................................................................30, 29

*Lanovaz v. Twinings N. Am., Inc.*
  2014 WL 1652338 (N.D. Cal. Apr. 24, 2014), *recons. denied*, 2014 WL 7204757
  (N.D. Cal. Dec. 17, 2014)....................................................................................................14

*Lozano v. AT & T Wireless Servs., Inc.*
  504 F.3d 718 (9th Cir.2007) ...............................................................................................10

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992)..............................................................................6

*Marlo v. UPS*
639 F.3d 942 (9th Cir. 2011) ..........................................................1, 9

*Mazur v. eBay Inc.*
257 F.R.D. 563 (N.D. Cal. 2009)........................................................20

*Mazza v. Am. Honda Motor Co.*
666 F.3d 581 (9th Cir. 2012)......................................................passim

*McLaughlin v. Am. Tobacco Co.*
522 F.3d 215 (2d Cir. 2008) ..............................................................22

*Moheb v. Nutramax Labs. Inc.*
2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ....................................17

*Negrete v. Allianz Life Ins. Co. of N. Am.*
238 F.R.D. 482 (C.D. Cal. 2006) .......................................................15

*O'Connor v. Boeing N. Am., Inc.*
197 F.R.D. 404 (C.D. Cal. 2000) .......................................................15

*Parsons v. Ryan*
754 F.3d 657 (9th Cir. 2014) ............................................................28

*Rai v. Santa Clara Valley Transp. Auth.*
2015 WL 860761 (N.D. Cal. Feb. 24, 2015) .........................13, 14, 15

*Randleman v. Fidelity Nat'l Title Ins. Co.*
646 F.3d 347 (6th Cir. 2011) ............................................................23

*Ries v. Arizona Beverages USA LLC*
287 F.R.D. 523 (N.D. Cal. 2012)........................................................27

*Romberio v. Unumprovident Corp.,*
385 Fed. Appx. 423, 431-33 (6th Cir. 2009) .....................................19

*Sanchez v. Wal Mart Stores, Inc.*
2009 WL 1514435 (E.D. Cal. May 28, 2009) ....................................30

*Shepard v. Lowe's HIW, Inc.,*
2013 WL 4488802 (N.D. Cal. Aug. 19, 2013) ...................................18

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

*Smith v. Microsoft Corp.*
297 F.R.D. 464 (S.D. Cal. 2014) ...................................................................18

*State of Alaska v. Suburban Propane Gas Corp.*
123 F.3d 1317 (9th Cir. 1997) .......................................................................28

*Stoudt v. E.F. Hutton & Co., Inc.*
121 F.R.D. 36 (S.D.N.Y. 1988) .....................................................................17

*Street v. J.C. Bradford & Co.*
886 F.2d 1472 (6th Cir. 1989) .......................................................................11

*Wal-Mart v. Dukes*
131 S.Ct. 2541 (2011)..............................................................................passim

*W. States Wholesale, Inc. v. Synthetic Indus., Inc.,*
*206 F.R.D. 271, 277 (C.D. Cal. 2002)* .........................................................30

*Wolin v. Jaguar Land Rover North America LLC*
617 F.3d 1168 (9th Cir. 2010) .......................................................................28

*Xavier v. Phillip Morris USA, Inc.*
787 F. Supp. 2d 1075 (N.D. Cal. 2011) .........................................................19

*Zamani v. Carnes*
491 F.3d 990 (9th Cir. 2007) .........................................................................21

*Zinser v. Accufix Research Inst., Inc.*
253 F.3d 1180 (9th Cir.) ...................................................................16, 17, 18

**CALIFORNIA CASES**

*Jones v. ConocoPhillips Co.*
198 Cal. App. 4th 1187 (2011) ......................................................................12

*Rawson v. J.C. Forkner Fig Gardens*
206 Cal. 4 (1928) ...................................................................................10, 19

*Ward Mfg. Co. v. Miley*
131 Cal.App.2d 603 (1955) .....................................................................10, 19

**OTHER CASES**

*B.B.P. Ass'n, Inc. v. Cessna Aircraft Co.*
420 P.2d 134 (Id. 1966) .................................................................................12

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

*Barre v. Gulf Shores Turf Supply, Inc.*
    547 So.2d 503 (Ala. 1989).................................................................12

*Currie v. McDonald's Restaurants of Canada, Ltd.,*
    74 O.R. (3d) 321, 325, 330, 336 (Ont. C.A. 2005)...............................18

*Inglis v. American Motors Corp.*
    209 N.E.2d 583 (Ohio 1965)............................................................12

*J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*
    89 P.3d 1009 (Nev. 2004).................................................................12

*Kinlaw v. Long Mfg. N.C., Inc.*
    259 S.E.2d 552 (N. Car. 1979).........................................................12

*Koperski v. Husker Dodge, Inc.*
    302 N.W.2d 655 (Neb. 1981)............................................................12

*Randy Knitwear, Inc. v. American Cyanamid*
    226 N.Y.S.2d 363 (1962).................................................................12

*Ventura v. Ford Motor Co.*
    433 A.2d 801 (N.J. Sup. 1981).........................................................12

**CALIFORNIA STATUTES**

Cal. Civ. Code § 3343(a) .......................................................................14

Cal. Com. Code § 2714..........................................................................14

Cal. Com. Code § 2719(3).......................................................................16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23.............................................................................passim

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1     **I.**     **INTRODUCTION**

2     Plaintiffs' certification motion should be denied because both the proposed and alternate

3 classes fail to meet the requirements of Fed. R. Civ. P. 23 ("Rule 23"). Plaintiffs bear the burden

4 to prove certification is warranted under Rule 23. *Marlo v. UPS*, 639 F.3d 942, 947 (9th Cir.

5 2011). Plaintiffs propose a class, asserting express warranty and fraudulent inducement claims, of

6 "All persons or entities who purchased Ubiquiti TOUGHCable Level 1 or Ubiquiti TOUGHCable

7 Level 2" where the purchase was completed in the United States. (MPA, p. 6, lns. 14-15.)

8     Plaintiffs bear the burden to prove common questions of law and fact predominate, a class

9 action is the superior method for adjudicating the controversy, and the class is ascertainable.

10 *Marlo, supra, 639 F.3d* at 947. The primary reason this class cannot be certified is that Plaintiffs

11 cannot meet their burden of establishing common questions of law or fact (if they even existed,

12 which they do not) predominate. Specifically, a thorough analysis under California's choice of

13 law principles reveals California law cannot apply to the claims of all class members as dramatic

14 conflicts exist between the laws of the jurisdictions where class members reside (all 50 states,

15 Washington D.C. and multiple foreign countries) and California has no interest in applying its

16 laws to persons residing outside its borders. Once it is clear California law cannot be applied to

17 the entire class, the proposed class cannot be certified. "Because the law of multiple jurisdictions

18 applies here . . ., variances in state law overwhelm common issues and preclude predominance for

19 a single nationwide class." *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 596 (9th Cir. 2012).

20     Predominance is lacking because the individual inquiries required by two affirmative

21 defenses (accord and satisfaction and enforcement of Ubiquiti's limited warranty) would

22 predominate over any alleged common issues of law or fact, and because Plaintiffs have not

23 proposed a viable (or even rational) damages model (a necessity to obtain class certification).

24 Plaintiffs' proposed alternate classes and second alternate issue classes cannot satisfy the

25 predominance requirement for the same reasons.

26     Plaintiffs' certification motion should also be denied because Plaintiffs cannot meet their

27 burden of proving class treatment is superior to individual actions by class members nor that the

28 class is ascertainable. This is because many putative members have damage claims large enough

(over \$40,000) to warrant individual actions, and many others are so small that small claims actions could be filed. Plaintiffs provide no plan for managing the class, and there may be no need for a class action because no other lawsuits regarding TOUGHCable Level 1 and/or TOUGHCable Level 2 (collectively, "TC") have been filed. *See*, *Hanlon v. Chrysler Corp*., 150 F.3d 1011 (9th Cir. 1998). Plaintiffs' proposed class is not ascertainable as determining class membership would require individual fact inquiries into where each TC purchase was completed.

Rule 23(a)'s requirements are also not met. There are no common facts because not all batches of TC were created the same way or had similar issues (if at all). Therefore, individual proof is required as to whether the TC Plaintiffs purchased was subject to a manufacturing error by the third party manufacturer. Ubiquiti has unique defenses to the claims presented by each plaintiff therefore typicality is not met. Finally, Plaintiffs request only some of the allegedly permissible damages, rendering them inadequate class representatives.

Conceding the weakness in their claim that California law should apply to the main class, Plaintiffs propose 12 alternative classes and as a second alternative, 7 issue classes. Nonetheless, those alternate and issue classes cannot be certified because Plaintiffs fail to show those classes meet the requirements of Rule 23. In fact, they make no Rule 23 showing whatsoever for the alternate and issue classes. The alternate classes also fail because the majority of the alternate classes consist only of purchasers who suffered losses, and are therefore "fail-safe" classes which cannot be certified by the Court. Plaintiffs' proposed issue classes are flawed because they fail to explain how certifying that type of issue class would further resolution of this dispute, as opposed to merely consuming time and resources.

In short, Plaintiffs have failed to carry their burden to meet the requirements of Rule 23(a) and Rule 23(b), as will be discussed herein and this Court should deny certification of any class.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     The Plaintiffs[1] Are Different Sophisticated Business Entities, Not Consumers

*Tasion Communications, Inc. dba Planet Telecom* ("Tasion"): is a telecommunications

---

[1] Plaintiffs' counsel has advised Ubiquiti's counsel that Fundamental Holdings, Corp., dba Peak Internet requests dismissal of its lawsuit with prejudice and dismissal of the Colorado class whom it represents without prejudice.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

provider with operations in Canada and Panama. Founded in 1997, Tasion offers high speed internet connectivity for business and residential subscribers.[2] (Fourth Amended Complaint ("FAC") ¶27.) It operates both in Canada and in Panama, where its president, David Veilleux resides. All of Tasion's purchases of TC were made over the telephone by its President David Veilleux. (FAC ¶82.) An individual factual inquiry is required as to where Tasion's sales were consummated, whether they were consummated in Panama, or in the United States. If the last act required to complete the purchase was consummated in Panama, then Tasion cannot be a member of the defined class, neither the main class nor alternate class No.12.[3]

*International Power Systems, LLC, dba Freeway Networks* ("Freeway"): was formed in 2004 and provides installation services for wireless internet businesses located in Arizona. (FAC ¶¶28, 115.) Its owner purchased TC from Streakwave over the phone and email. (FAC ¶133.) Thus, the sales/purchase occurred in Arizona, not in Panama.

*Nationwide Computer Systems, Inc., dba Camplink* ("Camplink"): is a nationwide internet service provider headquartered in Florida which provides internet connectivity for operations on the East Coast of the United States, including RV parks and campgrounds located in Florida, Maine, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, and Pennsylvania.[4] (FAC ¶30.) Its owners are highly educated businessmen.[5] The complaint does not specify whether purchases were over the internet or the telephone. Camplink offers different internet service plans to its customers based on time of occupancy at the parks. Some parks/campgrounds are seasonal, closed for the winter.[6]

---

[2] In Panama, the company boasts on providing high speed wireless internet service in some of the most remote regions in Panama with the development of extended communications technologies. www.planettelecom.com; www.ptpanama.com (last visited May 31, 2015).

[3] Tasion requests an alternate class of all persons who incurred losses in Panama and also requests therein a subclass for TC Level 2, yet Tasion never purchased TC Level 2. (Choo Dec., at Ex. 51.) Therefore, there is no injury and it is an inadequate representative for such a class.

[4] Camplink's website boasts its parent company has provided businesses with top-notch computer consulting and networking services since 1986. It has installed wireless networks in Laos, Costa Rica and Ecuador. In 2003 it began its Camplink division which quickly became its primary business focus. www.camplink.net; www.nationwide.net (last visited May 31, 2015).

[5] Camplink's founders are Mike Burns, graduate of MIT's Sloan School of Management and Tom Fantacone, MIT graduate with a Physics and Mathematics degree and a Masters degree in Physics from Stanford. www.camplink.net (last visited May 31, 2015).

[6] Choo Dec., at Ex. 1.

## B. The OUTDOOR Climates Vary Among Plaintiffs

These businesses operate in different environments. The claim in this lawsuit is that TC was not an "outdoor" cable,[7] but the locale of installation of TC is different for each plaintiff.

*Tasion*: purchased TC in Panama for use in Panama, a tropical maritime environment.[8] Over 55.25% of the TC Tasion purchased in 2011 is still performing four years later "outdoors" in that tropical, hot, humid climate.[9] Tasion purchased TC between March 8, 2011 and February 3, 2012.[10] In discovery responses,[11] Tasion states that it does not know where the cable was installed or the positioning of the cable at the time of installation.[12] Position of the cable impacts any determination of whether the cable could withstand the "outdoors."[13]

*Freeway*: Arizona is a desert climate.[14] Freeway installed TC in Tucson, Phoenix, Flagstaff, Prescott and Yavapai County, at sites varying from flat rooftops in Tucson to mountain locations within the pine forest in Yavapai County.[15] While climates differ between Phoenix, Tucson and Flagstaff, Arizona generally is a hot, desert climate with very long, hot summers averaging 107 days annually of temperatures over 100 degrees.[16]

*Camplink*: operates in 9 states along the Atlantic coast area, from Florida to Maine. The temperatures in Maine are vastly different than the temperatures in Florida. In addition to variations in climate, these states have different durations of seasons and different average humidity levels. Camplink alleges it installed TC in 34 parks, with 18 parks in Florida and 16 parks spread throughout Maine, New Hampshire, Massachusetts, New York, New Jersey, Pennsylvania, Ohio, North Carolina, and Florida.[17]

---

[7] The allegation of the lack of UV protection in TC concerns a third party manufacturer, long since replaced, and a limited time of production – March-December 2011.

[8] *Id.*, at ¶3, Ex. 2.

[9] *Id.*, at ¶¶6, 7.

[10] *Id.*, at Ex. 7.

[11] *Id.*, at Ex. 9.

[12] *Id.*

[13] Peak's TC is working "outdoors" in Colorado; over 50% of Tasion's TC is working "outdoors". *Id.*, at ¶¶6, 7, Ex. 50.

[14] *Id.*, at ¶4, Ex. 3.

[15] Freeway describes replacing TC at 138 locations with short exposed, roof work, versus 20 terminations in remote mountains with long and medium conduit runs and medium exposure. (*See*, *Id.*, at ¶9.) Thus, there is climate variation among Freeway's own installations.

[16] *See*, *Id.*, at ¶50.

[17] *See*, *Id.*, at Ex. 5, which identifies the sites where TC was installed.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

The temperatures and climates in which the cable operated "outdoors" varied depending on the Plaintiffs' location. The locations of the installation of the TC itself varied from installations facing direct sunlight to installations with no direct sunlight and installations with only partial sunlight. Different climates, environmental elements, and the quality and quantity of UV exposure all make a difference in the "outdoor" use of the TC such that common facts do not exist (Rule 23(a)(2)) and individual issues predominate (Rule 23(b)(3), as discussed *infra*.

**C.    Differences Exist About What, When, How and By Whom TC Was Installed**

The TC purchased, installed and removed by Plaintiffs differs. These differences show there are no common facts (Rule 23(a)(2)) and that individual issues predominate (Rule 23(b)(3)).

*Tasion*: bought 22 boxes of TC Level 1 from March 8, 2011 through February 3, 2012. (FAC ¶¶ 80-82.)[18] Tasion does not know where it installed TC.[19] Tasion used other Cat5e cable in addition to TC. Tasion did not keep records of which type of Cat5e cable (whether TC or any other type of cable) it installed at any location.[20] Four of the six cable installers were not around at the time of replacement of the cable[21]; the whereabouts of five of the six cable installers is unknown[22]

Tasion's president does not know of any specific locations that have TC presently installed, stating that the "burden to obtain information as to whether any given site contains TC far outweighs any probative value that could be supplied by that information."[23] Tasion cannot identify any customers who utilized TC that was allegedly defective.[24] Exhibit A to Tasion's Responses to Interrogatories Set 1, verified by Tasion's president, shows that 33 of the 40 cable installation dates occurred <u>before</u> Tasion even purchased its first box of TC Level 1 on March 8,

---

[18] Choo Dec., at Exs. 7, 51.
[19] Interrogatory 8 states that "Tasion did not record or maintain records of which of its installations utilized TC or any other type of cable." (*Id.*, at Ex. 13.)
[20] *Id.*, at Ex. 13, 16.
[21] *Id.*, at Ex. 14.
[22] *Id.*, at Ex. 15.
[23] In Tasion's Suppl. Responses to Interrogatory Set 2, No. 18, Tasion states that P038 (Exhibit A) was prepared from P057. Tasion identifies in its 2nd Suppl. Response to Interrogatory Set 1, Nos. 13 & 14 that P057 is a listing of customer installs from 2008 through 2014 regardless of cable used. Interrogatory No. 9 refers the reader again to Exhibit A. Exhibit A was also produced by Plaintiffs as P038. (*Id.*, at Ex. 16.)
[24] Supplemental Response to Interrogatory No. 11 states that Tasion has records of only 2 customer outages. In Tasion's 2nd Suppl. Responses to Interrogatories Set 1, No. 11, Tasion states that there were no communications of which Tasion is aware between Tasion and its customers which specifically concerned TC. (*Id.*, at ¶¶14, 15.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

2011.[25] This means that the cable installed and replaced was not TC, but is some other cable. Tasion's lawsuit is about some other cable – not Ubiquiti's TC.[26]

Tasion's discovery responses list the dates and locations at which it installed cable on certain towers. Twelve dates of tower installations occurred entirely in 2013, over one year after Tasion's last purchase of TC and well after TC was discontinued.[27] Tasion admits that after March 31, 2012, no TC was installed at any location.[28] In sum, these twelve tower installations could not have used TC. Tasion admits that it has had no communications between itself and its customers concerning TC.[29] Therefore, Tasion installed and replaced cable which was not TC, and Tasion does not know where it installed the TC it purchased and cannot show that any customer lost internet service due to TC. Tasion has no proof of any injury due to TC, and its case should be dismissed for lack of Article III standing.[30]

*Freeway*: bought 5 boxes of TC from December 15, 2010 through February 7, 2012.[31] Freeway differs from Tasion and Camplink because 4 of the 5 boxes purchased were TC Level 2. TC Level 2 is a different product than TC Level 1.[32] Unlike Tasion, Freeway replaced 100% of the TC, whether or not the cable needed to be replaced.[33] It had no communications between itself and its customers concerning TC before such replacement.[34] Rather, a "link failure" was reported at only 8 of the 173 locations listed, or 4.62%, and only 10 inspections out of the 173 locations listed, or 53.78%, were made.[35] Freeway also admits that not all the outages, if any, were caused

---

[25] Choo Dec., at Ex. 7.

[26] In its Suppl. Responses to Interrogatories Set 1, No. 8, Tasion states prior to its use of TC, Tasion used regular indoor Cat5e cable for its installations. What failed was not TC but other Cat5e cable as listed in Exhibit. A. (*See Id.*, at ¶6.)

[27] *See Id.*, at Exs. 8, 9. Tasion admits that these dates (in Interrogatory No. 8) are the dates that the cable was installed at the tower locations. (*Id.*, at Ex. 22.)

[28] *Id.*, at Ex. 23.

[29] *Id.*, at Ex. 17.

[30] It is Plaintiffs continuing obligation to demonstrate it suffered 'injury in fact" granting Article III standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (standing must be supported "with the manner and degree of evidence required at successive stages of the litigation"). Even at class certification, Tasion is required to put forward evidence demonstrating in fact that it has legal standing to pursue the claims alleged in the FAC. *Gonzales v. Comcast Corp.*, 2012 WL 10621, at *5 (E.D. Cal. Jan. 3, 2012) *report and recommendation adopted*, 2012 WL 217708 (E.D. Cal. Jan. 23, 2012).

[31] Choo Dec., Exs. 24, 25.

[32] *Id.*, at Exs. 26, 27.

[33] *Id.*, at Ex. 3.

[34] *Id.*, at Ex. 28.

[35] Exhibit A was prepared from Freeway Networks Transaction List by Customer January 2011-May 2012 and

by TC.[36]

    *Camplink*: purchased 7 boxes of TC Level 1 from September 2, 2011 through February 28, 2012.[37] Significantly, Camplink's own documents show that several alleged installations of TC were not TC because TC had not been purchased prior to those installations.[38] The installation date of August 11, 2011 for ███████████████ in Maine precedes Camplink's first purchase of TC on September 2, 2011. Thus, Camplink has no proof of any injury in Maine due to TC. Maine's class claim (alternative class 4) must be dismissed for lack of Article III standing. (fn. 31, *supra*.) The second site is ████████████ in Florida, where again cable was installed on March 7, 2011, preceding Camplink's first date of purchase of TC.[39] Finally, a third site, ████████████████, is not TC because the two purchases on September 2, 2011 were shipped to RV parks in Pennsylvania and Ohio.[40] Thus there are individual differences among the Camplink's sites, and sites where the cable installed was clearly **not** TC.

### D.    All Three Plaintiffs Have Vastly Different Damages

    *Tasion:* claims $30,652.50 in damages, with labor of *$██/hour* for *756.5 hours* ($████████), management time of *$██/hour* for *110 hours* ($█████), and ████ out of pocket.[41]

    *Freeway*: claims $48,491 in damages, with debug/reprogramming of *40 hours* of *$██/hour* ($██████), travel time of *79 hours* at *$██/hour* ($█████), 3,600 miles at $0.56/mile ($2,016), parts/labor/equipment ($█████); admin time of *40 hours* at *$██/hour* ($4,000).[42] Freeway initially claimed $15,000 for ████ cable installations, yet Exhibit A lists ██ cable installations.[43]

    *Camplink:* Labor costs revealed in the documents produced in discovery reveal different labor rates than in the charts attached to written discovery responses.[44] The documents produced

---

Customer Contact List. (*See,* Choo Dec., at Exs. 52, 53, 54.) No link failures were reported at condominiums developments listed, in Tucson, Mayer, and Cave Creek Arizona. (*See, Id.,* at ¶20.)

[36] *Id.,* at Ex. 29.
[37] *Id.,* at Ex. 30.
[38] *Id.,* at ¶23.
[39] *Id.*
[40] *Id.,* at Ex. 30.
[41] *Id.,* at Ex. 18.
[42] *Id.,* at Ex. 31.
[43] *Id.,* at ¶24.
[44] *Id.,* at ¶26.

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

reveal labor rates of $█/hour for the main installer and $█/hour for a helper.[45] Unlike Tasion and Freeway, Camplink's charts attached to its discovery responses do not show an hourly rate for labor costs to replace the TC, but instead categorizes damages.[46]

Since Plaintiffs individual damages differ both in the amount and the type of damages claimed but also in the method used to calculate those damages, Plaintiffs fail to meet the commonality requirement of Rule 23(a)(2). Additionally, because the damages claimed are substantial, as discussed *infra*, they fail to meet the superiority requirement of Rule 23(b)(3).

### E.    Causation – Individual Issues Predominate

*Tasion*: does not know where the TC was installed and cannot locate the installers. Tasion lists 33 sites where the cable installed preceded Tasion's first purchase of TC. Tasion had no communications with its customers.[47] Tasion will be unable to show who, what type, how, when, or where TC was installed and whether proper installation procedures were followed.[48]

*Freeway*: did not replace TC based on any customer complaints. Freeway has no records of complaints regarding TC.[49] No inspections were conducted prior to replacement of TC, and Freeway talked to no customers prior to replacing TC.[50] It acknowledges that not all outages were due to TC. Ninety-Five percent of Freeway's customers had no internet failure.[51]

*Camplink*: does not know where TC was installed and cannot say that it was all bad. (FAC ¶201.) Its documents reveal that individuals installing replacement cable commented on the prior bad installation of TC;[52] replacement installers were sent to replace working cable.[53]

### III.    LEGAL STANDARDS FOR CLASS CERTIFICATION

Plaintiffs must meet Rule 23 requirements with admissible evidence. *Comcast v. Behrend*, 133 S.Ct. 1426 (2013) makes it clear that Plaintiffs' burden on class certification goes far beyond

---

[45] Choo Dec., at Ex. 33.
[46] *Id.*, at Ex. 34.
[47] *Id.*, at ¶¶14, 15.
[48] *Id.*, at ¶¶11-15, 17-18.
[49] *Id.*, at ¶20.
[50] *Id.*
[51] Exhibit A was prepared from Freeway Networks Transaction List by Customer January 2011-May 2012 and Customer Contact List. (*See, Id.*, at Exs. 52, 53, 54.)
[52] In an email to the owner on March 3, 2013 an installer stated there was a bad job on the prior install, the cable was stapled to a tree and bent at 90 degree angles, crimping the wire. (*Id.*, at Ex. 36.)
[53] *Id.*, at Ex. 55.

merely pleading a case – they must "prove that there are **in fact** sufficiently numerous parties, common questions of law and fact, typicality of claims or defenses and adequacy of representation," and "must also satisfy through evidentiary proof at least one of the provisions of rule 23(b)." *Id*. at 1432 (emphasis in original; internal quotations omitted). This requirement extends to Plaintiffs' proposed alternative classes as well. Implicit in the statutory requirements is that Plaintiffs must also demonstrate ascertainability and membership in the class. *In re High-Tech Employee Antrtrust Litig.,* 985 F. Supp. 2d 1167, 1182 (N.D. Cal. 2013).

The Court must conduct a rigorous analysis for each of the class certification factors. *Comcast*, 113 S.Ct. at 1432. It must "closely scrutinize factual evidence and expert reports" seeking to establish claims can be proven on a class-wide basis. *High-Tech, supra*, 985 F. Supp. 2d at 1186 (citing *In re Rail Freight Fuel Surcharge Antitrust Litig*., 725 F.3d 244, 247(D.C. Cir. 2013)). Remarkably, Plaintiffs submit no expert declarations, class management plan or viable damages model supporting certification. Promises to "connect the dots" at some later point cannot assist the Court's *rigorous* class certification analysis. Plaintiffs have not met their burden of proof. The evidence filed in support of this Opposition, including the declarations of Defendants' experts, demonstrate that neither the primary class nor alternate classes should be certified.

## IV.   REQUIREMENTS OF RULE 23(B)(3) NOT MET

Plaintiffs bear the burden to prove that common questions of law or fact *predominate*, a class action is the *superior* method for adjudicating the controversy, and that the class is *ascertainable. Marlo, supra,* 639 F.3d at 947; *see also*, Kane Dec., ¶28.

### A.   Plaintiffs Cannot Show Predominance Because Too Many States' Laws Apply

The predominance requirement is far more demanding than commonality. *Gene & Gene LLC v. Bio Pay LLC*, 541 F.3d 318, 326 (5th Cir. 2008). To make this analysis, the Court must first determine the substantive law applicable to the claims; the proof necessary for each claim / defense; and how the issues would be tried (class versus individual treatment). (Kane Dec., ¶7.)

#### 1.   The Laws of All Countries and/or States in Which Putative Class Members Reside Govern Their Individual Claims

Plaintiffs propose a class of all persons whose purchase was "completed" in the United

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

States. (MPA at p. 6, lns. 13-14.) Even under California law, a contract is deemed "made where the last act required for the completion of its execution was performed." *Rawson v. J.C. Forkner Fig Gardens*, 206 Cal. 4, 6 (1928). "When an acceptance is . . . by telephone, the place of contracting is where the acceptor speaks his acceptance." *Ward Mfg. Co. v. Miley*, 131 Cal.App.2d 603, 610 (1955). Because the place of contracting (or purchase) depends on where *acceptance* occurred, this class consists of persons located worldwide.[54] (Kane Dec., ¶15.) When a party proposes a world-wide (or nationwide) class the Court must determine which jurisdiction's substantive laws apply to the members' claims. "[T]he law on predominance requires the district court to consider variations in state law when a class action involves multiple jurisdictions." *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir.2007). This analysis is required because the larger the number of countries and/or states whose laws apply, the less likely it is that "questions of law or fact common to class members predominate over any questions affecting only individual members. . . ." Fed. R. Civ. P. 23(b)(3). (Kane Dec., ¶¶7, 12.)

### a. California Choice of Law Rules Apply

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Mazza, supra*, 666 F.3d at 589 (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir.), *amnd.* 273 F.3d 1266 (9th Cir. 2001)). California's choice of law rule applies the "government interest analysis," a three step process.[55]

### b. Step 1 – The Laws Are Different in the 50 States and Multiple Countries that Are Potentially Affected Jurisdictions

### (1) There are Many Potentially Affected Jurisdictions

Ubiquiti sold TC only to distributors, who were located on five (5) continents in twenty-

---

[54] For example, if the distributor accepted an offer from a foreign purchaser, the purchase would be completed in the United States although the purchaser was located in a foreign country.

[55] "First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different. Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists. Third, if the court finds that there is a true conflict, it . . . compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied." *Mazza, supra*, 666 F.3d at 590 (quoting *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 81–82 (Cal. 2010)) (citations and quotations omitted).

OPPOSITION TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

nine (29) countries.[56] Streakwave's documents reveal its purchasers had billing addresses

██████████████████████████████████. (Himmelfarb Dec., Ex. 31.) Hence,

putative class members reside in each of those states and countries, each of which is a "potentially

affected jurisdiction[]" for choice of law analysis because even if purchases were "completed" in

the United States, many *purchasers reside elsewhere*. (Kane Dec., ¶¶15, 17.)

Plaintiffs argue this Court may apply California law to the claims of all putative class

members. (MPA, p. 6, lns. 17-19). The fallacy of this argument is demonstrated by the Seventh

through Twenty-Third Causes of Action, asserting claims under the laws of eleven (11) states

*other than* California.[57] By so doing, Plaintiffs impliedly concede the laws of California cannot

and should not apply to class members residing in those eleven (11) states, and instead the laws of

the state in which each respective class member resides must apply to his/her/its claims. The same

is true for class members residing in states (and countries) *other than those named* in the FAC.

### (2) The Laws of the Affected Jurisdictions Are Different

### (a) Fraud Claims Materially Differ Among States

Plaintiffs seek a worldwide class for their fraudulent inducement claim, but the laws of the

50 states evidence serious differences. For example, the burden of proof regarding fraud varies

dramatically.[58] In California and 11 other states, a fraud claim must be proven by a preponderance

of the evidence, but 32 states and Washington D.C. require some variation of clear and

convincing evidence. Six states have hybrid standards of proof for fraud claims. (*See* Courteau

Dec., Ex. 1.) Thirty-two states require scienter; whereas, 18 states and Washington D.C. permit a

fraud claim based on reckless statements. (*Id*.) Statutes of limitations for fraud vary significantly

– from one to six years. (*Id*.) States also apply different methods of calculating damages for

---

[56] Those five continents, with the twenty-nine countries in which the distributors are located, are: (1) North America – United States, Canada, Mexico; (2) South America – Brazil, Chile, Columbia, Ecuador, Paraguay, Peru; (3) Europe/Asia – Albania, China (Hong Kong), Czech Republic, Hungary, India, Indonesia, Kosovo, Macedonia, Nepal, Poland, Saudi Arabia, Serbia, Spain, Thailand, Turkey, Ukraine, United Arab Emirates; (4) South Africa; and (5) Australia – Australia, New Zealand. (Himmelfarb Dec., Ex. 22.)

[57] Those states are Arizona, Colorado, Florida, Maine, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Ohio, and Pennsylvania. (*See*, FAC ¶¶ 357-559.)

[58] A Court sitting in diversity applies a heightened burden of proof imposed by the state whose law is being applied. *See, Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479 (6th Cir. 1989).

fraud.[59] Finally, states differ dramatically in terms of whether a presumption of reliance arises in class actions. (Kane Dec., ¶¶18, 21, 23.) Several states reject a presumption of reliance,[60] although Plaintiffs will argue reliance is presumed in California.[61] In sum, states' fraud laws differ regarding burden of proof, whether scienter is required, the statute of limitations, the methods for calculation of damages, and whether a presumption of reliance applies.[62]

### (b) Breach of Warranty Claims Differ Among States

The laws of the states regarding breach of express warranty vary with regard to the issues of reliance, pre-litigation notice, and privity. Some jurisdictions require that a plaintiff prove reliance on a warranty; some require pre-litigation notice; some require both; and some require neither. (Kane Dec., ¶ 8; Courteau Dec., Ex. 2.) Some states bar express warranty claims without privity;[63] more states hold no privity is required;[64] and others require privity but surround the general rule with exceptions.[65] Thus, there are clear differences between the laws of the 50 states as to notice, reliance and privity for express warranty claims.

### c. Step 2 – A True Conflict Exists Based on Each Jurisdiction's Interest in the Application of Its Own Laws

The conflicts between the laws of the various states regarding claims for fraud and express warranty create a "true conflict" prohibiting application of California law to the claims of the entire class. "[F]oreign states have a strong interest in the application of their laws to transactions between their citizens and corporations doing business within their state." *Mazza, supra*, 666 F.3d

---

[59] Thirty-one states use a "benefit of the bargain" method; 9 states and Washington D.C. use an "out of pocket" method; and 10 states take a "flexible" approach to calculating damages. (Courteau Dec., Ex. 1.)

[60] *See, J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 89 P.3d 1009, 1018 (Nev. 2004); *Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 411 (W.D. Ok. 1990); *In re Enron Corp. Securities, Derivative & "ERISA" Litig.*, 490 F. Supp. 2d 784, 814 (S.D.Tex. 2007) (Texas courts do not recognize a "fraud on the market theory of reliance for common law claims").

[61] Plaintiffs are wrong, as they rely on cases involving violation of the UCL, which this is not.

[62] The standard of proof for punitive damages, which Plaintiffs intend to seek, also differs, with 7 states requiring proof by a preponderance of the evidence; 36 states requiring clear and convincing evidence; 4 states and Washington D.C. with hybrid standards; and 3 states that do not permit such damages. (Courteau Dec., Ex. 1.)

[63] *See, e.g., Barre v. Gulf Shores Turf Supply, Inc.*, 547 So.2d 503, 504-05 (Ala. 1989).

[64] *See, e.g., B.B.P. Ass'n, Inc. v. Cessna Aircraft Co.*, 420 P.2d 134, 138-39 (Id. 1966); *Koperski v. Husker Dodge, Inc.*, 302 N.W.2d 655, 664 (Neb. 1981); *Ventura v. Ford Motor Co.*, 433 A.2d 801, 811 (N.J. Sup. 1981); *Randy Knitwear, Inc. v. American Cyanamid*, 226 N.Y.S.2d 363, 366-67 (1962); *Kinlaw v. Long Mfg. N.C., Inc.*, 259 S.E.2d 552, 554-55 (N. Car. 1979); *Inglis v. American Motors Corp.*, 209 N.E.2d 583 (Ohio 1965).

[65] *Jones v. ConocoPhillips Co.*, 198 Cal. App. 4th 1187, 1201 (2011).

---

at 594. Conversely, "California's interest in applying its law to residents of foreign states is attenuated." *Id*.; *see also, Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982) ("While protecting local investors is plainly a legitimate state objective, the State has no legitimate interest in protecting nonresident shareholders"). Plaintiffs' fraud claims involve the same interests as the consumer protection statutes in *Mazza, supra,* because both concern the issue of false advertising.

### d. Step 3 – Other Jurisdictions' Interests Would be More Impaired by Application of California Law

As stated *supra*, California has an attenuated interest in regulating transactions that occur outside of its borders, and acknowledges "a jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders. . . ." *Mazza, supra*, 666 F.3d at 592. Here, the transactions at issue occurred in multiple different states and countries, which weighs heavily whether California's law applies to all class members, impacting the predominance and superiority requirements. (Kane Dec., ¶¶7, 9, 12, 15.) "[I]f California law were applied to the entire class, foreign states would be impaired in their ability to calibrate liability to foster commerce" (*Mazza, supra*, 666 F.3d at 593), while application of the laws of each class member's state or country of residence would not impair California's interests at all. Accordingly, California law cannot apply to the claims of each class member.

Because the laws of each class member's state must be applied to its claims, individual issues relating to the laws of 50 states (and other countries) would predominate if the class were certified. Plaintiffs' motion for class certification should therefore be denied. (Kane Dec., ¶28.)

### 2. Predominance Also Fails Because Plaintiffs' Damages Model is Flawed

Regardless of which states' laws apply, to establish predominance Plaintiffs "must present a damage model that (1) identifies damages that stem from the defendant's alleged wrongdoing and (2) establishes that 'damages are susceptible of measurement across the entire class.'" *Rai v. Santa Clara Valley Transp. Auth.*, 2015 WL 860761, at *14 (N.D. Cal. Feb. 24, 2015) (quoting *Comcast, supra*, 133 S.Ct. at 1433). Plaintiffs' proposed damages model fails for two reasons. First, their model does not attempt to calculate all categories of damages allegedly suffered by the class, instead purporting to measure "just one of the categories[], direct labor costs to replace

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    [TC]." (MPA, p. 23, lns. 13-14.)[66] This makes it likely a large number of class members will opt

2    out, eliminating any benefits from a class procedure. *See, In re Agent Orange Prod. Liab. Litig.*,

3    818 F.2d 145, 166 (2d Cir. 1987) (if members with strong cases opt out, there is less incentive to

4    settle weaker cases so "[b]oth the class action and the strong cases would then have to be tried").

5    Second, Plaintiffs' proposed damages model does not measure alleged labor costs to

6    replace TC; instead it arbitrarily assigns a per-box dollar amount to each claim. Plaintiffs admit

7    their simplistic model assumes that regardless of the location of installation the amount of time

8    required to install a given amount of cable is identical – *i.e.* it takes the same amount of time to

9    install thirty feet of cable on a tower in a jungle as it does to install on a suburban home. This

10   assumption, unsupported by expert opinion, defies logic and facts.[67] Plaintiffs' proposed damages

11   model also assumes a uniform hourly labor rate in any given region of the world, and that all

12   cable installers are paid on an hourly basis, but this also defies logic and facts.[68] Plaintiffs have

13   not "presented a damages model capable of isolating" the damages potentially available. *Lanovaz*

14   *v. Twinings N. Am., Inc.*, 2014 WL 1652338, at *5 (N.D. Cal. Apr. 24, 2014), *recons. denied*,

15   2014 WL 7204757 (N.D. Cal. Dec. 17, 2014) (denying certification of a damages class for lack of

16   a viable damages model). Plaintiffs' model does not even meet the "facially plausible" standard

17

---

18   [66] In California, the measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted," plus

19   incidental and consequential damages. Cal. Com. Code § 2714. Damages for fraudulent inducement are the "difference between the actual value of that with which the defrauded person parted and the actual value of that

20   which he received," as well as "[a]mounts actually and reasonably expended in reliance." Cal. Civ. Code § 3343(a).
     [67] For example, Tasion's discovery responses reveal that for non-tower locations, installs requiring 1 hour involved

21   ███ feet of cable (███ ft /hr); installs of 2 hours involved ███ feet of cable (███ ft /hr); installs of 3 hours involved ███ feet of cable (███ ft/hr). (Choo Dec., Ex. 6.) Tower installations also varied, with one tower

22   requiring █ hours to install ███ feet of cable (█ ft/hr), while another tower required █ hours to install ███ feet of cable (█ ft/hr). (*Id.*) Thus, Plaintiffs' claim that it requires the same amount of time to install a given length of

23   cable is ***undeniably and demonstrably false***.
     [68] For example, Peak paid a flat labor fee of $65 per install, while Tasion ($███) and Freeway ($███) paid hourly

24   rates. (*Id.*, at Exs. 6, 31, 37.) Despite the Court's order requiring responses to Ubiquiti's discovery, Camplink failed to provide this information – instead merely providing a lump sum of costs by location. (*Id.* at ¶26, Exs. 33-35.)

25   Plaintiffs' own damages claims also demonstrate the fallacy of their model. Tasion claims damages of $40,676.13 based on its purchase of 22 boxes of TC ($1,848.92/box); Peak Internet claims approximately $11,250-$14,500 based

26   on its purchase of 2 boxes ($5,625-$7,250 / box); Freeway claims $48,941 based on its purchase of 5 boxes ($9,788.20/box); and Camplink claims $142,935.50 based on its purchase of 7 boxes ($20,419.36/box). (*Id.*, Exs. 6,

27   7, 31, 34, 35, 37.) A per box damage range of $1,848.92 to $20,419.36 is clear evidence that Plaintiffs' model cannot "establish[] that 'damages are susceptible of measurement across the entire class.'" *Rai, supra*, 2015 WL 860761, at

28   *14. Although damage "[c]alculations need not be exact" (*Comcast, supra*, 133 S.Ct. at 1433), at a minimum they must amount to more than guesswork.

they cite in *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 493 (C.D. Cal. 2006).

Despite bearing the "burden of showing that there is a classwide method of awarding relief that is consistent with [their] theory of" liability, Plaintiffs provide no expert testimony supporting their proposed damages model. *Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *12 (N.D. Cal. Jan. 7, 2014). This is fatal to Plaintiffs' certification request, regardless of other flaws in the model. "[U]nder *Comcast*, a court can certify a Rule 23(b)(3) class only if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability." *Id*. Because Plaintiffs fail to provide such evidence, and because Plaintiffs' model neither "identifies damages that stem from the . . . alleged wrongdoing" nor "establishes that 'damages are susceptible of measurement across the entire class'" (*Rai, supra*, 2015 WL 860761, at *14), they cannot meet their burden and certification must be denied.

### 3.    Affirmative Defenses – Individual Issues Predominate

"[A]ffirmative defenses must be factored into the calculus of whether common issues predominate." *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 438 (4th Cir. 2003) (reversing certification for lack of predominance due to affirmative defense issues); *see also, O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000) (decertifying class, in part, for lack of predominance because of individualized issues in statute of limitations defense). Here, Ubiquiti raises two affirmative defenses that preclude predominance.

#### a.    Accord & Satisfaction

Many putative class members are subject to an accord and satisfaction defense. Whenever purchasers reported TC jacket issues, Ubiquiti would provide free replacement cable pursuant to its RMA process. Between May 9, 2011 and April 15, 2014, Ubiquiti provided free replacement cable to the purchasers of nearly ███ boxes of TOUGHCable (███ RMA numbers), amounting to over ██% of the boxes sold.[69] To participate in Ubiquiti's RMA process, a purchaser would fill-out the RMA web-page, which had a link to Ubiquiti's "Product Warranty," which states

---

[69] Choo Dec., ¶30.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

"The sole responsibility of [Ubiquiti] under this warranty shall be limited to repair of this product, or replacement thereof, at the sole discretion of [Ubiquiti]."[70] Such disclaimers are enforceable under Cal. Com. Code § 2719(3). Given the number of RMAs and TC boxes subject to those RMAs, individual issues relating to accord and satisfaction will easily overwhelm any common issues, warranting denial of class certification.

### b. Ubiquiti's Product Warranty

As discussed above, Ubiquiti's Product Warranty limits its liability to the replacement or repair of the product, which forecloses claims for the labor costs of replacing the product. This warranty and limitation of liability applies to all Ubiquiti products, including TOUGHCable.[71] Although Plaintiffs will argue the Product Warranty does not apply to the class members because they allegedly had no notice of it, Ubiquiti is entitled to discovery regarding each class member's awareness of the Product Warranty prior to purchasing TC. Because this affirmative defense will require mini-trials for each class member, there can be no predominance. *See, Curtis v. Extra Space Storage, Inc.*, 2013 WL 6073448, at *3 (N.D. Cal. 2013) (no predominance, individualized analysis required as to intent).

### B. Plaintiffs Cannot Establish Superiority

Superiority concerns the class members': (1) interest in individually controlling prosecution of separate actions; (2) the likely difficulties in managing a class action; (3) the availability of procedural alternatives; (4) and the extent and nature of any litigation concerning the controversy already begun. *See*, Fed. R. Civ. P 23(b)(3); *Hanlon, supra*, 150 F.3d 1011.

With regard to the first factor, class action treatment is *not superior* where substantial individual damages are claimed. *See*, *Zinser, supra,* 253 F.3d at 1190-91. In *Zinser*, the Ninth Circuit affirmed denial of certification, explaining that individual damages of $50,000 "do[] not argue persuasively for class certification." *Id*. at 1191; *see also*, Kane Dec., ¶5. "The [class action] Rule was not designed to permit large claimants, who are fully capable of proceeding on their own, to strengthen their bargaining position by threatening . . . the prospect of class-wide

---

[70] Choo Dec., at ¶49, Ex. 56.
[71] *Id.*, at ¶49.

relief and large attorney fee awards." *Stoudt v. E.F. Hutton & Co., Inc.,* 121 F.R.D. 36, 38 (S.D.N.Y. 1988) (class members each seeking approximately $60,000); *see also*, *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996) (finding that substantial individual damage claims eliminate the "most compelling rationale for finding superiority in a class action"). Here, three class representatives have large claims – Camplink: $142,935.50; Freeway: $48,941; Tasion: $40,676.13 – and other class members likely would claim similar large amounts, making individual claims superior than class.[72] Where plaintiffs fail to come forward with evidence as to superiority, class certification is properly denied. *Mazza*, *supra*, 666 F. 3d at 589; *Zinser, supra*, 253 F. 3d at 1186. In this case, class certification should be denied here.

The second superiority factor, manageability, "requires consideration of the potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages." *Moheb v. Nutramax Labs. Inc.*, 2012 WL 6951904, at *8 (C.D. Cal. Sept. 4, 2012). Those considerations weigh against certification. Here, Ubiquiti did not sell directly to purchasers, so it cannot provide notice to class members. The significant issues regarding calculation of damages are discussed above in Part IV.A.2., *supra*. In addition, "[c]ourts are 'reluctant to permit actions to proceed' when there are 'formidable . . . difficulties of distributing any ultimate recovery to the class members,' because such actions 'are not likely to benefit anyone but the lawyers who bring them.'" *Id*., at *8 (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974)). Such difficulties exist here due to the need for each class member to prove his/her/its damages. Thus, manageability issues weigh against a finding that class treatment would be superior to individual actions.

The third superiority factor (procedural alternatives) also weighs against certification because many class members could economically assert claims in small claims court. This fact is shown by Plaintiffs' claim that single box purchases make up over 49% of Streakwave's sales (presumably a representative sample of all sales), implying damages are small. (MPA, p.17, lns. 17-18.) "[S]mall claims court would be a realistic possibility of redress . . ., as the proposed class

---

[72] Choo Dec., at Exs. 6, 7, 31, 34, 35, 37.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

members have the incentive and means to bring . . . suits on their own without expending

significant resources." *Smith v. Microsoft Corp.*, 297 F.R.D. 464, 469 (S.D. Cal. 2014).

With regard to the fourth factor, the fact that no other TC lawsuits have been initiated weighs against a class action being superior. *See, Zinser, supra,* 253 F.3d at 1191 ("[a]lthough thousands of patients were implanted with the [product], only nine lawsuits are pending; this indicates that individual litigation may be sufficient to satisfy potential claims"). The above demonstrates Plaintiffs' cannot establish superiority, and certification should be denied.

Finally, where (as here) putative class members reside abroad, to satisfy the superiority requirement Plaintiffs must show that foreign courts will recognize the *res judicata* effect of a U.S. class action judgment. *See, In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 105-06 (S.D.N.Y. 2007) (excluding from class residents of countries that "more likely than not" would refuse to give *res judicata* effect); *see also*, *In re Alstom S.A. Sec. Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008) (same). As discussed above, Plaintiffs' proposed class includes persons who reside worldwide. Despite seeking a worldwide class, Plaintiffs fail to prove that class members' countries would give *res judicata* effect to a class judgment by this Court. Indeed, many countries *would not recognize* such a judgment.[73] Because Plaintiffs fail to meet their burden that foreign recognition is more likely than not, superiority fails and they cannot satisfy Rule 23(b)(3).[74]

**C.     Ascertainability Not Met**

**1.     Individual Inquiries Required**

"A class should be sufficiently definite and 'clearly ascertainable' by reference to objective criteria 'so that it is administratively feasible to determine whether a particular person is a class member' and thus 'bound by the judgment.'" *In re Hulu Priv. Litig.*, 2014 WL 2758598, at *13 (N.D. Cal. June 17, 2014) (quoting *Shepard v. Lowe's HIW, Inc.*, 2013 WL 4488802 (N.D.

---

[73] Courts in Canada, where Tasion is located, have rejected U.S. class judgments. *Currie v. McDonald's Restaurants of Canada, Ltd.*, 74 O.R. (3d) 321, 325, 330, 336 (Ont. C.A. 2005) (refusing to recognize a U.S. class action judgment). Other countries that would not recognize this Court's class-action judgment include France, Germany, Italy, Philippines, Switzerland and the U.K. *See, Bersch v. Drexel Firestone, Inc.* 519 F.2d 974, 996-97 (2nd Cir. 1975); *Vivendi, supra,* 242 F.R.D. 76; *CL-Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 459-60 (S.D.N.Y. 1989).

[74] In *Daimler Chrysler AG Sec. Litig.*, 216 F.R.D. 291, 301 (D. Del. 2003) the court concluded certification is properly denied "where obstacles exist due to the inclusion of foreign class members," and excluded all foreigners from the class due to "practical difficulties involved in maintaining a class comprising of foreign[ers]." *Id.*

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Cal. Aug. 19, 2013)). The class definition "is of critical importance" precisely because "it identifies the persons (a) entitled to relief; (b) bound by a final judgment; and (c) entitled to notice. . . ." Cal. Prac. Guide Fed. Civ. Pro. Before Trial, ¶ 10:273 (The Rutter Group 2015).

Plaintiffs' proposed class is not ascertainable because the members cannot be identified without a factual and legal determination – on a member-by-member basis – of whether each member's "purchase was completed in the United States." (MPA at p. 6, lns. 13-14; Kane Dec., ¶15.) Even if California law applied (which it does not, as discussed in Part IV.A.1., *supra*), a contract is deemed "made where the last act required for the completion of its execution was performed." *Rawson, supra*, 206 Cal. at 6. When a purchase is made by telephone, it is made at the location of the party who accepts the offer/counter offer. *See, Ward, supra*, 131 Cal. App. 2d at 610. Thus, to determine where a purchase was made each transaction must be examined.

Plaintiffs' argument that the class may be ascertained merely by reference to receipts retained by purchasers (*i.e.*, self-identification) ignores the legal and factual issues surrounding where those purchases were "completed."[75] A receipt will not establish which person (the purchaser or seller) accepted the offer/counter offer, or how the transaction was accomplished (by telephone, internet, email, over a meeting/sales pitch, *etc.*) These issues – what was said, by whom, etc. – are central to the question of where the purchase was "completed," the resolution of which would require extensive individualized fact inquiries. "[C]ourts of appeals have found class certification to be inappropriate where ascertaining class membership would require unmanageable individualized inquiry." *Xavier v. Phillip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (citing *Romberio v. Unumprovident Corp.*, 385 Fed. Appx. 423, 431-33 (6th Cir. 2009)). The Northern District has held that a class of persons who purchased products incorporating flash memory was not ascertainable because identifying the members would require examination of each product purchased by each member. *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *15 (N.D. Cal. June 9, 2010). This "underscore[d] the factually-intensive nature and the administrative infeasibility of ascertaining class members." *Id*. Here, the burden of

[75] Plaintiffs briefly argue that purchasers may be identified by distributors' sales records, but offer sales records of only one of Ubiquiti's distributors, and have not sought sales records from any other distributors (whether located in the United States or abroad), if they even are available. (*See*, Himmelfarb Dec., Ex. 31; Choo Dec., ¶50.)

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  identifying class members would be no less, requiring individual inquiries into each purchase to

2  determine where it occurred. Certification should therefore be denied for lack of ascertainability.

### 2. Plaintiffs' Proposed Class is Overbroad As Defined

4  "Certification is improper if there is 'no definable class,'" and there is no definable class if

5  the class is overbroad. *Diacakis v. Comcast Corp.*, 2013 WL 1878921, at *4 (N.D. Cal. May 3,

6  2013). In *Diacakis*, the Court found a class of purchasers of a cable package overbroad because it

7  included members who had not been deceived by the alleged representations and omissions.

8  "Since the proposed class includes persons who were not injured in the same manner as Plaintiff,

9  the proposed class is overbroad." *Id.* at *4. Plaintiffs proposed class is also overbroad because it

10  includes non-harmed class members.[76] The same is true for alternative classes 1 and 2. *Mazur v.*

11  *eBay Inc.* 257 F.R.D. 563, 567 (N.D. Cal. 2009) (holding that because a class was "defined [to]

12  include . . . non-harmed auction winners, [that] portion of the class definition is both imprecise

13  and overbroad"). Because Plaintiffs' proposed class is overbroad, certification should be denied.

### V. PLAINTIFFS' ALTERNATIVE ARGUMENTS FOR CERTIFICATION OF 12 CLASSES AND/OR 7 ISSUE CLASSES ARE ALSO FLAWED

#### A. Plaintiffs Fail to Meet Their Burden Regarding Certification of Their Proposed Alternative Classes and Issues Classes

17  After giving short shrift to their Rule 23 burden for the proposed class, and essentially

18  conceding that conflicts of law prohibit the application of California law to the class, Plaintiffs

19  provide no Rule 23 analysis for their proposed alternate classes and second alternate issue classes.

20  As to both of the alternate classes, Plaintiffs bear the burden of establishing the elements of Rule

21  23. "Where . . . the issues . . . are subdivided [such as where alternate classes or issue classes are

22  sought], it is the separated issue(s) . . . that must each meet the requirements of Rule 23." *In re*

23  *Paxil Litig.*, 212 F.R.D. 539, 543 (C.D. Cal. 2003). Despite bearing the burden of proof under

24  Rule 23, Plaintiffs perform no Rule 23 analysis whatsoever regarding the alternate classes and

25  second alternate issue classes. (Kane Dec., ¶¶19-27.) Instead, Plaintiffs request the Court certify

---

[76] No class may be certified that contains members lacking Article III standing. *Mazza, supra*, 666 F.3d at 594-95 (concluding class was overbroad because it did not exclude those who would have been aware of the alleged misrepresentation before purchasing).

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  the alternate classes without providing any legal or factual basis for doing so. (Kane Dec., ¶20.)[77]

2  Because Plaintiffs bear the burden to establish certification by a preponderance of the evidence, a

3  burden that is not "a mere pleading standard" (*Wal-Mart v. Dukes*, 131 S.Ct. 2541, 2551 (2011)),

4  their failure to meet that burden as to the alternate classes requires denial of certification.

5  Moreover, Plaintiffs' alternate classes requires this Court sitting in California to apply the

6  law of the identified states, rather than letting those other states manage the cases within their

7  own borders. For example, Plaintiffs are asking this Court to apply New Jersey law to a New

8  Jersey group of citizens for violation of New Jersey's consumer protection statute (and fraudulent

9  inducement), and so on for the rest of the alternative classes. There is no management plan

10  presented nor showing of how these alternative classes meet the superiority and predominance

11  requirements of Rule 23(b)(3). From a resources and management perspective, a California court

12  has no reason to preside over a case requiring application of the laws of 9 other states to citizens

13  of those other states. No reason is given because there is none. There is also no showing that Rule

14  23(a)(1) numerosity (at least 40 purchasers in the states and/or country) is met for these alternate

15  classes.[78] Plaintiffs' failure to meet their burden to establish class certification, as to the alternate

16  classes requires denial of certification as to those classes. *Id.* at 2551.

17  Plaintiffs' alternate classes fail the predominance requirement for the same reasons their

18  primary class fails predominance. *See* Part IV.A.2., *supra*. For example, fraud requires individual

19  determinations. Certification of the twelve proposed alternative classes should also be denied

20  because those classes would involve the laws of 9 different states (Florida, Maine, Massachusetts,

21  New Hampshire, New Jersey, New York, North Carolina, Ohio, and Pennsylvania) and a foreign

22  country (Panama), so they would suffer the same manageability issues as the initial proposed

23

---

24  [77] This court should not permit Plaintiffs to do so in their reply papers. A "district court need not consider arguments raised for the first time in a reply brief" *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

25  [78] For example, Streakwave's records show ███████████████████████████████████ . (Himmelfarb Dec.

26  Ex. 31.) "Generally speaking, courts will find that the 'numerosity' requirement has been satisfied when the class comprises *40 or more* members, and will find that it has *not* been satisfied when the class comprises 21 or fewer." *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998) (emphasis added); *see also, General Tel. Co. of*

27  *Northwest, Inc. v. EEOC*, 446 U.S. 318, 330 (finding a class of 15 members too small); *Harik v. California Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) (rejecting proposed classes of 7, 9 and 10 members); *Barnes v. Ross*, 926

28  F. Supp. 2d 499, 505 (S.D.N.Y. 2013) (proposed class of 10 rejected).

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

class (in that the Court and jury would need to apply multiple states laws), as well as having the same ascertainability and numerosity issues as the primary class. (Kane Dec., ¶28; *see also*, Part IV.C., *supra*.) Alternative classes 1 and 2 are also overbroad, as they include purchasers who were not injured by the alleged misconduct. *See, Diacakis,* supra, 2013 WL 1878921.

Certification of Rule 23(c)(4) classes on the seven issues identified by Plaintiffs must also be denied because Plaintiffs fail to identify the objective such classes would advance – certainly not resolution of any issue as weighty as liability, damages, or causation. (Kane Dec., ¶¶25-27.) The Central District recently rejected certification of an issue class regarding "whether [defendant] has misled consumers by labeling [products] as being '100% Natural' when, in fact, they are made from GMOs." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 581 (C.D. Cal. 2014). Although that question was common to the class, members would nevertheless need to prove individualized reliance and causation, so "certifying this type of issue class might simply consume time and resources (both the parties' and the court's) without fundamentally advancing the resolution of the litigation" by resolving even liability.[79] *Id.* "Such an approach . . . would still require the Court to overcome numerous complexities raised by having to apply so many different state laws and by the individual issues regarding liability for fraud and misrepresentation." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 656 (C.D. Cal. 1996); *see also, McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008) ("given the number of questions that would remain for individual adjudication, issue certification would not 'reduce the range of issues in dispute and promote judicial economy'"), *abrog. on other grounds* by *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); Kane Dec., ¶27. Thus, certification of issue classes should be rejected.

/ / /

---

[79] Plaintiffs' request for a punitive damages class is flawed because they have not been given leave to assert such a claim. Even if they could, when multiple states' laws apply to a class (as here), there is no predominance/manageability when the issue (punitive damages) would be resolved differently under the states' laws. *See, In re Northern Dist. Of Calif., Dalkin Shield IUD Products Liab. Litig.*, 693 F.2d 847, 850 (9th Cir. 1982) (recognizing different punitive damages standards exist among the states, which negatively impacts certification), *abrog. on other grounds as recog.* by *Baxter Healthcare Corp. v. U.S. Dist. Court for Cent. Dist. Of Cal.*, 121 F.3d 714 (9th Cir. 1997); *In Re Aqua Dots Prod. Liab. Lit.*, 654 F. 3d 748, 752 (7th Cir. 2011) (recognizing each state's punitive damage law is unique); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig.*, 276 F.R.D. 336, 341 (W.D. Mo. 2011) ("the difficulties involved in comparing and contrasting all of the nuances of the laws of 51 jurisdictions is undeniably complicated).

## B. Alternative Classes Are Unpermitted "Fail Safe" Classes

A "fail safe" class is one in which "the putative class is defined in a way that precludes membership unless defendant's liability is first established." Cal. Prac. Guide Fed. Civ. Pro. Before Trial, ¶ 10:436.5. Fail safe classes deprive the defendant of the res judicata effect of a judgment in its favor because by disproving liability it eliminates all members from the class. (Kane Dec., ¶24.) For example, in *Genenbacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485 (C.D. Ill. 2007), certification was denied because, if the defendant prevailed, the plaintiff "would no longer fit the class definition." *Id.* at 488; *see also, Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (class defined as all those "entitled to relief" was improper as a "fail-safe class"); *In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*, 289 F.R.D. 526, 545-46 (N.D. Cal. 2012) (class defined "as including only employees 'to whom Defendant failed to fully reimburse all mileage" was a fail-safe class because "the class members either win or are not in the class"). Plaintiffs' alternative classes 3 through 12 are improper fail-safe classes because each defines class membership as those persons "who incurred losses . . . as a result of defective [TC]." (MPA, p. 7, lns. 2-21.) If Ubiquiti proves that "losses" did not occur or TC is not "defective," there would be no class members and the Court could not enter a judgment against them. Certification of the alternate classes should therefore be denied.

## VI. PLAINTIFFS CANNOT MEET THE REQUIREMENTS OF FED. R. CIV. P. 23(A).

### A. Plaintiffs Cannot Meet The Commonality Requirement

Plaintiffs must demonstrate "the capacity of [this] classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, *supra*, 131 S.Ct. at 2551. *Dukes* emphasized that commonality requires the class members' claim to "depend on a common contention" such that "determination of the truth or falsity will resolve an issue that is central to the validity of each claims in one stroke." *Id.* at 2545. Plaintiffs have not met their burden to demonstrate a common question of fact or law that would resolve any issues "in one stroke" because there are no common answers to drive the resolution of the litigation.

### 1. Batch Issue – There is no Common Answer

The fact that not all TC is or was the same prevents a finding of commonality. TC Level 1

initially had a ███ jacket but that was replaced shortly thereafter by TC Level 1 made with a PE jacket. Documents produced by Ubiquiti show that ████, Ubiquiti's first third party manufacturer, made several processing errors regarding one or more, *but not all*, batches of TC. In December 2010, within the same month as the ████ test was performed, Ubiquiti decided to ██████████████ and changed the jacket material of TC Level 1 from ███ to PE.[80] Thus, even if Plaintiffs' claim that TC Level 1 failed the UV test is true (it is not), that test was performed on a *different formulation* of TC Level 1 with a different jacket material than the jacket material for the majority of TC Level 1 manufactured by ██████.[81]

Documents also show that a second UV test performed in November 2011 by ████ on TC Level 1 manufactured by ████ with the PE jacket *undeniably passed that UV test.*[82] Representations regarding the "outdoor" nature of TC cannot be false (under Plaintiffs' own reasoning) if TC passed that UV test. Despite ████ TC Level 1 passing the 2011 UV test, in late 2011 Ubiquiti replaced ████ with a different manufacturer (████) which had its own formulation for the jacket which included PE as the jacket material. For a short time (prior to Ubiquiti ██████████████████████████, respectively) cable manufactured by ████ was branded and sold as TC Levels 1 and 2 in 2011.[83] Based on the dates of Plaintiffs purchase of TC, it is very possible that the TC purchased by the Plaintiffs in the early part of 2012 was actually made by ████. One would need to look at the TC at each installation to determine the identity of the manufacturer. Again this is an individual fact specific inquiry.

Plaintiffs claim the common question is whether Ubiquiti's marketing of TC as "outdoor" cable was false. That question is incapable of being answered unless you know who made it, when it was made, what it was made of, where it was installed, and how it was installed. This requires an individual fact specific inquiry. In sum, TC is not the same – there are batch issues and cable identification issues. Not every "batch" of TC manufactured by ████ had manufacturing issues, according to ████ who kept informing Ubiquiti that any errors in

---

[80] Choo Dec., Exs. 39-40.
[81] *Id.*, at Exs. 41-44.
[82] *Id.*, at Ex. 45.
[83] *Id.*, at Ex. 46.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  production were mere processing errors and that manufacturing procedures were in place to

2  ensure no other production errors occurred.[84] While TC was only manufactured by ███ from

3  December 2010-October 2011, less than a year, this is the first suit filed over 34 boxes of TC

4  despite the approximately ███ boxes of TC sold.[85] In sum, whether any TC failed requires an

5  individual determination of when the TC was purchased, who was the manufacturer, which jacket

6  material was used, and whether that particular "batch" had a processing issue. These are all

7  individual issues because, contrary to Plaintiffs' claim, not *all* TC was unsuited for outdoor use.

8  Plaintiffs will be unable to show except on an individual basis when and where the TC was

9  purchased, from which manufacturer, and how it was installed.

10      These facts present a dramatically different picture from the one Plaintiffs allege. They

11  reveal issues concerning only *certain batches* of TC, rather than a uniform defect in the product

12  rendering it unfit for "outdoor" use. This distinction is important because it is only if TC were

13  uniformly defective that Plaintiffs' proposed "common question" could possibly satisfy the Rule

14  23(a) requirement that the class members "have suffered the same injury" and assert claims that

15  are "capable of classwide resolution." (*Dukes, supra*, 131 S.Ct. at 2551.) This "batch" issue

16  means that "Ubiquiti's advertising and marketing of TC as 'Outdoor' cable" (MPA, p. 9, lns. 24-

17  25) might be false as to certain batches (i.e., certain batches were not suited for outdoor use), but

18  true as to the majority of batches (i.e., those batches are suited for outdoor use). Therefore, the

19  "determination of [the] truth or falsity" of Plaintiffs' proposed common question will not "resolve

20  an issue that is central to the validity of each one of the claims in one stroke" (*Dukes, supra*, 131

21  S.Ct. at 2551), because that question will be answered differently as to different batches of TC.

22  These facts demonstrate that Plaintiffs' proposed class fails to meet the commonality requirement.

23          **2.    No Common Facts Among Plaintiffs' Claims**

24      Plaintiffs claim the common question is whether the claim of "outdoor" was untrue, but

25  this question is not capable of one answer (*Id.*) as Plaintiffs would lead the court to believe.[86]

---

[84] Choo Dec., at Exs. 47, 48, 49.
[85] Out of approximately ███ boxes of TC sold, only about ███ boxes of TC was replaced through the RMA process. (*See Id.*,¶30.)
[86] See Declaration of Dr. Stewart submitted herewith ("Stewart Dec."), which states "The absence of evidence or even expert opinion that supports plaintiffs' contention that defendants are responsible for any damages that plaintiffs

1   Plaintiffs' claims are not common. First, TC had batch issues which prevented any TC product

2   from being similar. Second, two of the three Plaintiffs have over 50% of their cable operating

3   "outdoors" years after purchase, supporting an installation error rather than product failure.[87] As

4   Dr. Stewart notes, Plaintiffs have failed to offer any evidence that the "outdoor" claim is false.

5   (Stewart Dec., ¶¶16, 18, 23.) "Plaintiffs do not offer any evidence that any claims by defendants

6   are actually false based on any empirical data." (*Id.*, ¶18.) Third, many of Plaintiffs' claimed

7   product failures are not TC because the cable was installed prior to Plaintiffs' purchase of TC.[88]

8   Thus, the cable installed could not have been TC. (*Id.*, at ¶¶16, 21.A., 24.) Fourth, Plaintiffs have

9   failed to prove causation, that any alleged product failure was due to an alleged lack of UV

10  ingredient rather than due to other causes, such a manufacturing error or installation error.[89]

11  Plaintiffs have instead offered speculative theories without any expert support. Fifth, as discussed

12  *supra*, the environment in which they operate, the product purchased, the damages claimed and

13  the issue of causation (the underlying facts), are very different for each class member. (Stewart

14  Dec., ¶¶15-21.) TC was installed in disparate locales around the world, with varying

15  environments and conditions, by different installers with different installation practices. (*Id.*, at

16  ¶¶21.D. & G., 24). Finally, the lack of customer complaints supports the lack of a common reason

17  for any alleged TC failure.[90] Plaintiffs have failed to provide evidence that any advertising claims

18  are false, deceptive or misleading and offer little or no evidence that any failures of service,

19  customer complaints, loss of business or costs of replacement are the result of TC. (*Id.*, at ¶25.)

20      In sum, it is Dr. Stewart's opinion, based on his experience and the documents and

21  discovery produced by Plaintiffs to date, that Plaintiffs do not represent a uniform class and that

22  individual issues predominate even if there is a basis for complaint by one or more of the

23  Plaintiffs. (*Id.*, at ¶25.) "Plaintiffs have offered no evidence of a common class and instead have

24  defined multiple classes and subclasses that differ with respect to geography, consequences of

---

25  assert makes it impossible to address plaintiffs' claims with any specificity by applying well-accepted methods of
26  market analysis. …In many cases plaintiffs are unable to identify where defendants' products were installed or who
    did the original installation. Such information is critical to an analysis of product failure." (Stewart Dec., ¶15.)
27  [87] Stewart Dec., ¶21.A.; Choo Dec., ¶¶6, 7, 42.
    [88] Stewart Dec., ¶¶16, 21.A., 24; Choo Dec., ¶¶6, 23.
    [89] Products may fail for many reasons including improper use and/or installation. (Stewart Dec., ¶15.)
28  [90] Choo Dec., ¶¶14,15,20.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

purchase and damages." (*Id.*, at ¶20.)[91]

The facts make it clear that Plaintiffs' proposed class lacks commonality and the requirements of Rule 23(a)(2) have not been met. To paraphrase *Dukes*: "[T]he members of the class:" installed a variety of different batches of TC, with different levels (Level 1 or Level 2), for variable lengths of time, "sprinkled across 50 states" and the world, by a "kaleidoscope" of installers, subject to a variety of regional environments that all differed; cable installed by "[s]ome [class members] thrived while others did poorly. They have little in common but their" purchase of TC and this lawsuit. (*Dukes, supra*, 131 S.Ct. at 2557.)

Plaintiffs' proposed class is far different from the one in *Hanlon, supra*, in which the product was a "defective designed rear liftgate latch." *Hanlon, supra*, 150 F.3d at 1019-20. There is no evidence of defective design here, but instead a manufacturing issue in batches of TC – an issue that would impact only certain purchasers. Plaintiffs' reliance on *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012) is misplaced because the *Ries* defendant presented no evidence the composition of the product at issue varied during the class period.[92] In this case Ubiquiti has presented evidence that TC varied during the class period. This action is much closer to *In re FEMA Trailer Formaldehyde Products Liab. Litig.,* 2008 WL 5423488 (E.D. La. Dec. 29, 2008),[93] in which the Court found commonality lacking because different products allegedly caused harm to Plaintiffs. *Id.* at *6. Similarly, a problem with one TC batch "will not answer the question as to any other" batch. *Id.* Under these facts, Plaintiffs cannot meet their burden to establish the requisite factual commonality to warrant class treatment, so no class can be certified.

## B. Plaintiffs' Claims Are Not Typical Of The Proposed Class

A proposed class representative is not typical if his or her claims are subject to time-

---

[91] Dr. Stewart also discusses the differences among the Plaintiffs as to the (1) nature of their businesses (Stewart Dec., at ¶21); (2) the temporal relationship between the product failure and purchase of TC (*Id.*, at ¶21.A.); (3) the amount of cable purchased (*Id.*, at ¶21.B.); (4) the reasons for replacing TC (*Id.*, at ¶21.C.); (5) the conditions under which TC was used (*Id.*, at ¶21.D.); (6) the labor costs (*Id.*, at ¶21.E.); (7) the purchase and replacement process (*Id.*, at ¶21.F.); (8)the differences in installation (*Id.*, at ¶21.G.) and (9) the nature and extent of product failure. (*Id.*, at ¶21.H.)

[92] Despite being labeled as containing High Fructose Corn Syrup or citric acid, certain batches of the product did not contain those ingredients and were therefore actually were "All Natural" or "100% Natural." *Ries, supra*, 287 F.R.D. at 527.

[93] Although *FEMA* involved multiple products and defendants, it is instructive to this case which involves multiple formulations of the TC jacket (which itself comprises two separate products).

---

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1  consuming defenses which would not apply to absent class members. *See State of Alaska v.*

2  *Suburban Propane Gas Corp.,* 123 F.3d 1317, 1321 (9th Cir. 1997); *Wolin v. Jaguar Land Rover*

3  *North America LLC*, 617 F.3d 1168, 1176 (9th Cir. 2010).[94] Typicality is not met because unique

4  defenses apply to each of the Plaintiffs. (*See* Part IV.A.3, *supra*.)

### 1.    Tasion's Claims are Not Typical

6    Tasion is a not a typical class representative because there are unique defenses to its

7  claims against Ubiquiti. It is questionable whether Tasion suffered any injury because it cannot

8  show where or when it installed TC. (Stewart Dec., ¶21.A.) Tasion's evidence shows that in 33

9  locations TC was not the cable installed. (*Id.*, at ¶21.A.; Choo Dec., ¶6.) It is questionable

10  whether Tasion has any Article III standing because the evidence produced to date clearly shows

11  that most if not all of the cable Tasion replaced was *not* TC. Tasion's discovery responses reveal

12  it cannot prove its case because it cannot prove where it installed TC, most of its claimed TC sites

13  did not have TC, and Tasion purchased the cable in Panama so it does not fit the class definition

14  of purchases completed within the United States.[95] Moreover, half of the TC Tasion installed is fit

15  for "outdoor" use because it is still functioning in the field.[96] (FAC ¶105.)

### 2.    Freeway's Claims are Not Typical

17    Freeway's claims are not typical because it cannot establish whether the cable it replaced

18  was defective TC or another brand. Freeway did not inspect the cable before replacing it, and had

19  not received any customer complaints.[97] Freeway also admits that there were other reasons for

20  service outages other than TC.[98] Additionally, the jacket material on most of Freeway's TC

21  differs from much of that of the other Plaintiffs, as Freeway only purchased Level 2.[99]

### 3.    Camplink's Claims are Not Typical

23    Camplink's claims are not typical because it is subject to the unique defense of lack of

_____

[94] "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting *Hanon, supra*, 976 F.2d at 508).
[95] Choo Dec., ¶6.
[96] *Id.*, at ¶¶6, 7.
[97] *Id.*, at ¶¶20.
[98] *Id.*, at Ex. 29.
[99] *Id.*, at ¶19.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco

1    injury – Camplink does not know where it installed TC or whether TC failed. (Stewart Dec.,

2    ¶21c; *see also*, FAC ¶201.) Discovery responses also show TC was not installed in Maine or sites

3    in Florida because Camplink purchased TC after the installation dates at these sites. (Choo Dec.,

4    ¶24; Stewart Dec. ¶21.A.) These issues are relevant to Camplink's lack of Article III standing.

5    **4.    Ubiquiti Has Unique Defenses Against Each of these Plaintiffs**

6    The collective use of the word "Plaintiffs" in the moving papers attempts to hide the fact

7    this Court must consider the individual and different nature of the businesses, the environment in

8    which TC was used, which type of TC was used, what damages are claimed, and what the cause

9    of any alleged product complaint is. (*See* Stewart Dec., ¶¶21-25.) Dr. Kane and Dr. Stewart's

10   declarations clearly illustrate Plaintiffs' claims are not typical – the products and the locations

11   were different,[100] and two of the three Plaintiffs do not know where TC was installed. It is

12   impossible to say whether TC worked "outdoors" if the Plaintiffs cannot remember where they

13   installed it. The three Plaintiffs purchased different types of cable. Plaintiffs have failed to

14   establish that there was a product failure caused by the cable jacket itself as opposed to being

15   caused by an installation error, batch issue, or placement of the cable, such that individual issues

16   would not predominate. While Plaintiffs argue that all TC is the same, they provide no evidence

17   to counter the batch argument, the product datasheets for the both products, Dr. Stewart's

18   declaration, and the lack of causation and injury shown by Plaintiffs.

19   **C.    Plaintiffs Are Not Adequate Class Representatives**

20   The Plaintiffs bear the burden of showing, by a preponderance of the evidence, the

21   adequacy requirement of Rule 23(a)(4). *In Re Hydrogen Peroxide Antitrust*, 552 F.3d 305, 321

22   (3d Cir. 2008). Plaintiffs are inadequate representatives because they engage in claim splitting,[101]

23   creating an inherent conflict of interest with the putative class members. Specifically, Plaintiffs

24   abandon allegedly compensable elements of damages (*i.e.* split claims), including: "[r]eplacement

---

[100] The addition of more purchasers from other geographical venues exacerbates the potential problem that
differences between the users and installers, as well as the installation environments, may indicate that the claims of
purchasers in one locale are not typical of those in different locales. (*See*, Kane Dec., ¶11; Stewart Dec., ¶21.D.)
[101] Claim splitting is prohibited because of "res judicata, which bars parties to a prior action[,] or those in privity with
them[,] from raising in a subsequent proceeding any claim they could have raised in the prior action where all of the
claims arise from the same set of operative facts." *Krueger, supra*, 2008 WL 481956, at *2 (quoting *In re Universal
Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 668 (D.Kan. 2004)).

cable and . . . cable connectors . . ., damaged radios[;] . . . travel to and from the replacement site (both travel costs and travel time) . . .; downtime, lost connectivity, and compensation to customers;" lost profits; and lost customers. (MPA, p. 23, lns. 6-9; FAC ¶¶276, 331.) Plaintiffs seek "just one of the [damage] categories . . ., direct labor costs to replace [TC]" (MPA, p. 23, lns. 12-14), which conflicts with the interests of the putative class to recover all damages.

"A class representative is *not an adequate representative* when the class representative abandons particular remedies to the detriment of the class." *W. States Wholesale, Inc. c. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002) (class cert denied – putative class representative abandoned particular damage claims); *Krueger v. Wyeth, Inc.,* 2008 WL 481956, at *2 (S.D. Cal. Feb. 19, 2008) (Plaintiff engaged in claim-splitting not an adequate class representative – class cert denied); *Sanchez v. Wal Mart Stores, Inc.,* 2009 WL 1514435, at *3 (E.D. Cal. May 28, 2009) (plaintiff's "strategic claim-splitting decision renders him inadequate class representative"); *Drimmer v. WD-40 Co.,* 2007 WL 2456003, at *3 (S.D. Cal. Aug. 24, 2007) *aff'd*, 343 F. App'x 219 (9th Cir. 2009) (class representative "cannot maintain a class action without seeking all available remedies for the class members"); *Fosmire v. Progressive Max Ins. Co.,* 277 F.R.D. 625, 634 (W.D. Wash. 2011) (plaintiff's attempt to split claims by excluding stigma damages renders her an inadequate class representative). Plaintiffs' have not met their burden of adequacy as required by Rule 23(a)(4).

## VII. <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs' motion for class certification must be denied. Plaintiffs have failed to prove by a preponderance of the evidence that they have met the requirements of both Rule 23(a) and Rule 23(b)(3).

Dated: June 5, 2015

ROPERS, MAJESKI, KOHN & BENTLEY

By:  /s/ N. Kathleen Strickland
N. KATHLEEN STRICKLAND
DEVIN C. COURTEAU
JUSTIN A. ZUCKER
STEPHAN CHOO
Attorneys for Defendant
UBIQUITI NETWORKS, INC.

Ropers Majeski Kohn & Bentley
A Professional Corporation
San Francisco